UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SEYED MOHSEN HOSSEINI-SEDEHY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ERIN T. WITHINGTON | ) Civil Action No. 04-cv-11948-RGS |
| and CITY OF BOSTON, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S OPPOSITION TO THE SUFFOLK DISTRICT ATTORNEY'S OFFICE
MOTION TO QUASH THE SUBPOENA**

Plaintiff Seyed Mohsen Hosseini-Sedehy ("Mr. Hosseini") submits his opposition to the

Suffolk District Attorney's Office Motion to Quash the Subpoena filed on behalf of the Suffolk

District Attorney's Office (the "District Attorney"). As reasons therefore, Mr. Hosseini states

that his civil rights were violated when the Defendant Erin Withington, acting in her capacity as

a Boston police officer, wrongfully arrested him on a false allegation of sexual assault.

Defendant Withington arrested Mr. Hosseini on the false charge not because she believed that

she had probable cause for the arrest but rather because she wanted to stop the complaining

witness, a Teamster laborer and subordinate of Mr. Hosseini, from calling her on a daily basis.

The District Attorney's records are relevant to this matter because Defendant Withington

testified in her deposition that she provided the District Attorney with her police reports before

she sought a warrant for Mr. Hosseini's arrest. Despite her sworn testimony, none of Defendant

Withington's reports are dated before March 22, 2004, the date of the false arrest. In fact, the

four substantive reports drafted by Defendant Withington were printed out eight days after she was served with this Complaint, which was more than six months after the false arrest.

During the pendency of the false criminal charges against Mr. Hosseini, the District Attorney claimed Defendant Withington failed to provide him with police reports and failed to cooperate with his evaluation of the merits of the charge against Mr. Hosseini. It is Mr. Hosseini's position that Defendant Withington is now exaggerating her contact with the District Attorney to show that she took the false criminal allegations more seriously than Mr. Hosseini now contends. For those reasons and the reasons set forth below, Mr. Hosseini asserts that the District Attorney's records are relevant to his claims against Defendant Withington and are not privileged. Thus, Mr. Hosseini requests that the motion be denied.

## I.    FACTUAL BACKGROUND

Mr. Hosseini is a forty-two year old father of a five-year-old son whose wife is an ensign in the United States Navy currently enrolled in the Tufts University dental school. Mr. Hosseini received his B.S. in 1984 and M.S. in applied math in 1986, both conferred by the University of Iowa. He has worked for GES Exposition Services, Inc. ("GES") since 1991. GES is in the business of setting up trade shows and conventions. Mr. Hosseini is a labor supervisor employed by GES.

In sharp contrast to Mr. Hosseini's reliable character, Joseph Bavis, a forty-eight year old laborer for the Teamsters union, has a criminal history of dishonesty, drug violations and violent offenses dating back to 1978[1]. Exhibit 1. Bavis has been charged with 28 crimes from 1978 through 2001, including armed assault with intent to kill, and convicted for 16 of those offenses,

---

[1] Although the investigating officer, the Defendant Erin Withington, believed that Joseph Bavis was the complaining witness against Mr. Hosseini, according to his Board of Probation record Bavis' real name is Joseph Baris. The Board of Probation lists Bavis as one of several aliases. Mr. Hosseini will use the name Bavis for consistency.

which range from assault and battery with a firearm to several violations of c. 94C, § 34 to wit: a

class A substance. GES used laborers from the Teamster union to set up trade shows and

conventions. When Bavis worked for GES, Mr. Hosseini was his supervisor.

In October 2000, Bavis allegedly hurt his back while at home performing yard work.

Exhibit 2. It is unclear how long Bavis stayed out of work. On November 1, 2002, Bavis

applied to the Department of Employment & Training ("DET") for unemployment benefits.

Exhibit 3. Bavis claimed to DET that GES laid him off on October 21, 2002. It appears Bavis

received unemployment benefits from December 11, 2002 until February 15, 2003. Exhibit 4.

On December 18, 2002, Bavis applied for and received disability benefits from the

Teamsters claiming that he last worked on November 22, 2002 and could no longer work

because of his back injury. Exhibit 2. Bavis collected Teamsters disability benefits from

November 30, 2002 until May 30, 2003. Exhibit 5. It appears Bavis was collecting both

unemployment benefits from the commonwealth and disability benefits from the Teamsters at

the same time for approximately two months. Exhibit 4; Exhibit 5.

On June 9, 2003, the Teamsters determined that Bavis had exhausted his disability

insurance payments. Exhibit 5. Shortly after his disability payments were exhausted, Bavis's

alleged medical condition improved, and he sought to return to work for GES. Exhibit 6. GES

refused to permit Bavis to return to work until he could prove that he was physically fit. On July

10, 2003, Bavis filed a union grievance against GES for not returning him to work. On

September 22, 2003, Bavis filed a complaint with the National Labor Relations Board against the

Teamsters because he was not allowed back to work for GES without proper medical clearance.

Exhibit 7.

On November 26, 2003, Bavis had scheduled a fitness for duty examination at the Caritas Good Samaritan Occupational Health Service. Exhibit 8. The medical examiner was unable to perform the examination because Bavis refused to provide a release for his medical records. On December 16, 2003, GES again advised Bavis, this time by certified mail, that he would not be able to return to work unless a medical evaluation determined that he was fit to work.

Shortly thereafter on December 22, 2003, Bavis complained to Defendant Erin Withington he was sexually assaulted on or about January 1, 2003 during work by his supervisor, Mr. Hosseini. Exhibit 9; Exhibit 10. Defendant Withington thought Bavis'allegation was strange. Exhibit 11. She was also concerned that Bavis could not provide her with an exact date for the alleged offense. Exhibit 12. In her twelve years as a police officer Defendant Withington's experience led her to believe that approximately half of the complaining witnesses that she dealt with were lying to her. Exhibit 13. Although she had obtained Board of Probation reports to determine the veracity of complaining witnesses in the past, Defendant Withington did not bother to look at Bavis' board of probation report. Exhibit 14. After speaking with Bavis, Withington intended to merely interview Mr. Hosseini and present the case to the District Attorney to let him decide what to do with the case. Exhibit 15.

After interviewing Bavis, Defendant Withington contacted a person at the Hynes Convention Center (the "Hynes") to advise him that she was investigating an allegation that allegedly occurred within the Hynes. Exhibit 16. The person at the Hynes offered to assist Defendant Withington, but she declined. She then called John Perry, a Teamster official, in an effort to contact Mr. Hosseini. Exhibit 17. Mr. Perry gave her the telephone number for GES. Exhibit 18. Mr. Perry also advised Defendant Withington that he did not want to get involved

with any of "Bavis' bullshit." Exhibit 19. Defendant Withington contacted GES to get Mr.

Hosseini's telephone number, but did not bother to discuss the allegations with GES. Exhibit 20.

Defendant Withington broke her ankle and was on disability leave from January 7, 2004

until March 4, 2004. Exhibit 21. Bavis called Defendant Withington about 10 times between

December 22, 2003 and January 7, 2004. Exhibit 22. During one of these calls Bavis

complained GES was retaliating against him for making his complaint by not permitting him to

work. Exhibit 23. Despite Bavis' complaint to Defendant Withington that he was denied work

by GES, he called her approximately twenty times during her 57-day disability leave claiming

Mr. Hosseini continued to assault him at work. Exhibit 24. Finally, on February 25, 2004, after

an independent medical examination, Bavis was cleared to return to work. Exhibit 25. Bavis did

not work with Mr. Hosseini from November 22, 2002 until February 25, 2004.

On March 4, 2004, the first day back from her disability leave, Mr. Hosseini offered to

meet with Defendant Withington. Exhibit 26. Mr. Hosseini erroneously believed that the

complaining witness was a Teamster by the name of Joseph Perry, who is a relative of John

Perry. Mr. Hosseini explained Joseph Perry had motive to lie because of work related issues.

Defendant Withington never advised Mr. Hosseini about Bavis' allegations during the interview,

but when asked if Mr. Hosseini ever had any other problems with other workers, Mr. Hosseini

explained that he and Bavis got into an argument when Mr. Hosseini grabbed Bavis' shoulders in

or around September 2002.   After speaking with Mr. Hosseini, Defendant Withington concluded

that it was not appropriate to arrest Mr. Hosseini on Bavis' allegation. Exhibit 27.

Either just before or immediately after Mr. Hosseini's interview, Defendant Withington

contacted Jimmy Flynn, the only witness Bavis claimed would support his allegation against Mr.

Hosseini. Exhibit 28. Mr. Flynn was a GES employee and former New York City police officer.

Mr. Flynn contradicted Bavis and told Defendant Withington that he did not witness Mr. Hosseini sexually assault Bavis. Mr. Flynn also warned Defendant Withington that Bavis was a loudmouth. After speaking with Mr. Flynn and Mr. Hosseini Defendant Withington felt her investigation was concluded. Exhibit 29.

After Defendant Withington made the determination that she would not arrest Mr. Hosseini on Bavis' allegation, Bavis called her daily complaining that he was being assaulted by Mr. Hosseini. Exhibit 30. On some days, Bavis called her two or three times. Exhibit 31. Bavis called so often Defendant Withington started to receive pressure from people in her office to do something about Bavis. Exhibit 32. Bavis' telephone calls were also annoying Defendant Withington. Exhibit 33. Despite Bavis' repeated telephone calls, Defendant Withington didn't bother to investigate Bavis' complaints after her March 4, 2004 interview with Mr. Hosseini. Exhibit 34. In fact, Defendant Withington never bothered to call GES to determine if Bavis was even working during the alleged sexual assault. Exhibit 35. In the five days preceding March 22, 2004, Bavis called so many times, Defendant Withington didn't return all of his calls because she felt Bavis was taking too much of her time. Exhibit 36.

On March 22, 2004 after another Bavis telephone call complaining of continued assaults, Defendant Withington decided to seek an arrest warrant for Mr. Hosseini. Exhibit 37. Before seeking the arrest warrant, she confirmed that Mr. Hosseini had no criminal record. Exhibit 38. 54. Defendant Withington was not concerned for Bavis' safety because Bavis was bigger than Hosseini and the only threats made to cause physical harm came from Bavis and were directed to Mr. Hosseini. Exhibit 39. Defendant Withington sought a warrant for Mr. Hosseini's arrest because it was easier than investigating Bavis' new allegations. Exhibit 40.

Defendant Withington arrested Mr. Hosseini in front of the Teamsters laborers during work hours. Exhibit 41; Exhibit 42. The arrest warrant had a date of the alleged sexual assault of December 22, 2003, the date of Bavis' interview with Defendant Withington. Exhibit 42. Defendant Withington put the date of offense on the application for an arrest warrant, knowing that it was false. Exhibit 43. When she arrested Mr. Hosseini, Defendant Withington never advised him that Bavis had made sexual assault against him. Exhibit 44. Defendant Withington neither bothered to interview Mr. Hosseini about Bavis' recent allegations, nor did she bother to conduct any further investigation into Bavis' allegations. Exhibit 45.

At her deposition, Defendant Withington testified that she did not conduct any further investigation into Bavis' allegations after her March 4, 2004 interview with Mr. Hosseini because the District Attorney was provided with her police reports. Exhibit 46. Defendant Withington received a civil summons for this civil action on September 29, 2004. Exhibit 47. Despite Defendant Withington's claim that provided her police reports to the District Attorney before the arrest of Mr. Hosseini, her reports are dated March 22, 2004, the date of the arrest, and printed out after the Complaint was served upon her. Exhibit 48.

## II.    PROCEDURAL BACKGROUND

On May 11, 2005 Mr. Hosseini served a subpoena duces tecum on the keeper of records for the Suffolk County District Attorney's Office seeking production of the following records:

1. All notes, memoranda, logs and records concerning the matter Commonwealth of Massachusetts v. Mohsen Hosseni, Boston Municipal Court Docket No. 0401CR001774;

2. All police reports provided by the Boston Police Department concerning the arrest of Mohsen Hosseini-Sedehy and booked under the name Mohsen Hosseni on March 22, 2004;

3. All police reports provided by the Boston Police Department concerning the investigation into allegations made by Joseph Bavis against Mohsen Hosseini-Sedehy that resulted in the arrest of Mohsen Hosseini-Sedehy on March 22, 2004 by the Boston Police Department;

4. All notes and memoranda concerning the investigation, arrest, and prosecution of Mohson Hosseini-Sedehy concerning Boston Municipal Court Docket No. 0401CR001774; and,

5. All correspondence, including but not limited to facsimile cover sheets, provided to the Suffolk District Attorney's office concerning the investigation into the allegations against Mohsen Hosseini-Sedehy that provided the basis for the Boston Municipal Court Docket No. 0401CR001774.

The District Attorney now seeks to have the subpoena duces tecum quashed on the grounds that: 1) the records sought are privileged investigatory material; 2) the records sought are protected by attorney work product exemption; 3) the records are not public records; and, 4) some of records are already in the possession of Mr. Hosseini[2].

## III.   ARGUMENTS

### A. THE COURT SHOULD DENY THE MOTION TO QUASH BECAUSE THE RECORDS SOUGHT ARE NOT PROTECTED BY ANY PRIVILEGE.

"Except as otherwise provided by the Constitution of the United States or provided by an Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of common law as they may be interpreted by the courts of the Untied States in light of reason and experience." Fed. R. Evid. 501.  In order to determine if a federal court adjudicating a federal claim will recognize a privilege founded in Massachusetts law, a two-step test is used: 1) whether the courts of Massachusetts would recognize such a privilege; and 2) if so, whether the asserted state privilege is "intrinsically meritorious in [the federal court's] independent judgment." *In re L. Joyce Hampers*, 651 F.2d 19, 22-23 (1st Cir. 1981).

In the case at bar, the District Attorney claims that the records sought are privileged under G.L. c. 4, § 7, cl. Twenty-sixth, Exemption (f).  Clause Twenty-sixth defines public

records.  Exemption (f) to clause Twenty-sixth provides that "investigatory materials necessarily

compiled out of the public view by law enforcement or other investigatory officials the

disclosure of which materials would probably so prejudice the possibility of effective law

enforcement that such disclosure would not be in the public interest" are exempt from public

records disclosure. G.L. c. 4, § 7, cl. Twenty-sixth, Exemption (f).  G.L. c. 66, 10, the Public

Records Act, has subsumed the common law investigatory privilege in Massachusetts. *District*

*Attorney for the Norfolk District v. Flatley*, 419 Mass. 507, 510-511 (1995).

      "There is no blanket exemption provided for records kept by [law enforcement agencies]

nor does the investigatory material exemption extend to every document that may be placed

within what may be characterized as an investigatory file." *Bougas v. Chief of Police of*

*Lexington*, 371 Mass. 59, 65 (1976).  The exemption accorded investigatory materials is

designed to avoid "premature disclosure of the Commonwealths' case prior to trial, the

prevention of the disclosure of confidential investigative techniques, procedures, or sources of

information, the encouragement of individual citizens to come forward and speak freely with

police concerning matters under investigation, and the creation of initiative that police officers

might be completely candid in recording their observation, hypotheses and interim conclusions."

*Id.* at 62. "In general, disclosure is favored - - the [public records] statute creates ' a presumption

that the record sought is public,' and the burden is 'upon the custodian to prove with specificity

the exemption which applies." *Reinstein v. Police Commissioner of Boston*, 378 Mass. 281, 294

(1979), *quoting Attorney General v. School Comm. of Northampton*, 375 Mass. 127, 132 (1978).

"There must be specific proof elicited that the documents sought are of a type for which an

exemption has been provided." *Bougas*, 371 Mass. at 65-66 (1976).

---

[2] Counsel conferred many times prior to the District Attorney filing this motion and agreed that
the District Attorney does not need to produce documents already in Mr. Hosseini's possession.

In this matter, the investigation has concluded and criminal charges dismissed.  There were no confidential investigative techniques, procedures or sources of information used by Defendant Withington.  The District Attorney merely claims records of law enforcement must be protected from disclosure "to secure cooperation of witnesses in future investigations."  This sweeping conclusion has been rejected by the Supreme Judicial Court.  *District Attorney for the Norfolk District*, 419 Mass. at 512 (1995).  In fact, the Supreme Judicial Court recognized the benefits of disclosing investigatory material in cases such as this because "[a] police officer who knows that no one from outside the law enforcement community will scrutinize his statements or his investigatory work may not feel the same level of pressure to be honest and accurate as would his counterpart in a system where . . . a person from the outside already has substantial information about the incident under investigation and has a strong motive to challenge the accuracy of the officer's memory or the reliability of his conclusions." *Globe Newspaper Company v. Police Commissioner of Boston,* 419 Mass. 852, 865, n. 13 (1995), *quoting  Kelly v. San Jose*, 114 F.R.D. 653, 665 (N.D. Cal. 1987).  Since the District Attorney has failed to prove that the records sought would be privileged under Massachusetts law, this court should refuse to recognize the privilege proffered by the District Attorney.

### B. THE DISTRICT ATTORNEY HAS NOT SHOWN THAT THE WORK PRODUCT EXEMPTION APPLIES TO ANY DOCUMENT SOUGHT IN THE SUBPOENA DUCES TECUM.

"[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of [Fed.R.Civ. 26] and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has a substantial need of the materials in the preparation of the party's case

and that the party is unable without substantial hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of the party concerning the litigation." Fed. R. Civ. P. 26(b)(3). "The privilege protects work done by an attorney in anticipation of, or during, litigation from disclosure to the opposing party." *State of Maine v. United States Dep't of the Interior*, 298 F.3d 60, 66 (2002). "[T]he burden is on the party resisting discovery to demonstrate in the first instance that the materials sought are indeed work product within the scope of this rule." *The City of Springfield, v. Rexnord Corporation*, 196 F.R.D. 7, 10 (D. Mass. 2000).

In this matter, the work product exemption does not apply. The District Attorney is neither opposing counsel nor counsel in a closely related case as the District Attorney contends. Although the criminal case is a related matter to the civil case, the criminal case dealt with issues that are not in dispute in this matter. In particular, there does not appear to be any dispute that Mr. Hosseini was arrested on a false charge as was the issue in the criminal case. The issue in this matter is whether Defendant Withington has the protection of qualified immunity for her actions. The District Attorney's file is sought to determine what if any communications Defendant Withington had with the District Attorney before she arrested Mr. Hosseini, statements made by Defendant Withington to the District Attorney after the arrest, records of the District Attorney's attempts to contact Defendant Withington after the arrest, and any other record that would evidence Defendant Withington's motive in arresting Mr. Hosseini. Particularly, Defendant Withington testified that she provided her police reports to the District

Attorney before the arrest.  The dates on the reports contradict Defendant Withington's testimony.

Finally, if the court believes that the District Attorney has met his burden by proving there exists documents in his file that are protected by the work product exemption, Mr. Hosseini asserts that he has a substantial need of the materials to prepare his case and he cannot  without substantial hardship obtain the substantial equivalent of the materials by other means.  The only witness that can contradict Defendant Withington's claim that she communicated with the District Attorney is the District Attorney himself.  Thus, even if the court finds that a portion of the District Attorney's file is protected by the work product exemption, the court should deny the motion to quash.

C.    **MASSACHUSETTS STATUTES PROTECTING THE NAME OF A SEXUAL ASSAULT COMPLAINANT DO NOT PROVIDE A BASIS TO QUASH THE SUBPOENA DUCES TECUM.**

The District Attorney also claims that the motion to quash should be allowed because some of the records sought may be protected from disclosure by statute, which prohibits disclosure without a court order.  G.L. c. 41, § 97D (reports of sexual assaults not pubic records); G.L. c. 265, § 24C (name of sexual assault complainant in reports withheld from public inspection absence court order).  This claim must fail because "[w]hen compliance with a federal subpoena compelled by the Supremacy Clause is at the same time the only act which could be a violation of state law, there remains no room for state law sanction." *In re L. Joyce Hampers*, 651 F.2d at 21 (1st Cir. 1981).  Furthermore, Mr. Hosseini has executed a Stipulation and Protective Order agreeing to protect the confidentiality of records produced by the defendants. Mr. Hosseini is in possession of what the Defendant Withington contends are all the police

reports.  Thus, the state statutes cited by District Attorney do not provide a basis to quash the subpoena duces tecum.

## IV. CONCLUSION

For the reasons set forth herein, Mr. Hosseini requests the Court deny the Suffolk District Attorney's Office Motion to Quash the Subpoena.

**REQUEST FOR ORAL ARGUMENT**

Believing that oral argument would assist the Court, Mr. Hosseini respectfully requests the opportunity to be heard.

Respectfully submitted,
Seyed Mohsen Hosseini-Sedehy
By his attorneys,

/s/ Gerard A. Butler, Jr.
Christopher A. Duggan
BBO # 544150
Gerard A. Butler, Jr.
BBO # 557176
Smith & Duggan LLP
Lincoln North
55 Old Bedford Road
Lincoln, MA 01773-1125
(617) 228-4400

Dated:  June 30, 2005

CERTIFICATE OF SERVICE

The undersigned certifies service of the foregoing on June 30, 2005, in accordance with

Federal Rule of Civil Procedure 5(b)(2)(D) and United States District Court for the District of

Massachusetts Electronic Case Filing Administrative Procedure § E(2) as all parties, having

appeared in this action through counsel admitted to practice before this Court, have been

identified by the Clerk as receiving Notice of Electronic Filing, and upon counsel for the moving

party by first class mail postage prepaid as follows:

Eva M. Badway, Esq.
Office of Attorney General
One Ashburton Place
Boston, Massachusetts 02108-1698


/s/ Gerard A. Butler, Jr.
Gerard A. Butler, Jr. (BBO No.  557176)

# EXHIBIT 1

Case 1:04-cv-11948-RGS    Document 22    Filed 07/01/2005    Page 16 of 163

```
DEFENDANT: BARIS, JOSEPH              DOB:09/23/1956 PCF: 732819CV   S*
(PRIMARY)      MOTHER : ELEANOR
               FATHER : THOMAS           SOC SEC : 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
               POB : CALIF
               ADDRESS: 525 E. 4TH ST. SOUTH BOSTON MA
               ZIP CODE: 02127-
ETHNICITY: WHITE         HGT: 700  WGT: 185  HAIR: GRAY/PRT GRY  EYES: HAZEL
===============================================================================
DEFENDANT : BARIS, JOSEPH
PLAINTIFF : JOYCE LEBEDEW
            STREET : 525 EAST 4TH STREET
            CITY : SOUTH BOSTON                   STATE : MA


DOCKET:    9703RO0122 COURT:  3 ORDER DATE : 05/05/1997 EXP DATE : 05/05/1998
           ORDER : CHAPTER 209A   SECTION   4   STATUS : CLOSED
```

##### ***** COURT ORDERS *****
-------------------------

```
 1. REFRAIN FROM ABUSE
 2. NO CONTACT STAY AT LEAST  100 YDS
 3. VACATE/STAY AWAY RESD
 5. STAY AWAY WORKPLACE
 6. CUSTODY OF FOLLOWING TO PLAINTIFF:
       MICHAYLA (1989)     JOSEPH (1994)
 7. NO CONTACT WITH ANY CHILD NAMED IN 6 OR LISTED BELOW
       STAY AWAY FROM SCHOOL, DAYCARE, OTHER: (SEE ORDER)
 8. VISITATION RIGHTS: SEE ORDER
 9. SUPPORT PAYMENT ORDERED
12. SURRENDER GUNS, AMMO, LIC, FID
```
-------------------------------------------------------------------------------

Case 1:04-cv-11948-RGS   Document 22   Filed 07/01/2005   Page 17 of 163
PRIM NAME: BARIS, JOSEPH                      DOB: 09/23/1956 PCF#: 732819CV   S*

SEX: M  SS #: 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 MOTHER: ELEANOR
                         FATHER: THOMAS
HOME ADDR :525 E. 4TH ST. SOUTH BOSTON MA         POB: CALIF
ZIP CODE : 02127-

ETHNICITY: WHITE         HGT: 700  WGT: 185  HAIR: GRAY/PRT GRY  EYES: HAZEL

ALIAS NAME(S): DAVIS, JOSEPH            DOB: 09/25/1956
               BAVIS, JOSEPH                 09/25/1956
               VIVAS, JOSEPH                 09/25/1956


DT: 07/26/2001 BOS CRT:  BOSTON MUNICIPAL DISTRICT( 1)    DKT#   0101CR2649A
OFFENSE: ASSAULT AND BATTERY(A&B)
DISPOSITION: DF D/R 8/10/01 C 11/7/01 DISM
                                                    STATUS: CLOSED


DT: 07/26/2001 BOS CRT:  BOSTON MUNICIPAL DISTRICT( 1)    DKT#   0101CR2649B
OFFENSE: DISORDERLY CONDUCT(DIS COND)
DISPOSITION: DF D/R 8/10/01 C 11/7/01 DISM
                                                    STATUS: CLOSED


DT: 09/10/1999 MAB CRT:  MARLBOROUGH DISTRICT( 21)    DKT#   9921CR1133A
OFFENSE: LARCENY MORE(LAR MORE)
DISPOSITION: C 3/20/00 DF 4/14/00 DR C 5/15/00 DF 5/22/00 D/R   STATUS: CLOSED
             PD

DT: 05/05/1997 BOS CRT:   SOUTH BOSTON DISTRICT( 3)    DKT#   9703CR0775A
OFFENSE: ASSAULT AND BATTERY(A&B)
DISPOSITION: C 7/8/97 (JT@6) 9/26/97 SUM 10/17/97
             DISM                                    STATUS: CLOSED

DT: 09/20/1994 BOS CRT:   BOSTON MUNICIPAL DISTRICT( 1)    DKT#   9401CR6377A
OFFENSE: SHOPLIFTIN(SHOPLIFT)
DISPOSITION: WAR WAR/WD C 1/26/95 FINE $100 2/11/95 DISM
                                                    STATUS: CLOSED


DT: 09/19/1994 BHA CRT:   SOUTH BOSTON DISTRICT( 3)    DKT#   9403CR1719A
OFFENSE: TRESPASSING(TRES)
DISPOSITION: WAR DISM R/C
                                                    STATUS: CLOSED


DT: 01/18/1994    CRT:   ROXBURY DISTRICT( 2)    DKT#   9402CR0302A
OFFENSE: POSS CLASS A CONT SUB(CSA POSS A)
DISPOSITION: G 1YR SS 1/16/96 PSF TERM
                                                    STATUS: CLOSED


DT: 11/18/1993    CRT:   SOUTH BOSTON DISTRICT( 3)    DKT#   9303CR1852A
OFFENSE: POSS CLASS A CONT SUB(CSA POSS A)
DISPOSITION: C 11/26/93 G. 1YR SS 11/25/94  2/17/94 WAR 9/22/94 STATUS: CLOSED
             1YR CMTD 60DYS SRV BAL STYD 9/21/95 1/16/96 T&D

DT: 12/23/1991    CRT:   ROXBURY DISTRICT( 2)    DKT#   9102CR11677A
OFFENSE: POSS CLASS A CONT SUB(CSA POSS A)
DISPOSITION: DF D/R DF 1/18/94 D/R G 1YR SS 1/16/96 TERM
                                                    STATUS: CLOSED

Case 1:04-cv-11948-RGS  Document 22  Filed 07/01/2005  Page 18 of 163
PRIM NAME: BARIS, JOSEPH                    DOB: 09/23/1956 PCF#: 732819CV  S*

DT: 12/23/1991     CRT:   ROXBURY DISTRICT( 2)          DKT#  9102CR11677B
OFFENSE: CONSPIRACY TO VIO CONT SUB ACT(CSA CONSP)
DISPOSITION: DF D/R DF 1/18/94 D/R G 1YR SS 1/16/96 TERM     STATUS: CLOSED


DT: 12/23/1991     CRT:   ROXBURY DISTRICT( 2)          DKT#  9102CR11677C
OFFENSE: KNOWINGLY REC STOLEN PROP(RSG)                OVER
DISPOSITION: DF D/R DF 1/18/94 D/R G 1YR SS 1/16/96 TERM     STATUS: CLOSED


DT: 06/19/1991     CRT:   SOUTH BOSTON DISTRICT( 3)     DKT#     9003CR1238A
OFFENSE: OPERATING AFTER SUSPEND LIC(114B-SUS)
DISPOSITION: G$80F$20SF$30VW DUE 7/19/91 DF 9/12/91 D/R PAID DI STATUS: CLOSED
             SM

DT: 05/06/1991     CRT:   SUFFOLK SUPERIOR( 84)         DKT#        095407
OFFENSE: A&B DANGEROUS WEAPON(A&B DW)
DISPOSITION: DF D/R C 3/20/92 6/3/94 DISM               STATUS: CLOSED


DT: 05/06/1991     CRT:   SUFFOLK SUPERIOR( 84)         DKT#        095410
OFFENSE: ASSAULT TO KILL(ASLT KILL)                    ARMED
DISPOSITION: DF D/R C 3/20/92 1/17/92 NG               STATUS: CLOSED


DT: 04/08/1991     CRT:   ROXBURY DISTRICT( 2)          DKT#     9002CR5380A
OFFENSE: OPERATING AFTER SUSPEND LIC(114B-SUS)
DISPOSITION: C 4/25/91 CC PD                           STATUS: CLOSED


DT: 03/07/1991     CRT:   ROXBURY DISTRICT( 2)          DKT#     9102CR1809A
OFFENSE: ASSAULT TO KILL(ASLT KILL)                    ARM
DISPOSITION: C 4/5/91 DISM                             STATUS: CLOSED


DT: 03/07/1991     CRT:   ROXBURY DISTRICT( 2)          DKT#     9102CR1809B
OFFENSE: A&B DANGEROUS WEAPON(A&B DW)
DISPOSITION: C 4/5/91 DISM                             STATUS: CLOSED


DT: 05/24/1990     CRT:   BOSTON MUNICIPAL JURY SIX(601) DKT#       903145
OFFENSE: A&B ON POLICE OFFICER(A&B PO)
DISPOSITION: C 7/26/90 1YR SS 7/22/92 VWF (@3 2441A) PAID TERM  STATUS: CLOSED
             & DISCH

DT: 05/24/1990     CRT:   BOSTON MUNICIPAL JURY SIX(601) DKT#       903146
OFFENSE: MAL DESTRUCTION OF PROPERTY(PROP MAL DES)
DISPOSITION: C 7/26/90 DISM (@3 2441B)                 STATUS: CLOSED


DT: 12/26/1989     CRT:   SOUTH BOSTON DISTRICT( 3)     DKT#   8903CR2441A
OFFENSE: A&B ON POLICE OFFICER(A&B PO)
DISPOSITION: C 2/28/90 CWOF 2/28/91 CC VWF 5/25/90 CWOF VAC    STATUS: CLOSED
             FJ

DT: 12/26/1989     CRT:   SOUTH BOSTON DISTRICT( 3)     DKT#   8903CR2441B
OFFENSE: MAL DESTRUCTION OF PROPERTY(PROP MAL DES)
DISPOSITION: C 2/28/90 CWOF 2/28/91 CC 5/25/90 CWOF VAC  FJ    STATUS: CLOSED

Case 1:04-cv-11948-RGS   Document 22   Filed 07/01/2005   Page 19 of 163
PRIM NAME: BARIS, JOSEPH                DOB: 09/23/1956 PCF#: 732819CV   S*

DT: 11/26/1986     CRT:   DORCHESTER DISTRICT( 7)         DKT#    86CR8025A
OFFENSE: OPER UND INFL OF LIQ(111A)
DISPOSITION: C 4/23/87 PROB 4/21/88 VWF PROG 10/12/88 VOP      STATUS: CLOSED
         5/31/90 PROB 5/31/91 C 8/23/90 DF 6/19/91 D/R TERM

DT: 11/26/1986     CRT:   DORCHESTER DISTRICT( 7)         DKT#    86CR8025B
OFFENSE: KNOWINGLY REC STOLEN PROP(RSG)
DISPOSITION: C 2/13/87 DISM                                    STATUS: CLOSED

DT: 11/26/1986     CRT:   DORCHESTER DISTRICT( 7)         DKT#    86CR8025C
OFFENSE: LEAVING SCENE:PROPERTY DAMGE(113A)
DISPOSITION: C 4/23/87 PROB 10/22/87 C 6/10/87 DF 5/31/90 D/R  STATUS: CLOSED
         PROB 5/31/91 C 8/23/90 DF 6/19/91 D/R TERM

DT: 10/15/1986     CRT:   DORCHESTER DISTRICT( 7)         DKT#    86CR5173A
OFFENSE: ATTACHING WRONG MV PLATES(124P)
DISPOSITION: DISM                                              STATUS: CLOSED

DT: 12/07/1981     CRT:   DORCHESTER DISTRICT( 7)         DKT#       34295
OFFENSE: ASSAULT DANGEROUS WEAPON(ASLT DW)
DISPOSITION: C 12/14/81 DISM                                   STATUS: CLOSED

DT: 12/07/1981     CRT:   DORCHESTER DISTRICT( 7)         DKT#       34296
OFFENSE: ASSAULT DANGEROUS WEAPON(ASLT DW)
DISPOSITION: C 12/14/81 DISM                                   STATUS: CLOSED

DT: 11/26/1980     CRT:   QUINCY DISTRICT( 56)           DKT#       19779
OFFENSE: POSS CONTROLED SUBSTANCE(CSA POSS)
DISPOSITION: C 4/9/80 G 6MO SS 4/6/82 PD TERM                  STATUS: CLOSED

DT: 10/10/1980     CRT:   SUFFOLK SUPERIOR( 84)          DKT#      597917ZZ
OFFENSE: A&B DANGEROUS WEAPON(A&B DW)                     F/A
DISPOSITION: C 3/11/82 10YR CMTD                               STATUS: CLOSED

DT: 10/10/1980     CRT:   SUFFOLK SUPERIOR( 84)          DKT#      597918ZZ
OFFENSE: FIREARM VIOLATION(SPECIFY)(FIR)                 CARRY
DISPOSITION: C 3/11/82 5YR CMTD                                STATUS: CLOSED

DT: 05/10/1980     CRT:   ROXBURY DISTRICT( 2)           DKT#        3573
OFFENSE: A&B DANGEROUS WEAPON(A&B DW)                    F/A
DISPOSITION: C 7/21/80 BO                                      STATUS: CLOSED

DT: 05/10/1980     CRT:   ROXBURY DISTRICT( 2)           DKT#        3574
OFFENSE: FIREARM VIOLATION(SPECIFY)(FIR)                 CARRY
DISPOSITION: C 7/21/80 BO                                      STATUS: CLOSED

DT: 04/17/1979     CRT:   ROXBURY DISTRICT( 2)           DKT#        5982
OFFENSE: POSS CLASS B CONT SUB(CSA POSS B)
DISPOSITION: PROB 12/21/79 TERM                                STATUS: CLOSED

Case 1:04-cv-11948-RGS   Document 22   Filed 07/01/2005   Page 20 of 163
PRIM NAME: BARIS, JOSEPH                    DOB: 09/23/1956 PCF#: 732819CV   S*

DT: 01/10/1978      CRT:   ROXBURY DISTRICT(  2)           DKT#       597916ZZ
OFFENSE: LARCENY(LAR)                              MV PARTS
DISPOSITION: C 1/24/78 CMTD SS 4/24/78                      STATUS: CLOSED

# EXHIBIT 2

**Teamsters CARE**

16 Sever Street • Charlestown, MA 02129-1309
Local phone: 617-241-9220 • In MA: 800-442-9939 • Outside MA: 800-225-6135
Fax: 617-241-8168 • Website: http://www.teamsterscare.

RECEIVED
DEC 3 1 2002
TEAMSTERSCARE 50

### *Weekly Disability Claim Form*

### Instructions

(1) **As the Member, you're responsible for filling out Section 1 of this form. You must also have your employer fill out Section 2 and your doctor Section 3.**

(2) **Mail the completed form to: Teamsters Union 25 Health Services & Insurance Plan, 16 Sever Street, Charlestown, MA 02129-1309**

(3) **When we receive your completed form, The TeamstersCare Disability Panel will review the information you've provided.**

RECEIVED
JAN 2 1 2003
By

## SECTION I.  TO BE COMPLETED BY THE MEMBER

Name __JOSEPH DAVIS__  Birthdate __6/28/58__ Social Security # __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__
Home Address (street) __138 ATHENS ST__  (town/state) __SOUTH BOS__ (zip) __02127__
__MASS__
Home Phone (617) __268-5724__

*Please provide dates for the following:*

When the sickness or injury occurred __OCT, 2000__
When you were first disabled by this sickness or injury __Nov 2002__
When you were first treated by a doctor for this disability __OCT, 2000__
Have you returned to work?  ☐ Yes  ☑ No  If "yes" on what date? __/__ /__

*Is this claim the result of:*  ☐ an illness  ☑ an accident  ☐ a motor vehicle accident  ☐ a work-related accident
*Explain in detail how, when and where this illness / accident happened* __WORKING IN MY BACKYARD CLEARING LEAVES + ROCKS__

*Do you have a lawsuit or Workers' Compensation or other insurance claim pending regarding this incident?*  ☐ Yes  ☑ No

Please sign here __Joseph Davis__   Today's date __12/18/02__

## SECTION 2.  TO BE COMPLETED BY MEMBER'S EMPLOYER

*Please answer the following questions:*

What was last date the above employee worked before the sickness or injury? __11-22-02__
What is the current job position of the employee? __Helper & Expo worker__
Has a Workers' Comp claim been filed for this incident?  ☐ Yes  ☑ No
Is light-duty work available for this employee?  ☐ Yes  ☑ No
Has the employee since returned to work? ☐ Yes  ☑ No  If "yes", on what date? __

Name (printed) __William L Dodd__   Signature __William L Dodd__
Company name __Teamsters Local #82__   Company phone number __617-269-6868__
Company address __330 Dorchester St So Boston MA__  Today's date __12/30/02__

EXHIBIT
2
3/31/06
PENGAD 800-631-6989

*(over to side two)*

# EXHIBIT 3

* * * COMMUNICATION RESULT REPORT ( NOV. 6. 2002 8:54AM ) * * *

TRANSMITTED/STORED : NOV. 6. 2002 8:49AM

FAX HEADER:

| FILE | MODE | OPTION | ADDRESS | RESULT | PAGE |
|---|---|---|---|---|---|
| 187 | MEMORY TX | | 16177277837 | OK | 1/1 |



EXHIBIT
1
5/31/05

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL          E-2) BUSY
E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION

---

## DET

MASSACHUSETTS
DIVISION OF
EMPLOYMENT
AND TRAINING

P.O. BOX 9694
Boston, MA 02114

IP 82951810 BAVI 110102 013    0194688010    1074

## Unemployment Insurance Request for Information

This form was mailed on November 04, 2002

**Due Date:** November 14, 2002

**Important!**
*To protect your rights to dispute this claim and any charges to your account that may result, and to receive a copy of the eligibility determination, this request must be completed in full and postmarked or faxed by the due date indicated above.*

ESR EXPOSITION SERVICE INC
C/O JON JAY ASSOCIATES INC
P O BOX 182523
COLUMBUS, OH 43218

ONLY use Black or Blue Ink!    To make changes, use Employer Change of Address Request (Form 0566).
Available at www.detma.org/revenue/forms.html or by calling (617) 626-5050.

**1.** Verify your DET Account number.     Make any corrections here: |___|___| -- |___|___|___|

**2.** This individual has filed a claim for Unemployment Insurance benefits, naming you as a former employer.

Name: Joseph Bavis          Claim Effective Date: 11/02/02     Provide the start date and    last physical day at work
SSN: 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            Claim File Date: 11/01/02          08/12/01 - 10/21/02

**3.** Read all of the statements carefully then fill in the **one** reason that best reflects the status of the claimant.

○ Laid off - Indicate recall date, if any  |M|M| |D|D| |Y|Y|
○ Quit
○ Discharged for deliberate misconduct or violation of company rules or policy, including absenteeism or tardiness.
○ Suspended for violation of company rules or policy.
○ Discharged or quit due to a conviction of a felony or misdemeanor.

○ Released due to inability to meet performance standards. No misconduct or violation of company rules or policy.
○ On strike or locked out
○ On a leave of absence
○ Reasonable assurance of reemployment (educational institution only)
○ Still employed or on call

Comments: _____

**4.** At separation, did this individual receive or apply for any of these types of payments? ( Fill in all that apply.)

○ Retirement Benefits?              ○ Pay in Lieu of dismissal notice?
○ Vacation Pay?                     ○ Severance Pay?     ○ Employee required to sign a release of claims to receive all severance pay.

**5.** Contact Name: (Please Print) Andrea Smith
Telephone: (614) 923980  Ext. ___   Fax: (___) ___ - ___   Signature: Andrea Smith   Title: Rep

**6.** Pre-addressed for your convenience, just fold and mail in the enclosed envelope or Fax to: (617) 727-7837

Contact us at: ☎ (617)626-5039  for more information on completing this form.

Form 1074 - Rev 08/15/02      55                                    HOS 55

# EXHIBIT 4



**JON JAY ASSOCIATES, INC.**

Formerly
*Frank* **Gates**
Unemployment Compensation Division

September 9, 2003

Mecie Hardi
Account Executive

Mr. Jim Hodgins
GES Exposition Services
125 North Street
Teterboro, NJ 07608

Dear Mr. Hodgins:

Jon-Jay Associates, Inc. has received charge statements from the state of Massachusetts, indicating that ESR's tax account has been charged with unemployment benefits drawn by Joe Bavis, as outlined below:

12/21/02 – 2/15/03:   $183 per week

7/5/03 – 7/26/03:     $183 per week

Sincerely,

Mecie Hardin
Account Executive



EXHIBIT
7
3/31/05

# EXHIBIT 5

DX Code _____

DX Description _____

Average length of days _____

**Teamsters**

EXHIBIT

3

3/31/05

## WEEKLY DISABILITY APPROVAL FORM

Member Name __Joseph Bavis__

Social Security No. __019 — 48 — 9810__

Date of Accident/WC _____

Date of Sickness/Disability __11/23/02__

Date of Lien signed _____

Beginning of Disability Coverage Date:

_____

Beginning Sickness/Disability Date:

__11/30/02__

| Approved Thru | Today's Date/Initial | | Approved Thru | Today's Date/Initial | |
|---|---|---|---|---|---|
| | | | 12/31/02 | 1/27/03 | CAB |
| | | | 1/31/03 | 2/21/03 | CAB |
| | | | 2/28/03 | 2/28/03 | CAB |
| | | | 3/31/03 | 3/25/03 | CAB |
| | | | 4/15/03 | 4/8/03 | CAB |
| | | | 5/15/03 | 5/6/03 | CAB |
| | | | 5/30/03 | 6/9/03 | CAB |

__$27.40__
HOURLY PAY RATE

__$300.00__
BENEFIT RATE

RATE FORMULA: (MINIMUM: $300/WK – MAXIMUM: $500/WK)

TOTAL 26 WEEKS = __5/30/03__    _Benefit Exhausted_

HOS 241

# EXHIBIT 6

**JIM HODGINS**

## REPORT OF GRIEVANCE

### Teamsters Local 82

Name _JOSEPH BAVIS PHONE 617-268-9724_

Address _138 ATHENS ST S.B. MASS 02127_

Employer _G.E.S. EXPOSITION SERVICES_

Employer's Address _950 GRIER DRIVE LAS VEGAS NV_ Phone _____

How long employed? _5 YRS_ Job Classification _____

## NATURE OF GRIEVANCE

Date: _2/10/03_

ON 6/24/03 ON ADVICE FROM MORGAN CRANE G.E.S SUPERVISOR
I WAS TOLD I HAD TO PROVIDE MY DOCTORS LETTER TO JOHN PERRY MY
B.A. WHICH I DID. THIS LETTER EXPLAINED THAT I HAD NO RESTRICTIONS
AND COULD RETURN TO FULL DUTY. AFTER WHICH JOHN PERRY STATED THAT
THE COMPANY WANTED MY FULL MEDICAL RECORDS AS A CONDITION ON MY RETURNING
TO WORK I BELIEVE THIS IS DISCRIMINATORY AND I WOULD LIKE MY JOB BACK
AND ALSO RECIEVE ANY WAGES AND
BENEFITS THAT I HAVE LOST.

_Joseph Bavis_
Signature of Member Filing Grievance

## ACTION TAKEN BY BUSINESS AGENT

Date: _____

_____

_____

_____

_____

Signature of Business Agent

EXHIBIT
4
3/31/05
PENGAD 800-631-6989

**COPY FOR EMPLOYER**

HOS 1

# EXHIBIT 7

INTERNET
FORM NLRB-508
(6-90)

FORM EXEMPT UNDER 44 U.S.C. 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
CHARGE AGAINST LABOR ORGANIZATION
OR ITS AGENTS

| DO NOT WRITE IN THIS SPACE | |
| --- | --- |
| Case | Date Filed |
| 1-CB-10190 | 9/22/2003 |

INSTRUCTIONS: File an original and 4 copies of this charge and an additional copy for each organization, each local, and each individual named in item 1 with the NLRB Regional Director of the region in which the alleged unfair labor practice occurred or is occurring.

**1. LABOR ORGANIZATION OR ITS AGENTS AGAINST WHICH CHARGE IS BROUGHT**

a. Name

TEAMSTERS 82

b. Union Representative to contact

JOHN PERRY

c. Telephone No.

617-269-6068

d. Address (street, city, state and ZIP code)

330 DORCHESTER ST SOUTH BOS. MA 02127

e. The above-named organization(s) or its agents has (have) engaged in and is (are) engaging in unfair labor practices within the meaning of section 8(b), subsection(s) (list subsections) (1)(a) of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

I JOSEPH BAVIS FEEL I HAVE NOT BEEN REPRESENTED FAIRLY BY MY BUSINESS AGENT JOHN PERRY. IN REGARDS TO AN OFF THE JOB INJURY FOR WHICH I HAVE BEEN CLEARED BY A DOCTOR TO RETURN TO WORK.

EXHIBIT
8
3/31/05
PENGAD 800-631-6989

| 3. Name of Employer | 4. Telephone No. |
| --- | --- |
| GREYHOUND EXPOSITION SERVICES | 1-201-538-3945 |

5. Location of plant involved (street, city, state and ZIP code)

BODWELL ST AVON MA.

6. Employer representative to contact

MORGAN CRANE

| 7. Type of establishment (factory, mine, wholesaler, etc.) | 8. Identify principal product or service | 9. Number of workers employed |
| --- | --- | --- |
| TRADE SHOW EMPLOYEE | | 24 PLUS XTRAS |

10. Full name of party filing charge

JOSEPH BAVIS

| 11. Address of party filing charge (street, city, state and ZIP code) | 12. Telephone No. |
| --- | --- |
| 138 ATHENS ST SOUTH BOSTON MA 02127 | 617-268-9724 |

**13. DECLARATION**

I declare that I have read the above charge and that the statements therein are true to the best of my knowledge and belief.

By  Joseph Bavis
(signature of representative or person making charge)

(title or office, if any)

Address  138 ATHENS ST APT 1, SOUTH BOSTON 268-9724        9/18/03
(Telephone No.)        (date)

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U. S. CODE, TITLE 18, SECTION 1001)
*U.S. GPO: 2000-464-640/29074

# EXHIBIT 8



**GES**
*everything***exposition**

December 11, 2003

Mr. Joseph Bavis
138 Athens Street
South Boston, MA 02127

RE: RETURN TO WORK PHYSICAL

Dear Mr. Bavis:

As you know I have been informed by the Caritas Good Samaritan Occupational Health Services office that you did indeed present yourself for your scheduled Fitness for Duty Examination on November 26, 2003. The Medical examiner was unable to perform the examination without the release of your medical records, in confidence, to CGSOH by your physician.

During our conversation on Monday, December 1, 2003 you again referred to Article 19 of the Teamsters Local 82 CBA with GES Exposition Services. This article is not applicable to your concern.

Therefore, I must restate our position, that you need to complete the medical evaluation, as indicated above, so that you are fit to return to work without restriction or to determine if any restrictions apply so that work assignments in the future do not put your health or the safety of others at risk.

Please contact me at your earliest convenience to re-schedule for the examination.

Sincerely,
GES Exposition Services

James E. Hodgins
Business Manager

JEH/mp

EXHIBIT
12
3/31/05

cc. Joseph Bavis, 525 East 4th Street, South Boston, MA  02127
    Fax: Joseph Bavis c/o Joyce Lebedew at Fax # (508) 617-2682
    John Perry, Local 82

HOS  138



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Joseph Bavis
138 Athens Street
South Boston, MA
02127

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Joseph Bavis_   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Joseph Bavis   12/16/0

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☒ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7003 1010 0003 1478 7321

PS Form 3811, August 2001   Domestic Return Receipt   102595-01-M-03

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Joseph Bavis
525 East 4th St.
South Boston, MA
02127

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _signature_   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
12-18

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☒ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7003 1010 0003 1478 7338

PS Form 3811, August 2001   Domestic Return Receipt   102595-01-M-03

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Joseph Bavis
138 Athens Street
South Boston, Ma.
02127

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Joseph Bavis_   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Joseph Bavis

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7003 2260 0003 6209 5829

PS Form 3811, August 2001   Domestic Return Receipt   102595-02-M-154

HOS 139

# EXHIBIT 9

# BOSTON POLICE
# INCIDENT REPORT

ORIGINAL ☒    SUPPLEMENTARY ☐

| KEY SITUATIONS SEXUAL ASSAULT | | | COMPLAINT NO 040143112 | | REPORT DIST. D4 | | CLEARANCE DIST |
|---|---|---|---|---|---|---|---|
| TYPE OF INCIDENT SEX-ASSAULT, INDECENT A&B (14 + ) | CRIME CODE 0 | | STATUS | | DATE OF OCCUR. A.01/01/03 | | B. 03/22/04 |
| LOCATION OF INCIDENT 900 BOYLSTON ST | | | APT. | DISPATCH TIME | TIME OF OCCUR. A. 12:00 AM | | B.12:00 AM |

| VICTIM (LAST, FIRST, MI) | | PHONE | SEX MALE | RACE WHITE NON-HISPANIC | | MARITAL STATUS UNMARRIED |
|---|---|---|---|---|---|---|
| ADDRESS | APT. | OCCUPATION TEAMSTER | | | AGE 47 | D/ |
| PERSON REPORTING SAME | | ADDRESS | | | APT. | PHONE |

| WAS THERE A WITNESS TO THE CRIME | | | | | | | | A ☐ YES ☒ NO |
|---|---|---|---|---|---|---|---|---|
| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT | HOME ADDRESS | | APT. | TELEPHONE RES BUS | |

NUMBER OF PERPETRATORS  1 ---- CAN SUSPECT BE IDENTIFIED AT THIS TIME

| P E R S O N S | STATUS SUSPECT | NAME (LAST, FIRST, MI) HOSSENI,MOHSEN | | | S.S. NO. 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 | BOOKING NO. 000000000 | PHOTO NO. | ALIAS | B ☒ YES ☐ NO |
|---|---|---|---|---|---|---|---|---|---|
| | WARRANT NO | ADDRESS 106 13TH STREET,CHARLESTOWN,MA,00000-0000 | | SEX MALE | RACE UNKNOWN | | AGE 42 | HEIGHT 5-09 | DOB 10/11/1961 |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | WEIGHT 155 | BUILD THIN | HAIR BLACK | EYES BROWN | |

| CAN SUSPECT VEHICLE BE DESCRIBED | | | | | | | C ☐ YES ☒ NO |
|---|---|---|---|---|---|---|---|
| V E H I C L E S | STATUS | REG. STATE | REG. NO. | PLATE TYPE | YEAR(EXP) | MODEL | |
| | VEHICLE MAKE YEAR | | VEHICLE NO. | STYLE | COLOR(TOP-BOTTOM) | | |
| | OPERATOR'S NAME | | | LICENSE NO. | STATE | OPERATOR'S ADDRESS | |
| | OWNERS'S NAME | | | OWNERS'S ADDRESS | | | |

| CAN PROPERTY BE IDENTIFIED | | | | | | | D ☐ YES ☒ NO |
|---|---|---|---|---|---|---|---|
| P R O P E R T Y | STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO. | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |

| IS THERE A SIGNIFICANT M.O. | | | | | E ☐ YES ☒ NO |
|---|---|---|---|---|---|
| M O | TYPE OF WEAPON-TOOL | NEIGHBORHOOD | | TYPE OF BUILDING | PLACE OF ENTRY |
| | WEATHER | LIGHTING | TRANSPORTATION OF SUSPECT | VICTIM'S ACTIVITY | |
| | UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | | RELATIONSHIP TO VICTIM | |

| IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE) | F ☐ YES ☒ NO |
|---|---|
| IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW) | G ☐ YES ☒ NO |

| BLOCK NO. | NARRATIVE AND ADDITIONAL INFORMATION IN 2003 THE SUSPECT TOUCHED THE VICTIM ON THE BUTTOCKS AND RUBBED HIS COVERED CROTCH AGAINST THE VICTIM AGAINST HIS WILL AND IN FEB 29 & MARCH 22, 2004 TOUCHED AND CARRESSED THE VICTIM ON HIS LOWER BACK AND ARMS AND HANDS AGAINST THE VICTIM'S WILL. THESE INCIDENTS TOOK PLACE AT 900 BOYLSTON STREET THE HYNES CONVENTION CENTER WHILE THE VCITIM WAS WORKING FOR THE SUSEPCT. | | | | ☒ YES ☐ NO |
|---|---|---|---|---|
| UNIT ASSIGNED V831 | TOUR OF DUTY 2 | REPORTING OFFICER'S NAME ERIN T SCHROEDER | REPORTING OFFICER'S SIGNATURE | REPORTING OFFICER'S ID 11456 | PARTNER'S ID | FI NO |
| DATE OF REPORT 03/22/04 | SPECIAL UNITS NOTIFIED(REPORTING) SEXUAL ASSAULT UNIT | | | | | TELETYPE NO. |
| TIME COMPLETED 10:50 AM | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME THOMAS P MALONEY | DUTY SUP. SIGNATURE | | DUTY SUP. ID 6660 |



EXHIBIT
# 17
3/31/05

# EXHIBIT 10

1    Volume I                          Pages:    1 - 242

2                                      Exhibits: 1 - 27

3                  UNITED STATES DISTRICT COURT

4                  DISTRICT OF MASSACHUSETTS

5                      No. 04-CV-11948-RGS

6    SEYED MOHSEN HOSSEINI-SEDEHY,

7              Plaintiff

8    vs.

9    ERIN T. WITHINGTON and the CITY

10   OF BOSTON,

11             Defendants

12

13          DEPOSITION OF ERIN T. WITHINGTON

14           Thursday, March 31, 2005

15            10:00 a.m. - 4:32 p.m.

16              SMITH & DUGGAN LLP

17             55 Old Bedford Road

18        Lincoln, Massachusetts  01773-1125

19

20

21

22        FARMER ARSENAULT BROCK LLC

23      617.790.4404   FAX  617.728.4403

24      Reporter:  Cynthia C. Henderson/RPR

4 (Pages 10 to 13)

Erin T. Withington - March 31, 2005

10

1  I explained to him that we deal with any type of
2  inappropriate touching, we don't deal with any
3  sexual harassment or anything.
4          He explained to me that he was having
5  a problem with one of his bosses at work who was
6  constantly touching him and some of the other men
7  that he worked with. He explained that his boss had
8  kissed him at one point and there had been an
9  incident on a loading dock. I said we don't take
10  any information on the phone because I don't know
11  who I am talking to, and if he would like to come in
12  and speak with me he could set up an appointment,
13  and we did that from that.
14      Q. At some point did Mr. Bavis come in and
15  speak with you?
16      A. Yes, he did. I don't know the exact date.
17  I believe it was December 22nd, but I am not a
18  hundred percent sure.
19      Q. Now, during that initial telephone call
20  that you had just talked about was there any other
21  thing said by Mr. Bavis?
22      A. In terms of?
23      Q. Other than what you have mentioned.
24      A. No. Not at the time.

11

1      Q. Where did you meet Mr. Bavis on or about
2  December 22nd, 2003?
3      A. He came to my office.
4      Q. And where was your office at the time?
5      A. 91 East Concord Street in Boston.
6      Q. And I assume that your office is in the
7  detective bureau of that building?
8      A. No. It's the old maternity ward at the
9  Boston Medical Center.
10      Q. Oh, okay. And what kind of office is it?
11  How big is it, how many police officers have offices
12  there, so to speak?
13      A. It's just the Sexual Assault Unit. Right
14  now we only have nine detectives and four
15  supervisors. We share space with the free clinic
16  and the administrative part of the Boston Medical
17  Center, so it's not a marked office.
18  It just says 85 to 91 East Concord.
19      Q. You indicated there are nine detectives and
20  four supervisors?
21      A. Sorry. Six supervisors, yes.
22      Q. And so fifteen officers?
23      A. Yes.
24      Q. And how many administrative staff are at

12

1  that office?
2      A. Four.
3      Q. And are those numbers what the staffing
4  level was back in December of 2003?
5      A. No. I believe we had three more detectives
6  at that point.
7      Q. So about twelve detectives back in December
8  of 2003?
9      A. Yes.
10      Q. Six supervisors and about four
11  administrative staff?
12      A. Yes.
13      Q. Could you further explain the portion of
14  that building that is occupied by the Sexual Assault
15  Unit? Is it a one floor or multi floors or what?
16      A. When you enter East Concord Street you go
17  up a flight of stairs. The outside of our door to
18  the left there is a sign that has Boston Police SAU.
19  It's a door, but there is a window you can see in.
20  You go in. It looks like a wing of a hospital.
21  There is a desk in front of you. To the left and to
22  the right are long hallways that have offices. Each
23  office has a shower in it and an office space. It
24  was originally where people gave birth. So you come

13

1  in the front door. There is a couch there.
2  Administrative staff sits there. There is a small
3  kitchen to the right, and like I said, down to the
4  left and down to the right are hallways.
5      Q. And do you have an office or did you have
6  an office back in 2003 or did you have a desk in an
7  open office area?
8      A. No. They are all separate offices with
9  doors, walls.
10      Q. When you met with Mr. Bavis on that day,
11  approximately December 22nd, 2003, where did you
12  speak with him?
13      A. I spoke with him in one of the other
14  detectives' offices that are bigger because there
15  was two people with him. There was another person
16  with him.
17      Q. Whose office did you speak in on that day?
18  Do you recall?
19      A. Yes. Detective Lisa Holmes' office.
20      Q. Is Holmes H-o-l-m-e-s?
21      A. Yes, it is.
22      Q. Was there anybody else present? Is that
23  Detective Holmes?
24'      A. Yes.

FARMER ARSENAULT BROCK LLC

# EXHIBIT 11

1    Volume I                          Pages:    1 - 242

2                                    Exhibits: 1 - 27

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5                   No. 04-CV-11948-RGS

6    SEYED MOHSEN HOSSEINI-SEDEHY,

7              Plaintiff

8    vs.

9    ERIN T. WITHINGTON and the CITY

10   OF BOSTON,

11             Defendants

12

13           DEPOSITION OF ERIN T. WITHINGTON

14              Thursday, March 31, 2005

15               10:00 a.m. - 4:32 p.m.

16                SMITH & DUGGAN LLP

17               55 Old Bedford Road

18          Lincoln, Massachusetts  01773-1125

19

20

21

22           FARMER ARSENAULT BROCK LLC

23        617.790.4404    FAX   617.728.4403

24        Reporter:  Cynthia C. Henderson/RPR

37 (Pages 142 to 145)

Erin T. Withington - March 31, 2005

142

1  **Q. But you considered Perry's claims in the**
2  **course of your investigation, did you not?**
3       MS. AMBARIK: Objection. You can
4  answer.
5       A. No. As far as arresting Mr. Hosseini, no.
6  **Q. As far as making any determination as to**
7  **the course of your investigation into Bavis's**
8  **allegations, did you consider the information Perry**
9  **gave you in any way, shape or form?**
10      A. I heard what he said. I documented it.
11  There was supposedly other people that wanted to
12  speak with me, and I never heard from them, so it
13  was part of the investigation, but I didn't weigh it
14  very heavily either way.
15  **Q. After speaking with Bavis and Perry on the**
16  **22nd of December, 2003, what was your plan to**
17  **investigate these allegations?**
18      A. I attempted to speak with Mr. Hosseini and
19  then, as I did, send it up to the District
20  Attorney's office and let them make a determination
21  to bring it into court.
22  **Q. And other than your intention to speak with**
23  **Mr. Hosseini, did you intend to do any further**
24  **investigation with Bavis's allegations on December**

143

1  **22nd?**
2       A. Yes.
3  **Q. What did you intend to do?**
4       A. Speak with the other people that they had
5  mentioned during that -- speak with other people
6  that worked with the two of them together.
7  **Q. Okay. What names did you get from Bavis**
8  **and Perry on December 22nd of 2003 other than Mr.**
9  **Hosseini?**
10      A. John Perry and a phone number for GES.
11  **Q. And what about the names of all these**
12  **people you are saying that they mentioned to you?**
13      A. They didn't give me the names. They just
14  referred to other people want to come forward, and I
15  think maybe there was a first name thrown out, but
16  there was no name and phone number or anything like
17  that given to me.
18  **Q. Did you ask for names?**
19      A. Yes.
20  **Q. And what was the response you got from**
21  **these two people?**
22      A. Let me see if this is something that they
23  are comfortable with, and I said, okay, if they
24  would like to come forward, gave them my name and

144

1  number and have them call me. You can't report for
2  someone else, I explained to them, and if they want
3  to be part of this complaint, they can also start
4  their own investigations and everybody would have
5  their own file.
6  **Q. So as of that first interview, December 22,**
7  **2003, the only names that you had were John Perry,**
8  **Mohsen Hosseini and GES?**
9       A. Yes.
10  **Q. And your plan on that day was to speak with**
11  **John Perry and Mohsen Hosseini; correct?**
12      A. Yes.
13  **Q. Did you have any other plan or did you have**
14  **any intent to conduct any other investigation into**
15  **Bavis's allegations on that day after you spoke with**
16  **Bavis and Perry after they left your office?**
17      A. On that specific day?
18  **Q. Yes.**
19      A. No.
20  **Q. And did you decide to seek an arrest**
21  **warrant for Mr. Hosseini on that day, December 22nd?**
22      A. No.
23  **Q. Why not?**
24      A. Because I wanted to speak with

145

1  Mr. Hosseini regarding the allegations, and since it
2  was two adult males that worked together, that I
3  figured let me speak to Mr. Hosseini, which is what
4  I do in all my cases, get his side of the story and
5  see what transpired from there, and explained to
6  both of them that this would probably make its way
7  through court and they could go to court.
8  **Q. And the fact that they were two adult males**
9  **that worked with each other, that was significant in**
10  **the course of your investigation; correct?**
11      A. Considering they had no relationship, they
12  weren't involved intimately, there was no real
13  relationship there, you know. It just seemed kind
14  of strange to me that it was making its way through
15  Sexual Assault.
16  **Q. This was an unusual complaint that**
17  **Mr. Bavis was making from a 48-year-old Teamster;**
18  **correct?**
19      A. It was a little strange, yes.
20  **Q. And the fact that this guy was coming in as**
21  **a 48-year-old Teamster complaining that his boss**
22  **touched him on the buttocks and sexually assaulted**
23  **him in the way he mentioned, that was unusual, was**
24  **it not?**

# EXHIBIT 12

1  Volume I                    Pages:    1 - 242

2                              Exhibits: 1 - 27

3            UNITED STATES DISTRICT COURT

4            DISTRICT OF MASSACHUSETTS

5                 No. 04-CV-11948-RGS

6  SEYED MOHSEN HOSSEINI-SEDEHY,

7           Plaintiff

8  vs.

9  ERIN T. WITHINGTON and the CITY

10  OF BOSTON,

11           Defendants

12

13        DEPOSITION OF ERIN T. WITHINGTON

14           Thursday, March 31, 2005

15           10:00 a.m. - 4:32 p.m.

16            SMITH & DUGGAN LLP

17            55 Old Bedford Road

18        Lincoln, Massachusetts  01773-1125

19

20

21

22        FARMER ARSENAULT BROCK LLC

23        617.790.4404   FAX  617.728.4403

24        Reporter:  Cynthia C. Henderson/RPR

23 (Pages 86 to 89)

Erin T. Withington - March 31, 2005

86

1  **Q. And having exact date, does that affect the**
2  **amount of proof that you as a criminal investigator**
3  **have in any investigation?**
4    A. It can if I can put someone there or not
5  there on the exact date, then, yes.
6    **Q. If you have an exact date, it's more proof**
7  **than if you have an allegation without an exact**
8  **date; right?**
9    A. Yes.
10   **Q. And one of the concerns you had in**
11 **investigating Joe Bavis's allegations was that there**
12 **was no exact date; correct?**
13   A. Yes.
14        (Weekly disability claim for Joe
15        Bavis marked Exhibit No. 2 for
16        identification.)
17   **Q. I place before you what has been marked**
18 **Exhibit No. 2.**
19   A. Okay.
20   **Q. I know that you mentioned the name Bill**
21 **Dodd at the bottom here. There may have been more**
22 **than one Dodd working for the Teamsters for GES too,**
23 **so I know the name Dodd had come up before.**
24   A. Yes.

87

1    **Q. Just like the Perrys?**
2    A. A lot of names came up a few times.
3    **Q. And can you describe what this document**
4  **appears to be?**
5    A. Weekly disability claim for --
6    **Q. And who was the claimant?**
7    A. Joe Bavis.
8    **Q. And does that appear to be the same person**
9  **that made the criminal allegations against Mr.**
10 **Hosseini on or about December 22nd, 2003?**
11   A. The address is the same, yes.
12   **Q. And the date of this application for**
13 **disability form, that's at the bottom of the second**
14 **box.**
15   A. Yes.
16   **Q. And what is that?**
17   A. December 18, 2002.
18   **Q. Now, were you aware that Mr. Bavis had**
19 **filed for weekly disability insurance on December**
20 **18, 2002 when you conducted the investigation into**
21 **Joe Bavis's allegations?**
22   A. No.
23   **Q. Would that information, the information .**
24 **contained in Exhibit 2, be significant to you if you**

88

1  had known about it?
2        MS. AMBARIK: Objection. You can
3  answer.
4    **Q. During your criminal investigation.**
5        MS. AMBARIK: Objection. You can
6  answer.
7    A. It would have made me ask him maybe
8  different questions like "Were you working?", things
9  like that.
10   **Q. What questions?**
11   A. "Were you working at the time this incident
12 occurred?"
13   **Q. And why would you ask that question?**
14   A. According to the paperwork, he didn't work
15 for it seems from November of 2002 to -- I don't
16 have an end date yet, so I don't know when.
17   **Q. But you would ask him that question because**
18 **it would concern you as to whether or not the**
19 **allegations were true; correct?**
20   A. If I had this paper, yes.
21   **Q. Yes. If you had the paper.**
22   A. Yes.
23        MR. BUTLER: Can I have that marked 3,
24 please?

89

1        (Weekly disability approval form
2        for Joe Bavis marked Exhibit No. 3
3        for identification.)
4    **Q. And when you are done looking at the**
5  **document, just look up and that will indicate to me**
6  **to ask you a question. What does Exhibit 3 appear**
7  **to be?**
8    A. A weekly disability approval form.
9    **Q. For whom?**
10   A. Joe Bavis.
11   **Q. And what was the date of the sickness or**
12 **disability for Bavis's weekly disability form?**
13   A. November 30, 2002.
14   **Q. And the date just above that?**
15   A. November 23rd, 2002.
16   **Q. That would be for the date of disability or**
17 **sickness, November 23rd, 2002?**
18   A. Yes.
19   **Q. And according to this form, when did the**
20 **benefits for Mr. Bavis get exhausted at the bottom**
21 **there?**
22   A. May 30, 2003.
23   **Q. Were you aware of the information contained**
24 **in Exhibit 3 when you conducted your investigation**

# EXHIBIT 13

```
 1   Volume I                           Pages:    1 - 242

 2                                      Exhibits: 1 - 27

 3                 UNITED STATES DISTRICT COURT

 4                  DISTRICT OF MASSACHUSETTS

 5                    No. 04-CV-11948-RGS

 6   SEYED MOHSEN HOSSEINI-SEDEHY,

 7            Plaintiff

 8   vs.

 9   ERIN T. WITHINGTON and the CITY

10   OF BOSTON,

11                Defendants

12

13           DEPOSITION OF ERIN T. WITHINGTON

14              Thursday, March 31, 2005

15               10:00 a.m. - 4:32 p.m.

16                SMITH & DUGGAN LLP

17               55 Old Bedford Road

18          Lincoln, Massachusetts  01773-1125

19

20

21

22          FARMER ARSENAULT BROCK LLC

23          617.790.4404    FAX  617.728.4403

24          Reporter:  Cynthia C. Henderson/RPR
```

18 (Pages 66 to 69)

Erin T. Withington - March 31, 2005

66

1  just want to talk about your experience as a police
2  officer or detective over the last approximately
3  twelve years. About how many investigations for any
4  criminal violation have you been involved in in the
5  course of twelve years?
6      A. Both in uniform and as a detective?
7      Q. Yes. Either as a patrol officer or a
8  detective, either police officer, patrol officer or
9  a detective.
10     A. I guess maybe fifteen hundred to two
11  thousand.
12     Q. And maybe I should have asked a little
13  different question, but I will clarify it now. The
14  fifteen hundred, two thousand, were those as a lead
15  investigator?
16     A. No.
17     Q. Okay. Out of those fifteen hundred to two
18  thousand criminal investigations over the past
19  twelve years, how many of those did you act as the
20  lead investigator?
21     A. About five hundred.
22     Q. And since you have become a police officer,
23  how many times approximately have you testified in
24  court?

67

1      A. About fifty.
2      Q. And out of those fifty, how many times did
3  you --
4      A. I am thinking. It might be a little low.
5  Maybe a hundred.
6      Q. About a hundred?
7      A. Yes.
8      Q. And out of those approximately a hundred
9  times you have testified, how many have been in the
10  Superior Court?
11     A. Maybe about twenty-five, thirty.
12     Q. And have the balance been in the District
13  Court?
14     A. Yes.
15     Q. About how many arrests have you been
16  involved in over the past twelve years?
17     A. As the arresting officer or involved in?
18     Q. Either arresting or assisting.
19     A. Maybe three, four, five hundred.
20     Q. Out of those three, four, five hundred,
21  about how many have you been the arresting officer?
22     A. I would say half.
23     Q. And during your experience in conducting
24  the criminal investigations and making the arrests

68

1  for criminal violations, is it your experience that
2  sometimes complaining witnesses have criminal
3  records?
4      A. Yes.
5      Q. Okay. And in approximately how many of the
6  criminal investigations that you have been involved
7  in -- I understand this is going to be an
8  approximation -- but in approximately how many of
9  those criminal investigations has the complaining
10  witness or the victim had a criminal background, if
11  you will?
12     A. I would say -- well, I do have to clarify.
13  Right now I work in the Child Abuse Unit, so I have
14  to exclude them, but prior to working in the Child
15  Abuse Unit I would say probably half.
16     Q. Is there a distinguishing factor between
17  being a police officer and a detective or is it a
18  patrol officer and a detective?
19     A. No. Police officer is fine. The only
20  distinguishing thing is one wears a uniform, one
21  wears plainclothes.
22     Q. But a patrol officer is not a detective?
23     A. No.
24     Q. But a patrol officer and a detective are

69

1  both police officers?
2      A. Yes.
3      Q. In the twelve years that you have been a
4  police officer and the approximately fifteen hundred
5  to two thousand criminal investigations you have
6  been involved in, have you come across an
7  investigation where the complaining witness -- or
8  you have determined that the complaining witness had
9  been lying to you?
10     A. Yes.
11     Q. And approximately how many of those cases
12  where the complaining witness had been lying to you?
13     A. Probably half.
14     Q. And you had mentioned earlier about the
15  Board of Probation and the report that you received.
16  Correct?
17     A. Yes.
18     Q. And as an investigator, whether it was as a
19  patrol officer or as a detective, have you ever had
20  an occasion to use a Board of Probation report as an
21  investigatory tool?
22     A. Yes.
23     Q. And what would be the significance of using
24  a Board of Probation report in terms of an

# EXHIBIT 14

1   Volume I                        Pages:    1 - 242

2                                  Exhibits: 1 - 27

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5                  No. 04-CV-11948-RGS

6   SEYED MOHSEN HOSSEINI-SEDEHY,

7            Plaintiff

8   vs.

9   ERIN T. WITHINGTON and the CITY

10  OF BOSTON,

11           Defendants

12

13          DEPOSITION OF ERIN T. WITHINGTON

14             Thursday, March 31, 2005

15              10:00 a.m. - 4:32 p.m.

16               SMITH & DUGGAN LLP

17              55 Old Bedford Road

18         Lincoln, Massachusetts  01773-1125

19

20

21

22          FARMER ARSENAULT BROCK LLC

23        617.790.4404    FAX  617.728.4403

24      Reporter:  Cynthia C. Henderson/RPR

Erin T. Withington - March 31, 2005

70

1  investigation?
2      A. To check to see if anybody else has ever
3  made an allegation -- and I speak from the Sexual
4  Assault Unit right now -- see if there has ever been
5  an allegation to the person like that before, do
6  they have any warrants, weapons charges; as you go
7  into the investigation, if you are going to do a
8  search warrant, if you are looking for the person,
9  where might you find them, have they ever been
10 arrested or served time.
11     Q. So there are a number of different purposes
12 you would make use of that Board of Probation
13 report?
14     A. Yes.
15     Q. One of them you just mentioned -- and I am
16 paraphrasing -- one of the purposes is to assist you
17 as the investigator in determining whether or not it
18 was more likely than not that the complaint against
19 a suspect was true; correct?
20     MS. AMBARIK: Objection. You can
21 answer.
22     A. Well, I don't use it to say more likely
23 than not, but if something like this has ever
24 occurred before, yes.

71

1      Q. I will rephrase the question. I think I
2  know what you are talking about, but in doing so,
3  let me ask you have you ever used the Board of
4  Probation report to help you determine the truth of
5  allegations made against a particular suspect?
6      A. Not help me determine the truth, but help
7  me see if it's something that they may be capable
8  of, yes.
9      Q. Is that kind of the same thing, though?
10     MS. AMBARIK: Objection. You can
11 answer.
12     A. I won't say it gives me yes, it's true or
13 no, it's not true. It just gives me have they been
14 known to do this in the past.
15     Q. So it's not conclusive evidence?
16     A. No.
17     Q. But the information you get from the Board
18 of Probation report can assist you in your
19 investigation?
20     A. Yes.
21     Q. In determining whether or not the
22 allegations are true?
23     A. Yes.
24     Q. In the fifteen hundred, two thousand

72

1  investigations you have been involved in, havè you
2  ever used a Board of Probation report or have you
3  ever sought a Board of Probation report on a
4  complaining witness or any other witness to an
5  investigation?
6      A. Yes.
7      Q. And what were the circumstances surrounding
8  acquiring this report?
9      A. Sometimes it's to determine the job of my
10 victim. If she tells me she was working at a
11 certain hour of the night, I would like to know what
12 their job is.
13     Q. Whether or not someone would be a
14 prostitute?
15     A. Yes. Sometimes people mention that they
16 have a warrant. Sometimes victims mention they have
17 a warrant, or sometimes you kind of get the feeling
18 that the victim maybe has more going on than what
19 they are just telling you.
20     Q. In your experience as a sexual assault
21 investigator, do you conduct an investigation into
22 allegations of a sexual assault made by an adult
23 complaining witness differently than you would a
24 child abuse investigation?

73

1      A. Yes.
2      Q. Can you just briefly explain how the two,
3  in general the two investigations would differ?
4      A. With an adult you can sit down and speak to
5  an adult, whether they are at the hospital or come
6  to your office, obtain whatever information you
7  need. If I needed more, I could continuously call
8  an adult.
9          With a child I would like to do a
10 process with a two-way mirror where the interviewer
11 interviews the child, so whatever questions you have
12 have to be asked that day at that moment. I would
13 tend to ask different questions of a child than of
14 an adult victim and also to involve more people with
15 a child than you would an adult. I need to know who
16 has access to a child and things like that, things I
17 don't need to know of an adult.
18     Q. And what general questions would you pose
19 to an adult that you wouldn't to a child in an
20 investigation to an alleged sexual assault?
21     A. What was your response, what did you do
22 when that happened, did you at any time tell the
23 person no. I wouldn't ask a child that.
24 Did they know that you didn't like what they were

32 (Pages 122 to 125)
Erin T. Withington - March 31, 2005

122

1    A. Yes.
2    Q. Did you do that in this case?
3    A. No.
4    Q. Why was that?
5    A. Mr. Bavis made mention to me that he had
6    had problems before, and I stated to him then that
7    it has nothing to do with the fact that he is coming
8    forward as a victim, that if he had problems with
9    the police before, then that was as a suspect, this
10   is as a victim.
11   Q. So is it fair to assume that when
12   Mr. Bavis came into your office on December 22nd,
13   you assumed that he was telling you the truth that
14   he was in fact a victim?
15   A. Yes.
16   Q. And did you view it as your role as an
17   investigator not to challenge that designation as a
18   victim?
19   MS. AMBARIK: Objection. You can
20   answer.
21   A. Yes.
22   Q. So would it be fair to say that you viewed
23   your role as an investigator into Bavis's
24   allegations as only providing support for

123

1    Mr. Bavis's allegations?
2    MS. AMBARIK: Objection. You can
3    answer.
4    A. No.
5    Q. And why not?
6    A. Because I'm impartial. I was looking to
7    prove or disprove Mr. Bavis's allegation.
8    Q. And if you were looking to prove or
9    disprove Mr. Bavis's allegations, given the fact
10   that Mr. Bavis had told you that he had a criminal
11   past, why didn't you at least print out a Board of
12   Probation report?
13   A. It was irregardless of why he was there.
14   He wasn't there as a suspect; he was there as a
15   victim. He said to me that he had had problems with
16   the police before. It has nothing to do with him
17   being a victim of sexual assault, so I didn't
18   bother, I didn't check on Mr. Bavis's Board of
19   Probation report.
20   Q. And that's your position even if they were
21   crimes of dishonesty on his Board of Probation
22   report?
23   A. Yes.
24   Q. And why wouldn't you consider any past

124

1    crimes of dishonesty in evaluating the credibility
2    of a person who came in and made allegations against
3    another citizen?
4    MS. AMBARIK: Objection. You can
5    answer.
6    A. In a sexual assault case I have to take
7    what he is saying. He is not in there telling me
8    Mr. Hosseini stole stuff from him, and he is not
9    talking about drug use. He is talking about someone
10   touching his body. None of his crimes which I now
11   know -- he was never charged with anything of a
12   sexual nature, so it has no reflection on whether or
13   not he is a victim of sexual assault.
14   Q. Has the Boston police or the City of Boston
15   trained you to take that position?
16   MS. AMBARIK: Objection. You can
17   answer.
18   A. No.
19   Q. Has the City of Boston or the Boston police
20   trained you to evaluate any witness differently than
21   another witness based on the crime that's alleged?
22   A. No.
23   Q. But in this case you are saying that you in
24   fact in your practice do take people who complain of

125

1    being victims of sexual assault and treat them
2    differently than other witnesses?
3    A. No. What I am saying is when a person
4    comes in complaining of sexual assault, I don't pull
5    up their record in front of them and start talking
6    about their past. They are there based on what they
7    are telling me happened to them.
8    Q. I am sorry. I am not asking if you pulled
9    out the Board of Probation record of
10   Mr. Bavis while he was in your presence. I am
11   saying at any time from December 22, 2003 to March
12   22nd, 2004 did you check his Board of Probation
13   record?
14   A. No.
15   Q. In the course of your duties how do you
16   obtain a Board of Probation record?
17   A. We have a computer that you put in your
18   password and it comes up.
19   Q. And where is this computer in relationship
20   to your office?
21   A. Inside my office.
22   Q. And how much time would it take for you to
23   enter the data that you need to enter in to get a
24   Board of Probation record?

# EXHIBIT 15

Volume I                          Pages:    1 - 242

                                  Exhibits: 1 - 27

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 04-CV-11948-RGS

SEYED MOHSEN HOSSEINI-SEDEHY,

          Plaintiff

vs.

ERIN T. WITHINGTON and the CITY

OF BOSTON,

          Defendants


DEPOSITION OF ERIN T. WITHINGTON

Thursday, March 31, 2005

10:00 a.m. - 4:32 p.m.

SMITH & DUGGAN LLP

55 Old Bedford Road

Lincoln, Massachusetts  01773-1125




FARMER ARSENAULT BROCK LLC

617.790.4404   FAX  617.728.4403

Reporter:  Cynthia C. Henderson/RPR

37 (Pages 142 to 145)

Erin T. Withington - March 31, 2005

142

1  **Q. But you considered Perry's claims in the**
2  **course of your investigation, did you not?**
3      MS. AMBARIK: Objection. You can
4  answer.
5      A. No. As far as arresting Mr. Hosseini, no.
6  **Q. As far as making any determination as to**
7  **the course of your investigation into Bavis's**
8  **allegations, did you consider the information Perry**
9  **gave you in any way, shape or form?**
10     A. I heard what he said. I documented it.
11 There was supposedly other people that wanted to
12 speak with me, and I never heard from them, so it
13 was part of the investigation, but I didn't weigh it
14 very heavily either way.
15     **Q. After speaking with Bavis and Perry on the**
16 **22nd of December, 2003, what was your plan to**
17 **investigate these allegations?**
18     A. I attempted to speak with Mr. Hosseini and
19 then, as I did, send it up to the District
20 Attorney's office and let them make a determination
21 to bring it into court.
22     **Q. And other than your intention to speak with**
23 **Mr. Hosseini, did you intend to do any further**
24 **investigation with Bavis's allegations on December**

143

1  **22nd?**
2      A. Yes.
3      **Q. What did you intend to do?**
4      A. Speak with the other people that they had
5  mentioned during that -- speak with other people
6  that worked with the two of them together.
7      **Q. Okay. What names did you get from Bavis**
8  **and Perry on December 22nd of 2003 other than Mr.**
9  **Hosseini?**
10     A. John Perry and a phone number for GES.
11     **Q. And what about the names of all these**
12 **people you are saying that they mentioned to you?**
13     A. They didn't give me the names. They just
14 referred to other people want to come forward, and I
15 think maybe there was a first name thrown out, but
16 there was no name and phone number or anything like
17 that given to me.
18     **Q. Did you ask for names?**
19     A. Yes.
20     **Q. And what was the response you got from**
21 **these two people?**
22     A. Let me see if this is something that they
23 are comfortable with, and I said, okay, if they
24 would like to come forward, gave them my name and

144

1  number and have them call me. You can't report for
2  someone else, I explained to them, and if they want
3  to be part of this complaint, they can also start
4  their own investigations and everybody would have
5  their own file.
6      **Q. So as of that first interview, December 22,**
7  **2003, the only names that you had were John Perry,**
8  **Mohsen Hosseini and GES?**
9      A. Yes.
10     **Q. And your plan on that day was to speak with**
11 **John Perry and Mohsen Hosseini; correct?**
12     A. Yes.
13     **Q. Did you have any other plan or did you have**
14 **any intent to conduct any other investigation on**
15 **Bavis's allegations on that day after you spoke with**
16 **Bavis and Perry after they left your office?**
17     A. On that specific day?
18     **Q. Yes.**
19     A. No.
20     **Q. And did you decide to seek an arrest**
21 **warrant for Mr. Hosseini on that day, December 22nd?**
22     A. No.
23     **Q. Why not?**
24     A. Because I wanted to speak with

145

1  Mr. Hosseini regarding the allegations, and since it
2  was two adult males that worked together, that I
3  figured let me speak to Mr. Hosseini, which is what
4  I do in all my cases, get his side of the story and
5  see what transpired from there, and explained to
6  both of them that this would probably make its way
7  through court and they could go to court.
8      **Q. And the fact that they were two adult males**
9  **that worked with each other, that was significant in**
10 **the course of your investigation; correct?**
11     A. Considering they had no relationship, they
12 weren't involved intimately, there was no real
13 relationship there, you know. It just seemed kind
14 of strange to me that it was making its way through
15 Sexual Assault.
16     **Q. This was an unusual complaint that**
17 **Mr. Bavis was making from a 48-year-old Teamster;**
18 **correct?**
19     A. It was a little strange, yes.
20     **Q. And the fact that this guy was coming in as**
21 **a 48-year-old Teamster complaining that his boss**
22 **touched him on the buttocks and sexually assaulted**
23 **him in the way he mentioned, that was unusual, was**
24 **it not?**

# EXHIBIT 16

```
 1   Volume I                          Pages:    1 - 242
 2                                     Exhibits: 1 - 27
 3                UNITED STATES DISTRICT COURT
 4                DISTRICT OF MASSACHUSETTS
 5                   No. 04-CV-11948-RGS
 6   SEYED MOHSEN HOSSEINI-SEDEHY,
 7            Plaintiff
 8   vs.
 9   ERIN T. WITHINGTON and the CITY
10   OF BOSTON,
11            Defendants
12
13          DEPOSITION OF ERIN T. WITHINGTON
14             Thursday, March 31, 2005
15             10:00 a.m. - 4:32 p.m.
16               SMITH & DUGGAN LLP
17               55 Old Bedford Road
18          Lincoln, Massachusetts  01773-1125
19
20
21
22           FARMER ARSENAULT BROCK LLC
23        617.790.4404    FAX   617.728.4403
24        Reporter:  Cynthia C. Henderson/RPR
```

Erin T. Withington - March 31, 2005

**22**

1  complaint?
2  A. No, I did not.
3  Q. So he volunteered the name Perry?
4  A. Yes.
5  Q. Did he use the term "BS" or was he more
6  explicit?
7  A. He was more explicit.
8  Q. He used a swear instead of using the term
9  BS?
10  A. Yes, he did.
11  Q. After you tried contacting GES to get
12  Hosseini's name and phone number and a contact
13  number, you then indicated that the next action you
14  took in this investigation was to call back Joseph
15  Bavis?
16  A. Yes.
17  Q. And the purpose of calling back Joseph
18  Bavis was to identify Mr. Hosseini and get a contact
19  number?
20  A. I was trying to find somebody who would be
21  cooperative, did they have someone else that would
22  give me this information that was cooperative and
23  wasn't so rude, and he gave me -- I can't remember
24  the person's name. It's in my reports. He gave me

**23**

1  another name and cell phone number, and I called
2  that person.
3  Q. A guy by the name of Dodd?
4  A. I believe his name is Henry or Sam.
5  Q. In one of our reports you have a
6  Mr. Dodd.
7  A. Yes.
8  Q. Does that name ring a bell?
9  A. It does. I believe he told me his first
10  name. I am not a hundred percent sure.
11  Q. And did you speak with this person that may
12  have been Mr. Dodd in person or on the telephone?
13  A. On the telephone.
14  Q. And what information did you receive from
15  Mr. Dodd during that telephone conversation?
16  A. I explained to him that I just needed to
17  know Mr. Hosseini's name and a way to get in touch
18  with him. He gave me his full name and he told me
19  that -- he gave me his cell phone and he told me he
20  thought he lived in Charlestown.
21  Q. After speaking with Mr. Dodd, what was the
22  next action you took with respect to this
23  investigation?
24  A. I then called the telephone number I was

**24**

1  given for Mr. Hosseini, and his voice mail does say,
2  "You have reached Mr. Hosseini." I left him a
3  message that there were allegations being made
4  against him, I would like to speak with him if he
5  would like to speak with me, and left him my phone
6  number.
7  Q. Do you remember if Mr. Hosseini
8  called you before you went out on disability?
9  A. I don't remember, but I don't believe he
10  had. I think he was away. I don't believe he did.
11  Q. Was there any other action you took with
12  respect to this investigation before you went out on
13  disability on January 7th, 2004?
14  A. I did speak with the attorney at the Hynes
15  Convention Center to let them know that there was an
16  investigation, that an allegation had occurred
17  within the Hynes, but that didn't include, it didn't
18  have anything to do with the Hynes itself, that
19  something had occurred there, and they just asked me
20  if I needed anything from them or if it came to a
21  point where the Hynes Convention Center might be
22  named as any type of party to this, if I could let
23  them know. I said I would, and I just wanted them
24  to know that I would be in and out of the building

**25**

1  and not to be surprised about that.
2  Q. What information did you receive from this
3  Hynes Convention Center attorney?
4  A. I didn't really receive any information. I
5  was letting him know that there was an investigation
6  going on and that I didn't tell them what it was
7  about, but there was an incident that had occurred,
8  that I would be in and out, that the Boston police
9  would be at the Hynes Convention Center.
10  Q. Do you remember if you did anything else
11  with respect to this investigation before you went
12  out on disability other than what you have just told
13  us?
14  A. No, I don't believe I did.
15  Q. Now, you indicated that you came back to
16  work in March, did you?
17  A. Yes.
18  Q. And what date did you come back to work?
19  A. I want to say March 7th or 8th.
20  Q. When you got back to work do you know if
21  any other detective had done any investigation on
22  this case, these allegations, while you were on
23  leave, disability leave?
24  A. No, they did not.

FARMER ARSÉNAULT BROCK LLC

# EXHIBIT 17

Volume I                              Pages:    1 - 242

                                      Exhibits: 1 - 27

              UNITED STATES DISTRICT COURT

              DISTRICT OF MASSACHUSETTS

                    No. 04-CV-11948-RGS

SEYED MOHSEN HOSSEINI-SEDEHY,

          Plaintiff

vs.

ERIN T. WITHINGTON and the CITY

OF BOSTON,

              Defendants


          DEPOSITION OF ERIN T. WITHINGTON

              Thursday, March 31, 2005

              10:00 a.m. - 4:32 p.m.

              SMITH & DUGGAN LLP

              55 Old Bedford Road

          Lincoln, Massachusetts  01773-1125




          FARMER ARSENAULT BROCK LLC

          617.790.4404    FAX  617.728.4403

          Reporter:  Cynthia C. Henderson/RPR

6 (Pages 18 to 21)

Erin T. Withington - March 31, 2005

**18**

1  had some complaints, and we ended the interview at
2  that point.
3      **Q. Now, during this interview did you take**
4  **notes?**
5      A. Yes, I did.
6      **Q. And what was the next thing that you did**
7  **with respect to investigating Mr. Bavis's complaints**
8  **or Mr. Perry's complaints?**
9      A. I attempted to contact the other
10  Mr. Perry, who I believe is a foreman in the union,
11  to find out -- they didn't really know Mr.
12  Hosseini's real first name. I believe that he goes
13  by a nickname or something else at work, so they
14  didn't have any real information or any way for me
15  to find him, so I did attempt to contact the other
16  Mr. Perry, who stated that he couldn't help me. He
17  gave me a number in I want to say New Jersey, I
18  believe. I tried to call them. They wouldn't give
19  me any information. This is over the course of time.
20          I then contacted Mr. Bavis and said,
21  "I have no one that can give me any information on
22  this person. I mean, you tell me that he works
23  there, people have confirmed that he works there,
24  but they won't give me his full name or any way of

**19**

1  getting in touch with him." They gave me the name of
2  someone who might be able to help me. I can't
3  remember his name off the top of my head. His name
4  is in my report, I know. I did call him. He gave
5  me Mr. Hosseini's name and I believe a cell phone
6  and asked me if he could stay out of the
7  investigation he would appreciate it. I said I
8  would see what I could do. I attempted to contact
9  Mr. Hosseini. I contacted his cell phone first.
10      **Q. What time period are we talking about?**
11      A. It was between December the 22nd and
12  January 7th because I broke my ankle on January 7th
13  while I was working, and I was out for two months.
14      **Q. Now, you indicated that you tried to**
15  **contact a Mr. Perry who worked at the Teamsters. Was**
16  **that -- did you try to contact Mr. Perry just to**
17  **identify Mr. Hosseini and get a phone number?**
18      A. Yes. I was trying to find out his real
19  name and some way to contact him.
20      **Q. And Mr. Perry told you that he couldn't**
21  **give you a phone number for Mr. Hosseini, but he**
22  **gave you a phone number in New Jersey?**
23      A. Yes.
24      **Q. Was that for Mr. Hosseini's employer?**

**20**

1      A. I believe that's who it was for. It was
2  for some other company, so I believe that's who they
3  all worked for.
4      **Q. And you had contact or you dialed this New**
5  **Jersey number and you spoke with somebody at GES**
6  **Exposition Services?**
7      A. Yes.
8      **Q. When you called GES -- and I will just use**
9  **the short term GES for GES Exposition Services. Is**
10  **that okay?**
11      A. Yes.
12      **Q. When you contacted GES in December, early**
13  **January, the purpose of you calling was to just get**
14  **the name of Mr. Hosseini and a telephone number so**
15  **you could speak with**
16  **Mr. Hosseini?**
17      A. Yes.
18      **Q. And when you did speak with someone at GES,**
19  **what information, if any, did they give you?**
20      A. None, actually. They just said that
21  somebody else would have to get back to me and that
22  this person wasn't available, this person was out of
23  state and just -- I got the runaround, basically.
24      **Q. Did you mention to GES at the time the the**

**21**

1  nature of your inquiry?
2      A. No, I did not.
3      **Q. And how about Mr. Perry? If I can jump**
4  **back to your conversation with the supervisor, Mr.**
5  **Perry. Did you mention the nature of your inquiry**
6  **to him?**
7      A. I mentioned that I needed to speak with him
8  regarding some allegations that had been made, if he
9  wanted to have Mr. Hosseini call me I would give him
10  my name and number. He basically said he wasn't
11  getting involved in any of the BS that was going
12  around with the other Perry and that he didn't want
13  to be involved and that he didn't know Mr.
14  Hosseini's real name or telephone number.
15      **Q. And that supervisor, Mr. Perry, was that a**
16  **John Perry?**
17      A. Yes.
18      **Q. And did Mr. John Perry when he said he**
19  **didn't want to get involved in the BS with the other**
20  **Perry, did he say Joe Perry?**
21      A. I don't remember exactly if he said Joe. I
22  know he said the other Perry.
23      **Q. Now, had you told John Perry at that time**
24  **that Joe Perry had come to your office and made a**

# EXHIBIT 18

Volume I                              Pages:    1 - 242

                                      Exhibits: 1 - 27

            UNITED STATES DISTRICT COURT

            DISTRICT OF MASSACHUSETTS

                No. 04-CV-11948-RGS

SEYED MOHSEN HOSSEINI-SEDEHY,

            Plaintiff

vs.

ERIN T. WITHINGTON and the CITY

OF BOSTON,

            Defendants


            DEPOSITION OF ERIN T. WITHINGTON

              Thursday, March 31, 2005

              10:00 a.m. - 4:32 p.m.

              SMITH & DUGGAN LLP

              55 Old Bedford Road

          Lincoln, Massachusetts  01773-1125




          FARMER ARSENAULT BROCK LLC

          617.790.4404    FAX   617.728.4403

          Reporter:  Cynthia C. Henderson/RPR

6 (Pages 18 to 21)

Erin T. Withington - March 31, 2005

---

**18**

1  had some complaints, and we ended the interview at
2  that point.
3      **Q. Now, during this interview did you take**
4  **notes?**
5      A. Yes, I did.
6      **Q. And what was the next thing that you did**
7  **with respect to investigating Mr. Bavis's complaints**
8  **or Mr. Perry's complaints?**
9      A. I attempted to contact the other
10  Mr. Perry, who I believe is a foreman in the union,
11  to find out -- they didn't really know Mr.
12  Hosseini's real first name. I believe that he goes
13  by a nickname or something else at work, so they
14  didn't have any real information or any way for me
15  to find him, so I did attempt to contact the other
16  Mr. Perry, who stated that he couldn't help me. He
17  gave me a number in I want to say New Jersey, I
18  believe. I tried to call them. They wouldn't give
19  me any information. This is over the course of time.
20      I then contacted Mr. Bavis and said,
21  "I have no one that can give me any information on
22  this person. I mean, you tell me that he works
23  there, people have confirmed that he works there,
24  but they won't give me his full name or any way of

---

**19**

1  getting in touch with him." They gave me the name of
2  someone who might be able to help me. I can't
3  remember his name off the top of my head. His name
4  is in my report, I know. I did call him. He gave
5  me Mr. Hosseini's name and I believe a cell phone
6  and asked me if he could stay out of the
7  investigation he would appreciate it. I said I
8  would see what I could do. I attempted to contact
9  Mr. Hosseini. I contacted his cell phone first.
10      **Q. What time period are we talking about?**
11      A. It was between December the 22nd and
12  January 7th because I broke my ankle on January 7th
13  while I was working, and I was out for two months.
14      **Q. Now, you indicated that you tried to**
15  **contact a Mr. Perry who worked at the Teamsters. Was**
16  **that -- did you try to contact Mr. Perry just to**
17  **identify Mr. Hosseini and get a phone number?**
18      A. Yes. I was trying to find out his real
19  name and some way to contact him.
20      **Q. And Mr. Perry told you that he couldn't**
21  **give you a phone number for Mr. Hosseini, but he**
22  **gave you a phone number in New Jersey?**
23      A. Yes.
24      **Q. Was that for Mr. Hosseini's employer?**

---

**20**

1      A. I believe that's who it was for. It was
2  for some other company, so I believe that's who they
3  all worked for.
4      **Q. And you had contact or you dialed this New**
5  **Jersey number and you spoke with somebody at GES**
6  **Exposition Services?**
7      A. Yes.
8      **Q. When you called GES -- and I will just use**
9  **the short term GES for GES Exposition Services. Is**
10  **that okay?**
11      A. Yes.
12      **Q. When you contacted GES in December, early**
13  **January, the purpose of you calling was to just get**
14  **the name of Mr. Hosseini and a telephone number so**
15  **you could speak with**
16  **Mr. Hosseini?**
17      A. Yes.
18      **Q. And when you did speak with someone at GES,**
19  **what information, if any, did they give you?**
20      A. None, actually. They just said that
21  somebody else would have to get back to me and that
22  this person wasn't available, this person was out of
23  state and just -- I got the runaround, basically.
24      **Q. Did you mention to GES at the time the**

---

**21**

1  nature of your inquiry?
2      A. No, I did not.
3      **Q. And how about Mr. Perry? If I can jump**
4  **back to your conversation with the supervisor, Mr.**
5  **Perry. Did you mention the nature of your inquiry**
6  **to him?**
7      A. I mentioned that I needed to speak with him
8  regarding some allegations that had been made, if he
9  wanted to have Mr. Hosseini call me I would give him
10  my name and number. He basically said he wasn't
11  getting involved in any of the BS that was going
12  around with the other Perry and that he didn't want
13  to be involved and that he didn't know Mr.
14  Hosseini's real name or telephone number.
15      **Q. And that supervisor, Mr. Perry, was that a**
16  **John Perry?**
17      A. Yes.
18      **Q. And did Mr. John Perry when he said he**
19  **didn't want to get involved in the BS with the other**
20  **Perry, did he say Joe Perry?**
21      A. I don't remember exactly if he said Joe. I
22  know he said the other Perry.
23      **Q. Now, had you told John Perry at that time**
24  **that Joe Perry had come to your office and made a**

---

FARMER ARSENAULT BROCK LLC

# EXHIBIT 19

1  Volume I                        Pages:    1 - 242

2                                  Exhibits: 1 - 27

3            UNITED STATES DISTRICT COURT

4            DISTRICT OF MASSACHUSETTS

5                No. 04-CV-11948-RGS

6  SEYED MOHSEN HOSSEINI-SEDEHY,

7            Plaintiff

8  vs.

9  ERIN T. WITHINGTON and the CITY

10 OF BOSTON,

11            Defendants

12

13        DEPOSITION OF ERIN T. WITHINGTON

14          Thursday, March 31, 2005

15           10:00 a.m. - 4:32 p.m.

16            SMITH & DUGGAN LLP

17            55 Old Bedford Road

18      Lincoln, Massachusetts  01773-1125

19

20

21

22        FARMER ARSENAULT BROCK LLC

23      617.790.4404    FAX  617.728.4403

24      Reporter:  Cynthia C. Henderson/RPR

Erin T. Withington - March 31, 2005

182

1 got to the elevator?
2     A. He wasn't handcuffed in front of everybody.
3     Q. But he was under arrest?
4     A. Yes.
5     Q. And he wasn't free to go?
6     A. He was not.
7     Q. He was coming with you at that time?
8     A. Yes.
9     Q. And the other Teamsters that worked under
10 him were all in that room?
11     A. Yes.
12     Q. Did you see Mr. Bavis there?
13     A. Mr. Bavis was downstairs to the right of
14 the main entrance sitting on a wall or a bench or a
15 wall inside the building.
16     Q. When you walked into the Hynes Convention
17 Center you showed your badges to the security
18 officers there?
19     A. Detective Lembo showed his badge to the
20 security officer.
21     Q. Did you ask the security officer any
22 questions about this allegation?
23     A. No.
24     Q. Did you ask the security officer if they

183

1 had any reports of any sexual offense occurring on
2 their property?
3     A. No.
4     Q. Why not?
5     A. Because at that point I had a warrant for
6 Mr. Hosseini's arrest, and he was inside the
7 building. We just wanted to let the security guard
8 know that the Boston police were in the building and
9 we were going to be arresting someone. We didn't
10 give his name.
11     Q. So when you walked into the Massachusetts
12 Convention Center, would it be fair to say you knew
13 that the convention center had security officers?
14     A. Yes.
15     Q. And you knew that before that date;
16 correct?
17     A. Yes.
18     Q. At any time after December 22nd, 2003 did
19 you pick up the phone and call the Massachusetts
20 Convention Center security office and ask for any
21 reports concerning these allegations that Bavis
22 made?
23     A. No.
24     Q. Why?

184

1     A. Mr. Bavis hadn't mentioned that he spoke
2 with anyone other than myself regarding making
3 allegations.
4     Q. Well, as a criminal investigator you don't
5 decide how you are going to investigate a crime
6 based on what the complaining witness tells you;
7 correct? You use your training and experience to
8 investigate the full circumstances of any criminal
9 allegation; right?
10     A. Yes.
11     Q. So the fact that Mr. Bavis didn't mention a
12 security officer at the Massachusetts Convention
13 Center would not mean that you as a trained
14 investigator wouldn't be interested in finding out
15 what, if anything, they knew about the circumstances
16 surrounding Mr. Bavis's and Mr. Hosseini's
17 relationship; right?
18     A. It never occurred to me.
19     Q. Did you ever ask if there was a grievance
20 that Bavis had filed because this was apparently or
21 allegedly work-related? Did he file a grievance
22 about an adverse working condition?
23     A. Mr. Bavis?
24     Q. Yes.

185

1     A. No.
2     Q. Did you ask anybody if Mr. Bavis had filed
3 a grievance with his union about any adverse working
4 conditions?
5     A. No. Anyone that I spoke to, either at GES
6 or Mr. John Perry, his answer was he didn't want to
7 get in the bullshit of Bavis. Really, no one was
8 helpful so, no, I didn't ask anyone.
9     Q. And the fact that John Perry didn't want to
10 get involved with any of Mr. Bavis's bullshit, did
11 that concern you that Bavis may not be telling you
12 the truth?
13     MS. AMBARIK: Objection. I don't think
14 it was Bavis who said that.
15     MR. BUTLER: Actually, it was.
16     THE WITNESS: It was.
17     MS. AMBARIK: My mistake.
18     Q. Did that concern you that John Perry, the
19 Teamsters supervisor or business agent or whatever
20 he was, that he said to you that he wasn't going to
21 get involved in any of Bavis's bullshit?
22     A. No. I just thought he was really rude the
23 whole conversation, so it was just another aspect of
24 his rudeness.

48 (Pages 186 to 189)

Erin T. Withington - March 31, 2005

186

1    Q. As a trained criminal investigator, did you
2  seek to find out why Mr. Perry, John Perry had said
3  that he didn't want to get involved in any of Mr.
4  Bavis's bullshit?
5    A. No.
6    Q. Did that comment stick out in your mind
7  that Mr. John Perry made?
8    A. Yes.
9    Q. So that was a significant event in your
10 investigation; correct?
11   A. No. His rudeness sticks out, and that was
12 part of his rudeness, yes.
13   Q. But it wasn't just the fact that he was
14 rude, was it? It was the content of what he said;
15 correct?
16     MS. AMBARIK: Objection. You can
17 answer.
18   A. No. It was just another aspect of his
19 rudeness.
20   Q. And that indicated to you that maybe Bavis
21 was not telling the truth; correct?
22   A. No.
23   Q. What did you think John Perry meant by
24 Bavis's bullshit?

187

1    A. Again, I don't know what Mr. Perry thinks.
2  I just found him to be rude, and that was his
3  comment and he wasn't going to help me and hung up
4  on the phone.
5    Q. Excuse me for using the term, but it's a
6  term that neither one of us initiated, "bullshit."
7  What was the meaning that you attributed to the word
8  "bullshit" on that day you spoke with John Perry?
9      MS. AMBARIK: Objection. You can
10 answer.
11   A. Just the fact that the Boston police were
12 calling him on his phone to ask him a question was
13 bullshit to him.
14   Q. What's the meaning of the word?
15   A. A headache, the bullshit. Bullshit means a
16 lot.
17   Q. There is another meaning for bullshit;
18 correct? It's lies?
19   A. Yes.
20   Q. And you knew that when you spoke with John
21 Perry, that that was one of the meanings of the
22 term?
23   A. Yes. Sure.
24   Q. And despite the fact that this Teamster had

188

1  told you that one of the Teamsters that worked under
2  him had, the fact that that person, John Perry, had
3  characterized Mr. Bavis's allegations as bullshit,
4  did that concern you enough to do any investigation
5  into the truthfulness of Mr. Bavis's allegations?
6      MS. AMBARIK: Objection. You can
7  answer.
8    A. It never got to the point of me saying
9  anything about allegations. It was "I would like to
10 speak with you regarding one of the other
11 employees." I believe his name is Molson, because
12 that's what they called him, and he said to me, "I
13 am not going to help you. I am not going to get
14 involved in any of Bavis's bullshit," and hung up
15 the phone. There was no further conversation after
16 that.
17   Q. But there was investigation after that that
18 you intended to do?
19   A. Yes.
20   Q. And my question is did you approach the
21 rest of the investigation with a critical eye
22 towards Bavis's credibility, based on the
23 information that John Perry gave you?
24   A. No.

189

1      (Supplemental report regarding the
2      arrest of Mohsen Hosseini marked
3      Exhibit No. 20 for
4      identification.)
5    Q. Now, can you please identify what Exhibit
6  20 is?
7    A. Supplemental report regarding the warrant
8  arrest of Mr. Hosseini.
9    Q. And when was the supplemental report done?
10   A. 3/22/04.
11   Q. What time?
12   A. 1:17 p.m.
13   Q. And that report was completed after you had
14 arrested Mr. Hosseini and he was, Mr. Hosseini was
15 booked; correct?
16   A. Yes.
17   Q. And how long does it take to book someone
18 or how long did it take to book
19 Mr. Hosseini on this day?
20   A. Maybe half an hour.
21   Q. What was entailed in that?
22   A. Personal information is given, picture
23 taken, fingerprints are taken, your phone call is
24 made.

# EXHIBIT 20

1  Volume I                          Pages:    1 - 242

2                                    Exhibits: 1 - 27

3            UNITED STATES DISTRICT COURT

4            DISTRICT OF MASSACHUSETTS

5                No. 04-CV-11948-RGS

6   SEYED MOHSEN HOSSEINI-SEDEHY,

7            Plaintiff

8   vs.

9   ERIN T. WITHINGTON and the CITY

10  OF BOSTON,

11           Defendants

12

13        DEPOSITION OF ERIN T. WITHINGTON

14           Thursday, March 31, 2005

15           10:00 a.m. - 4:32 p.m.

16             SMITH & DUGGAN LLP

17            55 Old Bedford Road

18       Lincoln, Massachusetts  01773-1125

19

20

21

22        FARMER ARSENAULT BROCK LLC

23       617.790.4404    FAX  617.728.4403

24       Reporter:  Cynthia C. Henderson/RPR

6 (Pages 18 to 21)

Erin T. Withington - March 31, 2005

18

1  had some complaints, and we ended the interview at
2  that point.
3      Q. Now, during this interview did you take
4  notes?
5      A. Yes, I did.
6      Q. And what was the next thing that you did
7  with respect to investigating Mr. Bavis's complaints
8  or Mr. Perry's complaints?
9      A. I attempted to contact the other
10 Mr. Perry, who I believe is a foreman in the union,
11 to find out -- they didn't really know Mr.
12 Hosseini's real first name. I believe that he goes
13 by a nickname or something else at work, so they
14 didn't have any real information or any way for me
15 to find him, so I did attempt to contact the other
16 Mr. Perry, who stated that he couldn't help me. He
17 gave me a number in I want to say New Jersey, I
18 believe. I tried to call them. They wouldn't give
19 me any information. This is over the course of time.
20     I then contacted Mr. Bavis and said,
21 "I have no one that can give me any information on
22 this person. I mean, you tell me that he works
23 there, people have confirmed that he works there,
24 but they won't give me his full name or any way of

19

1  getting in touch with him." They gave me the name of
2  someone who might be able to help me. I can't
3  remember his name off the top of my head. His name
4  is in my report, I know. I did call him. He gave
5  me Mr. Hosseini's name and I believe a cell phone
6  and asked me if he could stay out of the
7  investigation he would appreciate it. I said I
8  would see what I could do. I attempted to contact
9  Mr. Hosseini. I contacted his cell phone first.
10     Q. What time period are we talking about?
11     A. It was between December the 22nd and
12 January 7th because I broke my ankle on January 7th
13 while I was working, and I was out for two months.
14     Q. Now, you indicated that you tried to
15 contact a Mr. Perry who worked at the Teamsters. Was
16 that -- did you try to contact Mr. Perry just to
17 identify Mr. Hosseini and get a phone number?
18     A. Yes. I was trying to find out his real
19 name and some way to contact him.
20     Q. And Mr. Perry told you that he couldn't
21 give you a phone number for Mr. Hosseini, but he
22 gave you a phone number in New Jersey?
23     A. Yes.
24     Q. Was that for Mr. Hosseini's employer?

20

1      A. I believe that's who it was for. It was
2  for some other company, so I believe that's who they
3  all worked for.
4      Q. And you had contact or you dialed this New
5  Jersey number and you spoke with somebody at GES
6  Exposition Services?
7      A. Yes.
8      Q. When you called GES -- and I will just use
9  the short term GES for GES Exposition Services. Is
10 that okay?
11     A. Yes.
12     Q. When you contacted GES in December, early
13 January, the purpose of you calling was to just get
14 the name of Mr. Hosseini and a telephone number so
15 you could speak with
16 Mr. Hosseini?
17     A. Yes.
18     Q. And when you did speak with someone at GES,
19 what information, if any, did they give you?
20     A. None, actually. They just said that
21 somebody else would have to get back to me and that
22 this person wasn't available, this person was out of
23 state and just -- I got the runaround, basically.
24     Q. Did you mention to GES at the time the

21

1  nature of your inquiry?
2      A. No, I did not.
3      Q. And how about Mr. Perry? If I can jump
4  back to your conversation with the supervisor, Mr.
5  Perry. Did you mention the nature of your inquiry
6  to him?
7      A. I mentioned that I needed to speak with him
8  regarding some allegations that had been made, if he
9  wanted to have Mr. Hosseini call me I would give him
10 my name and number. He basically said he wasn't
11 getting involved in any of the BS that was going
12 around with the other Perry and that he didn't want
13 to be involved and that he didn't know Mr.
14 Hosseini's real name or telephone number.
15     Q. And that supervisor, Mr. Perry, was that a
16 John Perry?
17     A. Yes.
18     Q. And did Mr. John Perry when he said he
19 didn't want to get involved in the BS with the other
20 Perry, did he say Joe Perry?
21     A. I don't remember exactly if he said Joe. I
22 know he said the other Perry.
23     Q. Now, had you told John Perry at that time
24 that Joe Perry had come to your office and made a

# EXHIBIT 21

```
 1   Volume I                      Pages:    1 - 242
 2                                 Exhibits: 1 - 27
 3              UNITED STATES DISTRICT COURT
 4              DISTRICT OF MASSACHUSETTS
 5                 No. 04-CV-11948-RGS
 6   SEYED MOHSEN HOSSEINI-SEDEHY,
 7              Plaintiff
 8   vs.
 9   ERIN T. WITHINGTON and the CITY
10   OF BOSTON,
11              Defendants
12
13         DEPOSITION OF ERIN T. WITHINGTON
14            Thursday, March 31, 2005
15            10:00 a.m. - 4:32 p.m.
16              SMITH & DUGGAN LLP
17              55 Old Bedford Road
18        Lincoln, Massachusetts  01773-1125
19
20
21
22          FARMER ARSENAULT BROCK LLC
23      617.790.4404   FAX  617.728.4403
24      Reporter:  Cynthia C. Henderson/RPR
```

Erin T. Withington - March 31, 2005

38

1  Mr. Bavis call you at work while you were out on
2  disability?
3      A. Maybe twenty.
4      Q. And at any of these times that he called
5  you did he leave any messages concerning the purpose
6  of his call?
7      A. I know he spoke to Sergeant Donovan because
8  Diane had answered so many calls at that point that
9  she said give it to Sergeant Donovan. Sergeant
10  Donovan explained to him that I was out with my
11  ankle, that I would be back soon, and he just wanted
12  me to know that he was still having a problem at
13  work. I don't know that he specified with who.
14      Q. And other than Sergeant Donovan's
15  conversation with Bavis, did Bavis leave any
16  messages other than he had called you these
17  approximately twenty times while you were out on
18  disability leave?
19      A. Not that I remember, no.
20      Q. Now, when you returned on March 7th or 8th,
21  what was the next thing you did with regard to this
22  investigation or the next information you received
23  concerning this investigation?
24      A. I called Mr. Hosseini's cell phone and I

39

1  did speak with him at that time and explained to him
2  that there were allegations made, which he was aware
3  of. He wasn't exactly -- he was aware that there
4  were allegations. I asked him if he wanted to come
5  in and meet with me. He said he would like to make
6  an appointment to meet with me. He came in. I
7  can't remember the exact date; a few days after
8  this, I know; and in the interim I had also been
9  given the name of somebody who might have witnessed
10  the incident on the dock who was a retired New York
11  police officer. I don't remember his name. I did
12  speak with him and he said to me that he had not
13  witnessed it, he just heard the yelling. He never
14  saw what happened, so we didn't talk about the
15  rest of the investigation after that.
16          I asked him if he knew all the
17  parties. He said he knew them. I think he was a
18  driver for GES at that time. At one time he had
19  been a New York police officer who had been hurt and
20  retired. We talked about that, non-case-related
21  things, and he just said he knows all of them, he
22  heard the yelling, but he never saw -- Mr. Bavis had
23  alleged he had seen Mr. Hosseini touch him. He
24  said, "Erin, I never saw what happened. I just

40

1  heard the yelling, so I couldn't be of any use to
2  you."
3      Q. And that retired police officer, that was
4  Jimmy Flynn?
5      A. Yes. Yes. I am sorry. I am horrible with
6  names.
7      Q. Did you speak with Jimmy Flynn before you
8  had set up an interview with Mr. Hosseini?
9      A. I can't remember if it was before or after.
10      Q. Did you speak with Jimmy Flynn before or
11  after you actually met with Mr. Hosseini?
12      A. I can't remember. I want to say before,
13  but I can't remember a hundred percent.
14      Q. How did you get in contact with Jimmy
15  Flynn?
16      A. I think I was given a phone number for him
17  by Mr. Bavis or he was given my phone number. I
18  know it was all by phone, and I know at one point I
19  called him and spoke with him, but I am not sure if
20  he had already called me and left a number for me to
21  get in touch with him.
22      Q. And what information did Mr. Flynn give you
23  about Mr. Bavis?
24      A. He just said he knew him from just being

41

1  around and stuff, that he knew Mr. Bavis. He
2  referred to him as a loudmouth, said he had a big
3  mouth. I said to him, "Had he mentioned that you
4  had witnessed an incident on the dock?" He said,
5  "No, that's not true. I wasn't there.
6  I didn't see it. I heard the yelling. I came
7  afterwards, and they are arguing, and Mr. Bavis
8  left, but I didn't see what happened." He said
9  afterwards the guys were saying that Joe said this
10  happened and Mr. Hosseini said this happened, and he
11  said, "You know, I wasn't there for it." We just
12  got off the subject, really, and he started talking
13  about the New York City police and the Boston police
14  and things like that.
15      Q. At that time did he tell you anything more
16  about Mr. Bavis?
17      A. Not that I remember, no.
18      Q. And at the time Mr. Flynn, did he tell you
19  that he was working out of the New York or New
20  Jersey GES office?
21      A. I think when I spoke to him he was there
22  because I know he had lived in New York at some
23  point, so I think he was in New Jersey.
24      Q. And do you remember if you had asked him

# EXHIBIT 22

1   Volume I                        Pages:    1 - 242

2                                   Exhibits: 1 - 27

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5                  No. 04-CV-11948-RGS

6   SEYED MOHSEN HOSSEINI-SEDEHY,

7              Plaintiff

8   vs.

9   ERIN T. WITHINGTON and the CITY

10  OF BOSTON,

11             Defendants

12

13       DEPOSITION OF ERIN T. WITHINGTON

14          Thursday, March 31, 2005

15           10:00 a.m. - 4:32 p.m.

16            SMITH & DUGGAN LLP

17           55 Old Bedford Road

18      Lincoln, Massachusetts  01773-1125

19

20

21

22        FARMER ARSENAULT BROCK LLC

23     617.790.4404   FAX  617.728.4403

24     Reporter:  Cynthia C. Henderson/RPR

8 (Pages 26 to 29)

Erin T. Withington - March 31, 2005

---

26

1    **Q.  Had any other detective done any**
2    **investigation on this case between December 22nd and**
3    **January 7th when you went out on leave other than**
4    **you?**
5        A.  No, they did not.
6    **Q.  Do you remember if you had discussed this**
7    **case with any other of the detectives before you**
8    **went out on leave?**
9        A.  Yes, I had.
10   **Q.  And who did you discuss it with before you**
11   **went out on leave?**
12       A.  I know I spoke with Detective Barry and
13   Detective Lembo.
14   **Q.  Did you speak with any other detectives**
15   **other than Detectives Barry and Lembo concerning**
16   **this investigation before you went out on leave?**
17       A.  No, not that I remember.
18   **Q.  And were either Detectives Barry or Lembo**
19   **supervisors back in 2003?**
20       A.  No.
21   **Q.  They were both detectives, as you were?**
22       A.  Yes.
23   **Q.  What conversation did you have with**
24   **Detective Barry regarding this investigation before**

---

27

1    **you went out on leave?**
2        A.  She was in the office when Mr. Perry and
3    Mr. Bavis came in.  When they left she asked me what
4    the case was about and I explained to her in a
5    nutshell what the case was about.
6    **Q.  What did you say to her?**
7        A.  That he was having a problem with his
8    supervisor, the supervisor was rubbing up against
9    him, and that they both were Teamsters and they were
10   both working at the Hynes Convention Center, and
11   that -- I think that's all I said.
12   **Q.  How about Detective Lembo?  Do you remember**
13   **what you discussed with Detective Lembo about this**
14   **investigation before you went out on leave?**
15       A.  In the interim from December to January and
16   then from January until I came back there was
17   numerous phone calls from Mr. Bavis in between all
18   this, so his name became very well known at our
19   unit, so everybody knew the case was mine; so
20   Detective Lembo asked me what the case was about and
21   why he was still continuing to call, so I explained
22   to him in a nutshell that he was having a problem
23   with his boss, that his boss was a male, he was a
24   male, he was alleging that his boss had rubbed up

---

28

1    against him, kissed him, and that's why he was
2    calling.
3    **Q.  And did Detective Lembo know that Bavis was**
4    **a Teamster at that time?**
5        A.  I don't remember if I told him at that
6    time.
7    **Q.  And what's Detective Barry's first name?**
8        A.  Allison.
9    **Q.  How do you spell Allison?**
10       A.  A-l-l-i-s-o-n.
11   **Q.  And how about Detective Lembo's first name?**
12       A.  Thomas.
13   **Q.  Thank you.  Before you went out on leave**
14   **how many times did Joe Bavis call the Sexual Assault**
15   **Unit?**
16       A.  Approximately ten times.
17   **Q.  Did Mr. Perry call at any time before you**
18   **went out on leave, that you recall?**
19       A.  I can't remember.
20   **Q.  And when I say Mr. Perry, unless I**
21   **distinguish a first name, it's the Joe Perry that**
22   **you spoke with on January 22nd.**
23       A.  Yes.
24   **Q.  I am sorry.  Did Mr. Perry, if you know,**

---

29

1    **call during this period of time between December**
2    **22nd and when you went out on leave?**
3        A.  I can't remember if he did.
4    **Q.  And the ten times that Bavis called the**
5    **Sexual Assault Unit before you went out on leave,**
6    **what was the purpose of his calls?**
7        A.  A couple of times he called.  Once he
8    called me back to give me Mr. Dodd's name and phone
9    number.  A couple of times he called to tell me that
10   there were other people that were complaining, that
11   he was talking to them about coming forward, but he
12   would get back to me with that, and then a couple of
13   times that he called was once was something else he
14   thought of that Mr. Hosseini had done and I believe
15   once was that Mr. Hosseini had said or done
16   something to him.  I think one involved a touching
17   of the arm, and I think Mr. Hosseini had said
18   something to him, so he just wanted me to be aware
19   of what was going on.
20   **Q.  So these telephone calls after your initial**
21   **interview of December 22nd, thereabouts, of Bavis**
22   **and when you went out on leave, one was to provide**
23   **information on Mr. Dodd to you?**
24       A.  Yes.

---

# EXHIBIT 23

```
 1   Volume I                        Pages:   1 - 242
 2                                   Exhibits: 1 - 27
 3                 UNITED STATES DISTRICT COURT
 4                 DISTRICT OF MASSACHUSETTS
 5                    No. 04-CV-11948-RGS
 6   SEYED MOHSEN HOSSEINI-SEDEHY,
 7           Plaintiff
 8   vs.
 9   ERIN T. WITHINGTON and the CITY
10   OF BOSTON,
11           Defendants
12
13          DEPOSITION OF ERIN T. WITHINGTON
14             Thursday, March 31, 2005
15              10:00 a.m. - 4:32 p.m.
16               SMITH & DUGGAN LLP
17               55 Old Bedford Road
18          Lincoln, Massachusetts  01773-1125
19
20
21
22          FARMER ARSENAULT BROCK LLC
23       617.790.4404   FAX  617.728.4403
24       Reporter:  Cynthia C. Henderson/RPR
```

Erin T. Withington - March 31, 2005

30

1    Q. And a couple of these calls concerned Mr.
2  Bavis's allegations that there were other witnesses
3  or complainants?
4    A. Yes.
5    Q. And did he refuse to give you the names of
6  these complainants over the phone?
7    A. He can't report for someone else, so I said
8  to him, "Well, you know, Joe, if somebody else wants
9  to come forward, you need to give them my name and
10  number. They need to report to me." He mentioned
11  somebody's first name, and I said, "I can't take the
12  first name based on what you are telling me. They
13  need to be a victim themselves."
14    Q. All right. So Mr. Bavis tried to give you
15  a name or one name?
16    A. I know he described an incident that had
17  occurred with someone else who I think was somehow
18  related to either him or Mr. Perry, and I said,
19  "Does this person want to speak with me right now?"
20  And he was embarrassed, and I explained to him that,
21  "You can't report for somebody else. Especially in
22  an assault, the person has to be the complainant. I
23  will give you my name and number and they can call
24  me, but you can't call me up and tell me things

31

1  about other people."
2    Q. You mentioned one of these calls after
3  December 22nd and when you went out on disability,
4  Mr. Bavis made another allegation against Mr.
5  Hosseini about Mr. Hosseini touching Mr. Bavis on
6  the arm?
7    A. Yes. I believe he called me and said that
8  he had touched his arm, rubbed his arm.
9    Q. Did he tell you that this happened at work?
10    A. I believe he did tell me it happened at
11  work.
12    Q. Did he say what day it was?
13    A. No, not that I can remember, no, and I am
14  not a hundred percent sure if he was telling me it
15  was recently it happened or if it was something that
16  he remembered that he had forgotten to tell me.
17    Q. And did you take any notes about these
18  telephone conversations you had with Mr. Bavis?
19    A. Other than to take Mr. Dodd's phone number
20  down, so no, I did not.
21    Q. You said one of the calls that Bavis had
22  made before you went out on disability was to report
23  a comment made by Mr. Hosseini?
24    A. Yes.

32

1    Q. What was that?
2    A. I can't remember if he said that -- it was
3  people were talking about him bringing a suit
4  against the company. Oh, and then they also did say
5  to me he wasn't getting work and he thought it was
6  because of the fact that he had brought this case
7  forward, which I then again explained to him that I
8  couldn't, that was something that was civil, that I
9  really couldn't do anything about that, I couldn't
10  force them to make him work or to let him work, that
11  that was something he would have to take up with his
12  supervisors, that wasn't part of the sexual assault,
13  that really the case hadn't been brought yet because
14  I still hadn't spoken to Mr. Hosseini, so I couldn't
15  say it was a result of the investigation, I couldn't
16  say that Mr. Hosseini was aware of the charges and
17  therefore wasn't letting him work because I hadn't
18  spoken to Mr. Hosseini yet.
19    Q. Back to the comment that Bavis reported to
20  you, what was the comment?
21    A. I can't remember if it was from
22  Mr. Hosseini, Mr. Perry, but it was something about
23  him not working, not being able to work because of
24  this type of thing.

33

1    Q. So Mr. Bavis was saying that
2  Mr. Hosseini made a comment to him about
3  Mr. Bavis not working for GES because of this
4  investigation?
5    A. Either Mr. Hosseini or John Perry had made
6  the comment to him, but he wasn't specific in who
7  had said what to him or how they had said it, just
8  the bottom line of that was that he wasn't getting
9  work and he thought it was based on this, which I
10  explained to him that the investigation really
11  hadn't started yet because of the fact that Mr.
12  Hosseini wasn't aware of the allegations, that that
13  was something he had to take up with either
14  management or his union or the civil side, that I
15  couldn't handle something like that for him.
16    Q. Now, were the number of calls that Bavis
17  made to you before you went out on disability, was
18  that unusual? Did that stick out in your mind
19  because it was an unusual amount of calls?
20    A. Depending upon the case, sometimes a victim
21  will call a lot. I thought based on this case it
22  was kind of unusual.
23    Q. Based on the circumstances and the
24  allegations in this case, it was unusual?

# EXHIBIT 24

1    Volume I                          Pages:    1 - 242

2                                      Exhibits: 1 - 27

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5                  No. 04-CV-11948-RGS

6    SEYED MOHSEN HOSSEINI-SEDEHY,

7           Plaintiff

8    vs.

9    ERIN T. WITHINGTON and the CITY

10   OF BOSTON,

11           Defendants

12

13         DEPOSITION OF ERIN T. WITHINGTON

14            Thursday, March 31, 2005

15            10:00 a.m. - 4:32 p.m.

16              SMITH & DUGGAN LLP

17            55 Old Bedford Road

18       Lincoln, Massachusetts  01773-1125

19

20

21

22         FARMER ARSENAULT BROCK LLC

23      617.790.4404   FAX  617.728.4403

24      Reporter:  Cynthia C. Henderson/RPR

Erin T. Withington - March 31, 2005

38

1  Mr. Bavis call you at work while you were out on
2  disability?
3      A. Maybe twenty.
4      Q. And at any of these times that he called
5  you did he leave any messages concerning the purpose
6  of his call?
7      A. I know he spoke to Sergeant Donovan because
8  Diane had answered so many calls at that point that
9  she said give it to Sergeant Donovan. Sergeant
10 Donovan explained to him that I was out with my
11 ankle, that I would be back soon, and he just wanted
12 me to know that he was still having a problem at
13 work. I don't know that he specified with who.
14     Q. And other than Sergeant Donovan's
15 conversation with Bavis, did Bavis leave any
16 messages other than he had called you these
17 approximately twenty times while you were out on
18 disability leave?
19     A. Not that I remember, no.
20     Q. Now, when you returned on March 7th or 8th,
21 what was the next thing you did with regard to this
22 investigation or the next information you received
23 concerning this investigation?
24     A. I called Mr. Hosseini's cell phone and I

39

1  did speak with him at that time and explained to him
2  that there were allegations made, which he was aware
3  of. He wasn't exactly -- he was aware that there
4  were allegations. I asked him if he wanted to come
5  in and meet with me. He said he would like to make
6  an appointment to meet with me. He came in. I
7  can't remember the exact date; a few days after
8  this, I know; and in the interim I had also been
9  given the name of somebody who might have witnessed
10 the incident on the dock who was a retired New York
11 police officer. I don't remember his name. I did
12 speak with him and he said to me that he had not
13 witnessed it, he just heard the yelling. He never
14 saw what happened, so we didn't talk about the
15 rest of the investigation after that.
16     I asked him if he knew all the
17 parties. He said he knew them. I think he was a
18 driver for GES at that time. At one time he had
19 been a New York police officer who had been hurt and
20 retired. We talked about that, non-case-related
21 things, and he just said he knows all of them, he
22 heard the yelling, but he never saw -- Mr. Bavis had
23 alleged he had seen Mr. Hosseini touch him. He
24 said, "Erin, I never saw what happened. I just

40

1  heard the yelling, so I couldn't be of any use to
2  you."
3      Q. And that retired police officer, that was
4  Jimmy Flynn?
5      A. Yes. Yes. I am sorry. I am horrible with
6  names.
7      Q. Did you speak with Jimmy Flynn before you
8  had set up an interview with Mr. Hosseini?
9      A. I can't remember if it was before or after.
10     Q. Did you speak with Jimmy Flynn before or
11 after you actually met with Mr. Hosseini?
12     A. I can't remember. I want to say before,
13 but I can't remember a hundred percent.
14     Q. How did you get in contact with Jimmy
15 Flynn?
16     A. I think I was given a phone number for him
17 by Mr. Bavis or he was given my phone number. I
18 know it was all by phone, and I know at one point I
19 called him and spoke with him, but I am not sure if
20 he had already called me and left a number for me to
21 get in touch with him.
22     Q. And what information did Mr. Flynn give you
23 about Mr. Bavis?
24     A. He just said he knew him from just being

41

1  around and stuff, that he knew Mr. Bavis. He
2  referred to him as a loudmouth, said he had a big
3  mouth. I said to him, "Had he mentioned that you
4  had witnessed an incident on the dock?" He said,
5  "No, that's not true. I wasn't there.
6  I didn't see it. I heard the yelling. I came
7  afterwards, and they are arguing, and Mr. Bavis
8  left, but I didn't see what happened." He said
9  afterwards the guys were saying that Joe said this
10 happened and Mr. Hosseini said this happened, and he
11 said, "You know, I wasn't there for it." We just
12 got off the subject, really, and he started talking
13 about the New York City police and the Boston police
14 and things like that.
15     Q. At that time did he tell you anything more
16 about Mr. Bavis?
17     A. Not that I remember, no.
18     Q. And at the time Mr. Flynn, did he tell you
19 that he was working out of the New York or New
20 Jersey GES office?
21     A. I think when I spoke to him he was there
22 because I know he had lived in New York at some
23 point, so I think he was in New Jersey.
24     Q. And do you remember if you had asked him

FARMER ARSENAULT BROCK LLC

# EXHIBIT 25

 **everything** exposition

February 25, 2004

Mr. John Perry
Secretary Treasurer
Teamsters Local Union #82
330 Dorchester Street
South Beach, MA  02127

RE: JOSEPH BAVIS

Dear Mr. Perry:

I am writing to inform you that Mr. Bavis was given a thorough return to work physical examination at the Caritas Good Samaritan Occupational Health Services facility on February 12, 2004.  It was determined that Mr. Bavis may return to work without restrictions, modifications and with no increased likelihood of re-injury.

Sincerely,
GES Exposition Services

James E. Hodgins
Business Manager

Enc:
JEH/mp



HOS  165

# EXHIBIT 26

1   Volume I                     Pages:   1 - 242

2                           Exhibits: 1 - 27

3          UNITED STATES DISTRICT COURT

4           DISTRICT OF MASSACHUSETTS

5             No. 04-CV-11948-RGS

6   SEYED MOHSEN HOSSEINI-SEDEHY,

7          Plaintiff

8   vs.

9   ERIN T. WITHINGTON and the CITY

10  OF BOSTON,

11         Defendants

12

13      DEPOSITION OF ERIN T. WITHINGTON

14        Thursday, March 31, 2005

15        10:00 a.m. - 4:32 p.m.

16         SMITH & DUGGAN LLP

17        55 Old Bedford Road

18   Lincoln, Massachusetts 01773-1125

19

20

21

22      FARMER ARSENAULT BROCK LLC

23   617.790.4404   FAX  617.728.4403

24   Reporter:  Cynthia C. Henderson/RPR

198

1  Hosseini, from Mr. Hosseini's lawyer asking if you
2  could produce some police reports on your
3  investigation in which you said that you would draft
4  the reports within a week or so and give them to the
5  D.A.? Do you remember that conversation?
6      A. No. I don't remember that conversation.
7      Q. If I can have you take a look at Exhibit 23
8  actually, do you know what it is? I want to go back
9  to Exhibit 22 if I may and we will go back to 23 in
10  a moment, but the bottom of Exhibit 22 there is a
11  fax transmission?
12      A. Yes.
13      Q. Did you fax this report to somebody on
14  October 7, 2004?
15      A. I assume 4861 is our Sexual Assault, it's
16  the fax at Sexual Assault.
17      Q. My question is did you fax this report to
18  somebody on that day, October 7, 2004?
19      A. I have no idea.
20      MS. AMBARIK: I think she faxed it to
21  me. I think this was upon my request.
22      Q. But it's fair to say that there was no hard
23  copy of Exhibit 22 in your files, your paper files
24  before October 7, 2004; correct?

199

1      A. No. That's not fair to say.
2      Q. It's not?
3      A. No.
4      Q. Do you have a hard copy of Exhibit No. 22
5  in your paper files?
6      A. I would assume I do, yes.
7          (Document entitled "Sexual
8          Assault Unit Case Update" marked
9          Exhibit No. 23 for
10          identification.)
11      Q. Now, you can take a look at Exhibit 23,
12  please. What is this entitled?
13      A. "Sexual Assault Unit Case Update."
14      Q. That's the title. Is there any
15  significance to the title to this document?
16      A. The case update?
17      Q. Yes.
18      A. I am saying that because you have got
19  different titles on 22, 23, 24, and 25. They just
20  go in order.
21      Q. So would 22 have been drafted before 23?
22      A. No. It just means 22 is your followup,
23  usually your victim's statement. Anything that
24  follows that after that is other conversations you

200

1  have had regarding the case.
2      Q. 22 was generated before 23; correct?
3      A. It doesn't necessarily mean that. That's
4  just the order that we put them in. The victim's is
5  always the followup.
6      Q. So you don't know if Exhibit 22 was drafted
7  before or after Exhibits 23 and 24 and 25?
8      A. I would assume Exhibit 22 was drafted
9  before. I don't know for a fact.
10      Q. What's the date?
11      A. Date assigned is March 22, 2004.
12      Q. What about the date in the upper right-hand
13  corner?
14      A. March 22, 2004.
15      Q. I am looking at the wrong exhibit. I am
16  not going to ask you a third time. Now, what is
17  Exhibit 23? I don't think I asked you that.
18      A. That's the interview that I had with Mr.
19  Hosseini.
20      Q. And having read this report, Exhibit 23,
21  did you draft this report?
22      A. Yes.
23      Q. Is your memory refreshed as to the date
24  that you interviewed Mr. Hosseini?

201

1      A. Yes.
2      Q. What date?
3      A. March 4th, 2004.
4      Q. In relationship to when you got back from
5  disability leave, what date was that?
6      A. I am going to assume then it was either
7  March 3rd or 4th, 2004.
8      Q. If you can go to Exhibit 25 very quickly.
9      A. Okay.
10      Q. The first line there, if you can read it to
11  yourself, does that indicate that you were out of
12  work from January 6th through March 3rd, 2004?
13      A. Yes.
14      Q. So is it fair to say that Mr. Hosseini came
15  down to meet with you on the first day you were back
16  from your disability leave?
17      A. Yes.
18      Q. And why did you have Detective Salley sit
19  in on your interview with Mr. Hosseini on that day?
20      A. We always do interviews with suspects with
21  two people.
22      Q. Why is that?
23      A. Just common practice at the Sexual Assault
24  Unit.

# EXHIBIT 27

1   Volume I                              Pages:   1 - 242
2                                         Exhibits: 1 - 27
3              UNITED STATES DISTRICT COURT
4              DISTRICT OF MASSACHUSETTS
5                   No. 04-CV-11948-RGS
6   SEYED MOHSEN HOSSEINI-SEDEHY,
7              Plaintiff
8   vs.
9   ERIN T. WITHINGTON and the CITY
10  OF BOSTON,
11             Defendants
12
13         DEPOSITION OF ERIN T. WITHINGTON
14            Thursday, March 31, 2005
15            10:00 a.m. - 4:32 p.m.
16               SMITH & DUGGAN LLP
17              55 Old Bedford Road
18         Lincoln, Massachusetts  01773-1125
19
20
21
22          FARMER ARSENAULT BROCK LLC
23       617.790.4404    FAX  617.728.4403
24       Reporter:  Cynthia C. Henderson/RPR

40 (Pages 154 to 157)

Erin T. Withington - March 31, 2005

154

1 but he in some form would touch him every time he
2 walked by him.
3    Q. Now, at any time from December 22nd, 2003
4 to March 22nd, 2004 you never contacted GES to
5 determine if Mr. Bavis was an employee of GES;
6 correct?
7    A. Yes, I did.
8    Q. When did you do that?
9    A. Before January 7th, before I was injured I
10 spoke with a woman at GES and was told that she
11 would not give me any information.
12    Q. Well, earlier you testified you called GES
13 just to get the name and telephone number of Mr.
14 Hosseini.
15    A. Yes.
16    Q. You didn't testify that you had called to
17 get information on Bavis; right?
18    A. Oh, I asked her about Mr. Hosseini, asked
19 her about I needed some information. Her answer was
20 she would give me no information, so I didn't get
21 any information on anyone. I didn't specifically
22 say, "I need information on Joe Bavis," no.
23    Q. But you had testified the purpose of your
24 call was to get the name and phone number of Mr.

155

1 Hosseini with GES; right?
2    A. Yes.
3    Q. And it was not to get any information on
4 Bavis?
5       MS. AMBARIK: Objection.
6    A. It wasn't an option.
7    Q. That's fine. You did not call GES on that
8 date to get information about Bavis; you were
9 calling to get information on Hosseini. Correct?
10    A. Yes.
11    Q. And at no other time did you contact GES
12 for any reason; correct?
13    A. After that, no.
14    Q. Why not?
15    A. They weren't very accommodating to even
16 give me anything about Mr. Hosseini. I was told I
17 would get no information at all. Why bother again?
18    Q. Well, because you were investigating a
19 sexual assault; correct?
20    A. Yes.
21    Q. And you didn't tell them that, did you?
22    A. That's confidential.
23    Q. Well, what's confidential in your mind?
24    A. The allegation of sexual assault and the

156

1 victim's name is confidential.
2    Q. But the fact that you are doing an
3 investigation into someone's employees is not
4 confidential, is it not?
5    A. No.
6    Q. And if you wanted information from GES, you
7 could have called and let them know that you are
8 conducting a serious investigation of any kind?
9    A. I think the fact that I called to ask them
10 about someone that worked there and was told that I
11 would get no information pretty much spoke to their
12 state of mind and how useful they were going to be
13 to me.
14    Q. On March 22, 2004 after you got the call
15 from Bavis, did you go down to the Hynes and talk
16 with some witnesses there?
17    A. No.
18    Q. Why not?
19    A. Because I made the determination to seek an
20 arrest warrant on Mr. Hosseini.
21    Q. Why?
22    A. Because of the fact that I had a victim
23 that was stating that he was still being sexually
24 assaulted on an almost daily basis by Mr. Hosseini.

157

1    Q. But you didn't try to corroborate
2 Mr. Bavis's allegations in any way, shape or form,
3 did you?
4    A. No.
5    Q. And is that consistent with the training
6 you received from the Boston Police Department or
7 from the City of Boston?
8       MS. AMBARIK: Objection. You can
9 answer.
10    A. Mr. Bavis was my probable cause so, yes,
11 probable cause, I can take an arrest warrant.
12    Q. And are you trained not to investigate or
13 try to corroborate a complaining witness's
14 allegation of sexual assault after they make it to
15 you?
16       MS. AMABARIK: Objection. You can
17 answer the question.
18    Q. Are you trained not to seek corroborating
19 evidence?
20    A. No.
21    Q. In fact, are you trained to seek
22 corroborating evidence when someone makes an
23 allegation of sexual assault?
24    A. We are encouraged to, yes.

FARMER ARSENAULT BROCK LLC

# EXHIBIT 28

1    Volume I                        Pages:    1 - 242

2                                   Exhibits: 1 - 27

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5                  No. 04-CV-11948-RGS

6    SEYED MOHSEN HOSSEINI-SEDEHY,

7              Plaintiff

8    vs.

9    ERIN T. WITHINGTON and the CITY

10   OF BOSTON,

11             Defendants

12

13        DEPOSITION OF ERIN T. WITHINGTON

14           Thursday, March 31, 2005

15            10:00 a.m. - 4:32 p.m.

16             SMITH & DUGGAN LLP

17             55 Old Bedford Road

18       Lincoln, Massachusetts  01773-1125

19

20

21

22        FARMER ARSENAULT BROCK LLC

23       617.790.4404   FAX  617.728.4403

24       Reporter:  Cynthia C. Henderson/RPR

11 (Pages 38 to 41)

Erin T. Withington - March 31, 2005

38

1  Mr. Bavis call you at work while you were out on
2  disability?
3     A. Maybe twenty.
4     Q. And at any of these times that he called
5  you did he leave any messages concerning the purpose
6  of his call?
7     A. I know he spoke to Sergeant Donovan because
8  Diane had answered so many calls at that point that
9  she said give it to Sergeant Donovan. Sergeant
10 Donovan explained to him that I was out with my
11 ankle, that I would be back soon, and he just wanted
12 me to know that he was still having a problem at
13 work. I don't know that he specified with who.
14    Q. And other than Sergeant Donovan's
15 conversation with Bavis, did Bavis leave any
16 messages other than he had called you these
17 approximately twenty times while you were out on
18 disability leave?
19    A. Not that I remember, no.
20    Q. Now, when you returned on March 7th or 8th,
21 what was the next thing you did with regard to this
22 investigation or the next information you received
23 concerning this investigation?
24    A. I called Mr. Hosseini's cell phone and I

39

1  did speak with him at that time and explained to him
2  that there were allegations made, which he was aware
3  of. He wasn't exactly -- he was aware that there
4  were allegations. I asked him if he wanted to come
5  in and meet with me. He said he would like to make
6  an appointment to meet with me. He came in. I
7  can't remember the exact date; a few days after
8  this, I know; and in the interim I had also been
9  given the name of somebody who might have witnessed
10 the incident on the dock who was a retired New York
11 police officer. I don't remember his name. I did
12 speak with him and he said to me that he had not
13 witnessed it, he just heard the yelling. He never
14 saw what had happened, so we didn't talk about the
15 rest of the investigation after that.
16        I asked him if he knew all the
17 parties. He said he knew them. I think he was a
18 driver for GES at that time. At one time he had
19 been a New York police officer who had been hurt and
20 retired. We talked about that, non-case-related
21 things, and he just said he knows all of them, he
22 heard the yelling, but he never saw -- Mr. Bavis had
23 alleged he had seen Mr. Hosseini touch him. He
24 said, "Erin, I never saw what happened. I just

40

1  heard the yelling, so I couldn't be of any use to
2  you."
3     Q. And that retired police officer, that was
4  Jimmy Flynn?
5     A. Yes. Yes. I am sorry. I am horrible with
6  names.
7     Q. Did you speak with Jimmy Flynn before you
8  had set up an interview with Mr. Hosseini?
9     A. I can't remember if it was before or after.
10    Q. Did you speak with Jimmy Flynn before or
11 after you actually met with Mr. Hosseini?
12    A. I can't remember. I want to say before,
13 but I can't remember a hundred percent.
14    Q. How did you get in contact with Jimmy
15 Flynn?
16    A. I think I was given a phone number for him
17 by Mr. Bavis or he was given my phone number. I
18 know it was all by phone, and I know at one point I
19 called him and spoke with him, but I am not sure if
20 he had already called me and left a number for me to
21 get in touch with him.
22    Q. And what information did Mr. Flynn give you
23 about Mr. Bavis?
24    A. He just said he knew him from just being

41

1  around and stuff, that he knew Mr. Bavis. He
2  referred to him as a loudmouth, said he had a big
3  mouth. I said to him, "Had he mentioned that you
4  had witnessed an incident on the dock?" He said,
5  "No, that's not true. I wasn't there.
6  I didn't see it. I heard the yelling. I came
7  afterwards, and they are arguing, and Mr. Bavis
8  left, but I didn't see what happened." He said
9  afterwards the guys were saying that Joe said this
10 happened and Mr. Hosseini said this happened, and he
11 said, "You know, I wasn't there for it." We just
12 got off the subject, really, and he started talking
13 about the New York City police and the Boston police
14 and things like that.
15    Q. At that time did he tell you anything more
16 about Mr. Bavis?
17    A. Not that I remember, no.
18    Q. And at the time Mr. Flynn, did he tell you
19 that he was working out of the New York or New
20 Jersey GES office?
21    A. I think when I spoke to him he was there
22 because I know he had lived in New York at some
23 point, so I think he was in New Jersey.
24    Q. And do you remember if you had asked him

# EXHIBIT 29

1  Volume I                          Pages:    1 - 242

2                                    Exhibits: 1 - 27

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5                  No. 04-CV-11948-RGS

6  SEYED MOHSEN HOSSEINI-SEDEHY,

7              Plaintiff

8  vs.

9  ERIN T. WITHINGTON and the CITY

10 OF BOSTON,

11             Defendants

12

13       DEPOSITION OF ERIN T. WITHINGTON

14          Thursday, March 31, 2005

15           10:00 a.m. - 4:32 p.m.

16            SMITH & DUGGAN LLP

17            55 Old Bedford Road

18      Lincoln, Massachusetts  01773-1125

19

20

21

22        FARMER ARSENAULT BROCK LLC

23    617.790.4404   FAX  617.728.4403

24    Reporter:  Cynthia C. Henderson/RPR

38 (Pages 146 to 149)

Erin T. Withington - March 31, 2005

146

1   A. We don't often get it, yes.

2   Q. As a matter of fact, you have never gotten

3 it?

4   A. I don't think so. I wouldn't say a hundred

5 percent.

6   Q. But you have never heard of it?

7   A. I have never had it personally.

8   Q. Detective Lembo has never heard of it;

9 right?

10      MS. AMBARIK: Objection.

11   Q. As far as he was speaking to you.

12   A. He never mentioned it to me that he had a

13 case like that, so I don't know.

14   Q. And Detective Barry certainly hasn't

15 mentioned that she had a similar case; correct?

16   A. She didn't mention it to me.

17   Q. You had mentioned you had about two hundred

18 other child abuse investigations.

19   A. Yes.

20   Q. Where did this investigation rank on your

21 order of priorities?

22   A. Like I said, I didn't think Mr. Bavis was

23 in any imminent danger. It was Christmas, I was

24 going on time off for Christmas, I didn't think

147

1 either one of them was in any bodily danger so, no,

2 it wasn't very high at that point.

3   Q. In fact, what you wanted to do was after

4 speaking with Mr. Hosseini give it to the D.A. to

5 make a decision on; correct?

6   A. Yes.

7   Q. You didn't think making an arrest was an

8 appropriate decision before March 22nd, 2004;

9 correct?

10      MS. AMBARIK: Objection.

11   A. Correct.

12   Q. You didn't think that making an arrest on

13 Mr. Hosseini was what you wanted to do in the course

14 of your investigation before March 22nd, 2004?

15   A. Correct. I didn't think it was necessary.

16   Q. Now, after you talked with Bavis and Perry,

17 Joe Perry, on the 22nd of December, the next thing

18 you wanted to do was call the Hynes' lawyer;

19 correct.

20   A. Right after they left?

21   Q. Whenever. The next step in your

22 investigation, whenever you got to it, was to call

23 the Hynes, let them know "I have got this case"?

24   A. No.

148

1   Q. What was the next thing you wanted to do?

2   A. Speak with Mr. Hosseini.

3   Q. Why did you call the Hynes then?

4   A. Because it took place in the Hynes

5 Auditorium, as a matter of courtesy to let them know

6 that the Boston police are in there and are

7 investigating a case within their building.

8   Q. And when did you make that call?

9   A. Maybe a couple of days, either maybe the

10 next day or after Christmas, but it wasn't the same

11 day.

12   Q. And you wanted to talk with that lawyer

13 from Hynes because you wanted to ask if Hynes needed

14 to be present for any interviews?

15   A. Correct.

16   Q. Right?

17   A. Yes.

18   Q. And you contacted the Hynes before you

19 contacted Mr. Hosseini; right?

20   A. No. I believe I left a message on the cell

21 phone number I was given for Mr. Hosseini first.

22   Q. Your intent was to contact the Hynes and

23 see if they wanted to be involved in the interview?

24   A. Just to let them know that there was an

149

1 investigation, that an incident took place within

2 their building.

3   Q. And the Hynes lawyer gave you GES's number

4 because he said this was not a Hynes matter, it was

5 a GES matter; correct?

6   A. He basically said that they appreciated the

7 information but they didn't need to be present,

8 which was fine.

9   Q. Now, after you had come back from

10 disability leave you got to speak with

11 Mr. Hosseini. Was it the same day that you got

12 back?

13   A. I believe it was, yes.

14   Q. The very same day you got back from

15 disability leave you contacted Mr. Hosseini, did you

16 not?

17   A. Yes.

18   Q. And he agreed to come down that very day to

19 speak with you about these allegations?

20   A. Was it that day?

21   Q. I am asking you if your memory at this time

22 was that it was that day.

23   A. That exact date or the next day,

24 . but -- I don't remember, but it was very shortly.

Erin T. Withington - March 31, 2005

150

1   Q. After you talked with Mr. Hosseini, as far
2   as you were concerned your investigation was done
3   and you were going to refer it to the D.A.; correct?
4   A. I was going to refer to the D.A. and let --
5   if they needed further investigation, they would let
6   me know, yes.
7   Q. But as far as you were concerned, your
8   investigation was concluded but you would be willing
9   to help out?
10  A. Yes.
11  Q. You had done as much as you wanted to do at
12  that time?
13  A. No. I just wanted to get both sides out
14  there. Whether or not I was completely done, no. I
15  wanted to know this is an allegation and this is the
16  answer.
17  Q. What did you want to do with regard to this
18  investigation after you spoke with
19  Mr. Hosseini?
20  A. Neither party gave me anybody else to speak
21  to. Nobody said, "You need to talk to them" or "He
22  has got this problem" or "I have this problem with
23  him," so no one really gave me anything to go on
24  after that, so I guess I was done.

151

1   Q. That's what I was getting at. After you
2   spoke with Mr. Hosseini, as far as you were
3   concerned this investigation was done; correct?
4   A. Yes.
5   Q. And this was not one of your more serious
6   cases; right?
7   A. No.
8   Q. You have talked to Bavis at that point and
9   you have talked to Hosseini, you are just going to
10  let the D.A. deal with it; right?
11  A. Yes.
12  Q. But Bavis and Perry kept calling your
13  office; right?
14  A. Yes.
15  Q. And it was becoming an annoyance; right?
16  A. Yes.
17  Q. And after that final telephone call on
18  March 22nd, 2004, quite frankly, you were sick of
19  hearing from Mr. Bavis; right?
20  MS. AMBARIK: Objection. You can answer
21  the question.
22  A. No. Just he had asked me why nothing was
23  done and I had to think of it in terms of if he had
24  been a female I would have done the same thing, so I

152

1   couldn't think of it, well, he is a guy, he can
2   handle it himself. I have a victim that's still
3   complaining and incidents are happening and I am not
4   doing anything about it.
5   Q. But you had no corroboration of Bavis's
6   allegations against Mr. Hosseini on March 22, 2004?
7   MS. AMBARIK: Objection. You can
8   answer.
9   A. No.
10  Q. And if Bavis had not been calling as often
11  as he was calling, you would not have made or you
12  would not have sought an arrest warrant; correct?
13  A. Yes.
14  Q. So the reason why you sought an arrest
15  warrant is because of the number of calls that Bavis
16  was making to you; right?
17  MS. AMBARIK: Objection.
18  A. No.
19  Q. What was the reason why you sought the
20  arrest warrant on March 22, 2004?
21  A. Because Mr. Bavis had stated that these
22  incidents were still occurring and that nothing was
23  being done and that he was still being touched on a
24  daily basis or somewhat of a daily basis, almost

153

1   daily basis, and like I said, if Mr. Bavis had been
2   a female I would have done the same thing, so I
3   couldn't say, well, he is a guy and he can handle
4   it. It was based on the fact that he was saying,
5   "This is still happening to me as a victim."
6   Q. And you had not done any investigation
7   after you spoke with Mr. Hosseini; correct?
8   A. Yes.
9   Q. You were only receiving these telephone
10  calls from Bavis and Perry; correct?
11  A. Yes.
12  Q. What did Bavis tell you that
13  Mr. Hosseini was doing to him from the time you
14  spoke with Mr. Hosseini until March 22 that caused
15  you to decide to apply for an arrest warrant?
16  A. He was rubbing his arm, he had walked by
17  him on a couple of occasions, and Mr. Bavis alleges
18  that he was bending over and Mr. Hosseini brushed
19  his groin against his buttocks.
20  Q. How many times?
21  A. I don't know exactly. I want to say maybe
22  that was two of the allegations, that he was still
23  touching him whenever he walked by him. Not every
24  time constituted an indecent assault and battery,

# EXHIBIT 30

1  Volume I                        Pages:    1 - 242

2                                  Exhibits: 1 - 27

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5                 No. 04-CV-11948-RGS

6  SEYED MOHSEN HOSSEINI-SEDEHY,

7           Plaintiff

8  vs.

9  ERIN T. WITHINGTON and the CITY

10 OF BOSTON,

11          Defendants

12

13       DEPOSITION OF ERIN T. WITHINGTON

14          Thursday, March 31, 2005

15          10:00 a.m. - 4:32 p.m.

16            SMITH & DUGGAN LLP

17           55 Old Bedford Road

18      Lincoln, Massachusetts  01773-1125

19

20

21

22       FARMER ARSENAULT BROCK LLC

23    617.790.4404   FAX  617.728.4403

24    Reporter:  Cynthia C. Henderson/RPR

13 (Pages 46 to 49)

Erin T. Withington - March 31, 2005

46

1  this investigation?
2      A. The phone calls from Mr. Bavis continued
3  daily, stating that Mr. Hosseini was still bothering
4  him, was still touching him. This went on for about
5  a week, and at some point it was once a day, at some
6  point it was two to three times a day, to the point
7  where other people in the office were getting -- I
8  don't want to -- they were getting so many messages
9  that it was finally asked, "Erin, what are you going
10  to do with this case?"
11      (Recess.)
12      Q. We left off just a moment ago on Mr. Bavis
13  calling daily to the Sexual Assault Unit.
14      A. Yes.
15      Q. And who was taking these calls from Mr.
16  Bavis on a daily basis? Do you remember?
17      A. Diane, the secretary. The liaison. Excuse
18  me. Sergeant Donovan took a couple. I took a
19  couple. Mostly Diane.
20      Q. Okay. And you indicated that Bavis was
21  calling once or maybe twice a day?
22      A. Yes.
23      Q. And for how long did this go on?
24      A. Probably about five days. I think there

47

1  was a weekend in the middle, so I think it was a few
2  days and then the weekend and then a couple of days
3  in the beginning of the week.
4      Q. So about five workdays?
5      A. Yes.
6      Q. And when you spoke with Mr. Bavis when you
7  took these calls, say the first time he called after
8  you spoke with Mr. Hosseini and after you put the
9  report in to the D.A?
10      A. I believe he said that, something about his
11  assignment and there was still a problem, that Mr.
12  Hosseini had walked by him and touched his arm. He
13  did tell me the arm thing again, and I said, "Well,
14  Joe, touching your arm is not a sexual assault." I
15  said, "I did speak to Mr. Hosseini, and I told him
16  that to really avoid contact with you, and that you
17  should avoid contact with him. It's in the court,
18  the D.A.'s office. I am just waiting for them to
19  either call you in or set up something." I said,
20  "So, you know, give it a few more days and let me
21  know what happens."
22      Q. And what did he say on that first call, if
23  anything else?
24      A. I believe that was it. I can't remember

48

1  verbatim. Mostly it was just I would come in and
2  there would be messages that Diane would give me
3  that he called.
4      Q. And when he called you that first time
5  after you had submitted the report to the D.A. did
6  Bavis tell you that this occurred at work, this
7  touching of his arm?
8      A. I don't kow that he said it. I know that I
9  actually assumed it occurred at work, so I'm sure
10  that he must have said -- well, I can't even say I
11  am sure. I thought he must have said that it
12  occurred there, but I know I assumed that he was
13  talking about work.
14      Q. Do you remember the substance of any other
15  calls you had with Mr. Bavis during those five
16  workdays?
17      A. To be honest, I didn't always return the
18  phone calls, so I didn't speak to him every day.
19      Q. And why was it that you didn't return the
20  phone calls?
21      A. Because I also have two hundred other
22  cases, and I work in the Child Abuse Unit, so I had
23  two hundred kids that I had to set up things and
24  deal with them, so I kind of had done all I could do

49

1  at that point with the investigation for Mr. Bavis,
2  and I didn't consider him to be in imminent danger,
3  so I kind of had to take care of other things
4  because he had consumed a lot of time at that point.
5      Q. Okay. Now, after these five days, five
6  workdays had passed and these calls were coming in
7  on a daily basis, one to two a day, what happened?
8  What was the next thing that happened with respect
9  to this investigation?
10      A. I know -- I am pretty sure within a couple
11  of those days I was out of the office two days for
12  training, so I think I came back and there was a
13  bunch of messages and stuff, and I know on the day
14  that I went and got the warrant Mr. Bavis had called
15  that morning, and I said -- I know that day he said,
16  "I am at work now. Mr. Hosseini came up to me,
17  rubbed my arms, blew me a kiss" or rubbed up against
18  him. There was some -- it didn't reach the point of
19  a sexual assault as far as something I would
20  normally investigate, but it was an assault and
21  battery, that this is still going on, this hasn't
22  stopped, so I got off the phone with him and I typed
23  up a warrant for indecent assault and battery, and I
24  went to B.M.C. to obtain the warrant.

# EXHIBIT 31

1    Volume I                        Pages:    1 - 242

2                                     Exhibits: 1 - 27

3               UNITED STATES DISTRICT COURT

4               DISTRICT OF MASSACHUSETTS

5                  No. 04-CV-11948-RGS

6    SEYED MOHSEN HOSSEINI-SEDEHY,

7              Plaintiff

8    vs.

9    ERIN T. WITHINGTON and the CITY

10   OF BOSTON,

11             Defendants

12

13         DEPOSITION OF ERIN T. WITHINGTON

14            Thursday, March 31, 2005

15             10:00 a.m. - 4:32 p.m.

16               SMITH & DUGGAN LLP

17              55 Old Bedford Road

18       Lincoln, Massachusetts  01773-1125

19

20

21

22         FARMER ARSENAULT BROCK LLC

23      617.790.4404    FAX  617.728.4403

24      Reporter:  Cynthia C. Henderson/RPR

Erin T. Withington - March 31, 2005

46

1  this investigation?
2     A. The phone calls from Mr. Bavis continued
3  daily, stating that Mr. Hosseini was still bothering
4  him, was still touching him. This went on for about
5  a week, and at some point it was once a day, at some
6  point it was two to three times a day, to the point
7  where other people in the office were getting -- I
8  don't want to -- they were getting so many messages
9  that it was finally asked, "Erin, what are you going
10 to do with this case?"
11    (Recess.)
12    Q. We left off just a moment ago on Mr. Bavis
13 calling daily to the Sexual Assault Unit.
14    A. Yes.
15    Q. And who was taking these calls from Mr.
16 Bavis on a daily basis? Do you remember?
17    A. Diane, the secretary. The liaison. Excuse
18 me. Sergeant Donovan took a couple. I took a
19 couple. Mostly Diane.
20    Q. Okay. And you indicated that Bavis was
21 calling once or maybe twice a day?
22    A. Yes.
23    Q. And for how long did this go on?
24    A. Probably about five days. I think there

47

1  was a weekend in the middle, so I think it was a few
2  days and then the weekend and then a couple of days
3  in the beginning of the week.
4     Q. So about five workdays?
5     A. Yes.
6     Q. And when you spoke with Mr. Bavis when you
7  took these calls, say the first time he called after
8  you spoke with Mr. Hosseini and after you put the
9  report in to the D.A?
10    A. I believe he said that, something about his
11 assignment and there was still a problem, that Mr.
12 Hosseini had walked by him and touched his arm. He
13 did tell me the arm thing again, and I said, "Well,
14 Joe, touching your arm is not a sexual assault." I
15 said, "I did speak to Mr. Hosseini, and I told him
16 that to really avoid contact with you, and that you
17 should avoid contact with him. It's in the court,
18 the D.A.'s office. I am just waiting for them to
19 either call you in or set up something." I said,
20 "So, you know, give it a few more days and let me
21 know what happens."
22    Q. And what did he say on that first call, if
23 anything else?
24    A. I believe that was it. I can't remember

48

1  verbatim. Mostly it was just I would come in and
2  there would be messages that Diane would give me
3  that he called.
4     Q. And when he called you that first time
5  after you had submitted the report to the D.A. did
6  Bavis tell you that this occurred at work, this
7  touching of his arm?
8     A. I don't kow that he said it. I know that I
9  actually assumed it occurred at work, so I'm sure
10 that he must have said -- well, I can't even say I
11 am sure. I thought he must have said that it
12 occurred there, but I know I assumed that he was
13 talking about work.
14    Q. Do you remember the substance of any other
15 calls you had with Mr. Bavis during those five
16 workdays?
17    A. To be honest, I didn't always return the
18 phone calls, so I didn't speak to him every day.
19    Q. And why was it that you didn't return the
20 phone calls?
21    A. Because I also have two hundred other
22 cases, and I work in the Child Abuse Unit, so I had
23 two hundred kids that I had to set up things and
24 deal with them, so I kind of had done all I could do

49

1  at that point with the investigation for Mr. Bavis,
2  and I didn't consider him to be in imminent danger,
3  so I kind of had to take care of other things
4  because he had consumed a lot of time at that point.
5     Q. Okay. Now, after these five days, five
6  workdays had passed and these calls were coming in
7  on a daily basis, one to two a day, what happened?
8  What was the next thing that happened with respect
9  to this investigation?
10    A. I know -- I am pretty sure within a couple
11 of those days I was out of the office two days for
12 training, so I think I came back and there was a
13 bunch of messages and stuff, and I know on the day
14 that I went and got the warrant Mr. Bavis had called
15 that morning, and I said -- I know that day he said,
16 "I am at work now. Mr. Hosseini came up to me,
17 rubbed my arms, blew me a kiss" or rubbed up against
18 him. There was some -- it didn't reach the point of
19 a sexual assault as far as something I would
20 normally investigate, but it was an assault and
21 battery, that this is still going on, this hasn't
22 stopped, so I got off the phone with him and I typed
23 up a warrant for indecent assault and battery, and I
24 went to B.M.C. to obtain the warrant.

# EXHIBIT 32

Volume I                                    Pages:    1 - 242

                                            Exhibits: 1 - 27

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 04-CV-11948-RGS

SEYED MOHSEN HOSSEINI-SEDEHY,

        Plaintiff

vs.

ERIN T. WITHINGTON and the CITY

OF BOSTON,

            Defendants


DEPOSITION OF ERIN T. WITHINGTON

Thursday, March 31, 2005

10:00 a.m. - 4:32 p.m.

SMITH & DUGGAN LLP

55 Old Bedford Road

Lincoln, Massachusetts  01773-1125




FARMER ARSENAULT BROCK LLC

617.790.4404    FAX   617.728.4403

Reporter:  Cynthia C. Henderson/RPR

Erin T. Withington - March 31, 2005

46

1    this investigation?
2        A. The phone calls from Mr. Bavis continued
3    daily, stating that Mr. Hosseini was still bothering
4    him, was still touching him. This went on for about
5    a week, and at some point it was once a day, at some
6    point it was two to three times a day, to the point
7    where other people in the office were getting -- I
8    don't want to -- they were getting so many messages
9    that it was finally asked, "Erin, what are you going
10   to do with this case?"
11       (Recess.)
12       Q. We left off just a moment ago on Mr. Bavis
13   calling daily to the Sexual Assault Unit.
14       A. Yes.
15       Q. And who was taking these calls from Mr.
16   Bavis on a daily basis? Do you remember?
17       A. Diane, the secretary. The liaison. Excuse
18   me. Sergeant Donovan took a couple. I took a
19   couple. Mostly Diane.
20       Q. Okay. And you indicated that Bavis was
21   calling once or maybe twice a day?
22       A. Yes.
23       Q. And for how long did this go on?
24       A. Probably about five days. I think there

47

1    was a weekend in the middle, so I think it was a few
2    days and then the weekend and then a couple of days
3    in the beginning of the week.
4        Q. So about five workdays?
5        A. Yes.
6        Q. And when you spoke with Mr. Bavis when you
7    took these calls, say the first time he called after
8    you spoke with Mr. Hosseini and after you put the
9    report in to the D.A?
10       A. I believe he said that, something about his
11   assignment and there was still a problem, that Mr.
12   Hosseini had walked by him and touched his arm. He
13   did tell me the arm thing again, and I said, "Well,
14   Joe, touching your arm is not a sexual assault." I
15   said, "I did speak to Mr. Hosseini, and I told him
16   that to really avoid contact with you, and that you
17   should avoid contact with him. It's in the court,
18   the D.A.'s office. I am just waiting for them to
19   either call you in or set up something." I said,
20   "So, you know, give it a few more days and let me
21   know what happens."
22       Q. And what did he say on that first call, if
23   anything else?
24       A. I believe that was it. I can't remember

48

1    verbatim. Mostly it was just I would come in and
2    there would be messages that Diane would give me
3    that he called.
4        Q. And when he called you that first time
5    after you had submitted the report to the D.A. did
6    Bavis tell you that this occurred at work, this
7    touching of his arm?
8        A. I don't kow that he said it. I know that I
9    actually assumed it occurred at work, so I'm sure
10   that he must have said -- well, I can't even say I
11   am sure. I thought he must have said that it
12   occurred there, but I know I assumed that he was
13   talking about work.
14       Q. Do you remember the substance of any other
15   calls you had with Mr. Bavis during those five
16   workdays?
17       A. To be honest, I didn't always return the
18   phone calls, so I didn't speak to him every day.
19       Q. And why was it that you didn't return the
20   phone calls?
21       A. Because I also have two hundred other
22   cases, and I work in the Child Abuse Unit, so I had
23   two hundred kids that I had to set up things and
24   deal with them, so I kind of had done all I could do

49

1    at that point with the investigation for Mr. Bavis,
2    and I didn't consider him to be in imminent danger,
3    so I kind of had to take care of other things
4    because he had consumed a lot of time at that point.
5        Q. Okay. Now, after these five days, five
6    workdays had passed and these calls were coming in
7    on a daily basis, one to two a day, what happened?
8    What was the next thing that happened with respect
9    to this investigation?
10       A. I know -- I am pretty sure within a couple
11   of those days I was out of the office two days for
12   training, so I think I came back and there was a
13   bunch of messages and stuff, and I know on the day
14   that I went and got the warrant Mr. Bavis had called
15   that morning, and I said -- I know that day he said,
16   "I am at work now. Mr. Hosseini came up to me,
17   rubbed my arms, blew me a kiss" or rubbed up against
18   him. There was some -- it didn't reach the point of
19   a sexual assault as far as something I would
20   normally investigate, but it was an assault and
21   battery, that this is still going on, this hasn't
22   stopped, so I got off the phone with him and I typed
23   up a warrant for indecent assault and battery, and I
24   went to B.M.C. to obtain the warrant.

# EXHIBIT 33

1    Volume I                        Pages:    1 - 242

2                                    Exhibits: 1 - 27

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5                   No. 04-CV-11948-RGS

6    SEYED MOHSEN HOSSEINI-SEDEHY,

7            Plaintiff

8    vs.

9    ERIN T. WITHINGTON and the CITY

10   OF BOSTON,

11            Defendants

12

13         DEPOSITION OF ERIN T. WITHINGTON

14            Thursday, March 31, 2005

15            10:00 a.m. - 4:32 p.m.

16              SMITH & DUGGAN LLP

17            55 Old Bedford Road

18       Lincoln, Massachusetts  01773-1125

19

20

21

22         FARMER ARSENAULT BROCK LLC

23     617.790.4404   FAX  617.728.4403

24     Reporter:  Cynthia C. Henderson/RPR

39 (Pages 150 to 153)
Erin T. Withington - March 31, 2005

---

150

1    Q. After you talked with Mr. Hosseini, as far
2 as you were concerned your investigation was done
3 and you were going to refer it to the D.A.; correct?
4    A. I was going to refer to the D.A. and let --
5 if they needed further investigation, they would let
6 me know, yes.
7    Q. But as far as you were concerned, your
8 investigation was concluded but you would be willing
9 to help out?
10    A. Yes.
11    Q. You had done as much as you wanted to do at
12 that time?
13    A. No. I just wanted to get both sides out
14 there. Whether or not I was completely done, no. I
15 wanted to know this is an allegation and this is the
16 answer.
17    Q. What did you want to do with regard to this
18 investigation after you spoke with
19 Mr. Hosseini?
20    A. Neither party gave me anybody else to speak
21 to. Nobody said, "You need to talk to them" or "He
22 has got this problem" or "I have this problem with
23 him," so no one really gave me anything to go on
24 after that, so I guess I was done.

---

151

1    Q. That's what I was getting at. After you
2 spoke with Mr. Hosseini, as far as you were
3 concerned this investigation was done; correct?
4    A. Yes.
5    Q. And this was not one of your more serious
6 cases; right?
7    A. No.
8    Q. You have talked to Bavis at that point and
9 you have talked to Hosseini, you are just going to
10 let the D.A. deal with it; right?
11    A. Yes.
12    Q. But Bavis and Perry kept calling your
13 office; right?
14    A. Yes.
15    Q. And it was becoming an annoyance; right?
16    A. Yes.
17    Q. And after that final telephone call on
18 March 22nd, 2004, quite frankly, you were sick of
19 hearing from Mr. Bavis; right?
20       MS. AMBARIK: Objection. You can answer
21 the question.
22    A. No. Just he had asked me why nothing was
23 done and I had to think of it in terms of if he had
24 been a female I would have done the same thing, so I

---

.152

1 couldn't think of it, well, he is a guy, he can
2 handle it himself. I have a victim that's still
3 complaining and incidents are happening and I am not
4 doing anything about it.
5    Q. But you had no corroboration of Bavis's
6 allegations against Mr. Hosseini on March 22, 2004?
7       MS. AMBARIK: Objection. You can
8 answer.
9    A. No.
10    Q. And if Bavis had not been calling as often
11 as he was calling, you would not have made or you
12 would not have sought an arrest warrant; correct?
13    A. Yes.
14    Q. So the reason why you sought an arrest
15 warrant is because of the number of calls that Bavis
16 was making to you; right?
17       MS. AMBARIK: Objection.
18    A. No.
19    Q. What was the reason why you sought the
20 arrest warrant on March 22, 2004?
21    A. Because Mr. Bavis had stated that these
22 incidents were still occurring and that nothing was
23 being done and that he was still being touched on a
24 daily basis or somewhat of a daily basis, almost

---

153

1 daily basis, and like I said, if Mr. Bavis had been
2 a female I would have done the same thing, so I
3 couldn't say, well, he is a guy and he can handle
4 it. It was based on the fact that he was saying,
5 "This is still happening to me as a victim."
6    Q. And you had not done any investigation
7 after you spoke with Mr. Hosseini; correct?
8    A. Yes.
9    Q. You were only receiving these telephone
10 calls from Bavis and Perry; correct?
11    A. Yes.
12    Q. What did Bavis tell you that
13 Mr. Hosseini was doing to him from the time you
14 spoke with Mr. Hosseini until March 22 that caused
15 you to decide to apply for an arrest warrant?
16    A. He was rubbing his arm, he had walked by
17 him on a couple of occasions, and Mr. Bavis alleges
18 that he was bending over and Mr. Hosseini brushed
19 his groin against his buttocks.
20    Q. How many times?
21    A. I don't know exactly. I want to say maybe
22 that was two of the allegations, that he was still
23 touching him whenever he walked by him. Not every
24 time constituted an indecent assault and battery,

---

# EXHIBIT 34

1    Volume I                          Pages:    1 - 242

2                                      Exhibits: 1 - 27

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5                  No. 04-CV-11948-RGS

6    SEYED MOHSEN HOSSEINI-SEDEHY,

7              Plaintiff

8    vs.

9    ERIN T. WITHINGTON and the CITY

10   OF BOSTON,

11             Defendants

12

13        DEPOSITION OF ERIN T. WITHINGTON

14           Thursday, March 31, 2005

15            10:00 a.m. - 4:32 p.m.

16             SMITH & DUGGAN LLP

17             55 Old Bedford Road

18        Lincoln, Massachusetts  01773-1125

19

20

21

22        FARMER ARSENAULT BROCK LLC

23        617.790.4404    FAX  617.728.4403

24        Reporter:  Cynthia C. Henderson/RPR

39 (Pages 150 to 153)
Erin T. Withington - March 31, 2005

150

1    Q. After you talked with Mr. Hosseini, as far
2  as you were concerned your investigation was done
3  and you were going to refer it to the D.A.; correct?
4    A. I was going to refer to the D.A. and let --
5  if they needed further investigation, they would let
6  me know, yes.
7    Q. But as far as you were concerned, your
8  investigation was concluded but you would be willing
9  to help out?
10   A. Yes.
11   Q. You had done as much as you wanted to do at
12 that time?
13   A. No. I just wanted to get both sides out
14 there. Whether or not I was completely done, no. I
15 wanted to know this is an allegation and this is the
16 answer.
17   Q. What did you want to do with regard to this
18 investigation after you spoke with
19 Mr. Hosseini?
20   A. Neither party gave me anybody else to speak
21 to. Nobody said, "You need to talk to them" or "He
22 has got this problem" or "I have this problem with
23 him," so no one really gave me anything to go on
24 after that, so I guess I was done.

151

1    Q. That's what I was getting at. After you
2  spoke with Mr. Hosseini, as far as you were
3  concerned this investigation was done; correct?
4    A. Yes.
5    Q. And this was not one of your more serious
6  cases; right?
7    A. No.
8    Q. You have talked to Bavis at that point and
9  you have talked to Hosseini, you are just going to
10 let the D.A. deal with it; right?
11   A. Yes.
12   Q. But Bavis and Perry kept calling your
13 office; right?
14   A. Yes.
15   Q. And it was becoming an annoyance; right?
16   A. Yes.
17   Q. And after that final telephone call on
18 March 22nd, 2004, quite frankly, you were sick of
19 hearing from Mr. Bavis; right?
20     MS. AMBARIK: Objection. You can answer
21 the question.
22   A. No. Just he had asked me why nothing was
23 done and I had to think of it in terms of if he had
24 been a female I would have done the same thing, so I

152

1  couldn't think of it, well, he is a guy, he can
2  handle it himself. I have a victim that's still
3  complaining and incidents are happening and I am not
4  doing anything about it.
5    Q. But you had no corroboration of Bavis's
6  allegations against Mr. Hosseini on March 22, 2004?
7      MS. AMBARIK: Objection. You can
8  answer.
9    A. No.
10   Q. And if Bavis had not been calling as often
11 as he was calling, you would not have made or you
12 would not have sought an arrest warrant; correct?
13   A. Yes.
14   Q. So the reason why you sought an arrest
15 warrant is because of the number of calls that Bavis
16 was making to you; right?
17     MS. AMBARIK: Objection.
18   A. No.
19   Q. What was the reason why you sought the
20 arrest warrant on March 22, 2004?
21   A. Because Mr. Bavis had stated that these
22 incidents were still occurring and that nothing was
23 being done and that he was still being touched on a
24 daily basis or somewhat of a daily basis, almost

153

1  daily basis, and like I said, if Mr. Bavis had been
2  a female I would have done the same thing, so I
3  couldn't say, well, he is a guy and he can handle
4  it. It was based on the fact that he was saying,
5  "This is still happening to me as a victim."
6    Q. And you had not done any investigation
7  after you spoke with Mr. Hosseini; correct?
8    A. Yes.
9    Q. You were only receiving these telephone
10 calls from Bavis and Perry; correct?
11   A. Yes.
12   Q. What did Bavis tell you that
13 Mr. Hosseini was doing to him from the time you
14 spoke with Mr. Hosseini until March 22 that caused
15 you to decide to apply for an arrest warrant?
16   A. He was rubbing his arm, he had walked by
17 him on a couple of occasions, and Mr. Bavis alleges
18 that he was bending over and Mr. Hosseini brushed
19 his groin against his buttocks.
20   Q. How many times?
21   A. I don't know exactly. I want to say maybe
22 that was two of the allegations, that he was still
23 touching him whenever he walked by him. Not every
24 time constituted an indecent assault and battery,

40 (Pages 154 to 157)

Erin T. Withington - March 31, 2005

154

1  but he in some form would touch him every time he
2  walked by him.
3      Q. Now, at any time from December 22nd, 2003
4  to March 22nd, 2004 you never contacted GES to
5  determine if Mr. Bavis was an employee of GES;
6  correct?
7      A. Yes, I did.
8      Q. When did you do that?
9      A. Before January 7th, before I was injured I
10  spoke with a woman at GES and was told that she
11  would not give me any information.
12      Q. Well, earlier you testified you called GES
13  just to get the name and telephone number of Mr.
14  Hosseini.
15      A. Yes.
16      Q. You didn't testify that you had called to
17  get information on Bavis; right?
18      A. Oh, I asked her about Mr. Hosseini, asked
19  her about I needed some information. Her answer was
20  she would give me no information, so I didn't get
21  any information on anyone. I didn't specifically
22  say, "I need information on Joe Bavis," no.
23      Q. But you had testified the purpose of your
24  call was to get the name and phone number of Mr.

155

1  Hosseini with GES; right?
2      A. Yes.
3      Q. And it was not to get any information on
4  Bavis?
5          MS. AMBARIK: Objection.
6      A. It wasn't an option.
7      Q. That's fine. You did not call GES on that
8  date to get information about Bavis; you were
9  calling to get information on Hosseini. Correct?
10      A. Yes.
11      Q. And at no other time did you contact GES
12  for any reason; correct?
13      A. After that, no.
14      Q. Why not?
15      A. They weren't very accommodating to even
16  give me anything about Mr. Hosseini. I was told I
17  would get no information at all. Why bother again?
18      Q. Well, because you were investigating a
19  sexual assault; correct?
20      A. Yes.
21      Q. And you didn't tell them that, did you?
22      A. That's confidential.
23      Q. Well, what's confidential in your mind?
24      A. The allegation of sexual assault and the

156

1  victim's name is confidential.
2      Q. But the fact that you are doing an
3  investigation into someone's employees is not
4  confidential, is it not?
5      A. No.
6      Q. And if you wanted information from GES, you
7  could have called and let them know that you are
8  conducting a serious investigation of any kind?
9      A. I think the fact that I called to ask them
10  about someone that worked there and was told that I
11  would get no information pretty much spoke to their
12  state of mind and how useful they were going to be
13  to me.
14      Q. On March 22, 2004 after you got the call
15  from Bavis, did you go down to the Hynes and talk
16  with some witnesses there?
17      A. No.
18      Q. Why not?
19      A. Because I made the determination to seek an
20  arrest warrant on Mr. Hosseini.
21      Q. Why?
22      A. Because of the fact that I had a victim
23  that was stating that he was still being sexually
24  assaulted on an almost daily basis by Mr. Hosseini.

157

1      Q. But you didn't try to corroborate
2  Mr. Bavis's allegations in any way, shape or form,
3  did you?
4      A. No.
5      Q. And is that consistent with the training
6  you received from the Boston Police Department or
7  from the City of Boston?
8          MS. AMBARIK: Objection. You can
9  answer.
10      A. Mr. Bavis was my probable cause so, yes,
11  probable cause, I can take an arrest warrant.
12      Q. And are you trained not to investigate or
13  try to corroborate a complaining witness's
14  allegation of sexual assault after they make it to
15  you?
16          MS. AMABARIK: Objection. You can
17  answer the question.
18      Q. Are you trained not to seek corroborating
19  evidence?
20      A. No.
21      Q. In fact, are you trained to seek
22  corroborating evidence when someone makes an
23  allegation of sexual assault?
24      A. We are encouraged to, yes.

FARMER ARSENAULT BROCK LLC

# EXHIBIT 35

1    Volume I                        Pages:    1 - 242

2                                    Exhibits: 1 - 27

3                UNITED STATES DISTRICT COURT

4                DISTRICT OF MASSACHUSETTS

5                   No. 04-CV-11948-RGS

6    SEYED MOHSEN HOSSEINI-SEDEHY,

7             Plaintiff

8    vs.

9    ERIN T. WITHINGTON and the CITY

10   OF BOSTON,

11            Defendants

12

13         DEPOSITION OF ERIN T. WITHINGTON

14            Thursday, March 31, 2005

15            10:00 a.m. - 4:32 p.m.

16             SMITH & DUGGAN LLP

17             55 Old Bedford Road

18        Lincoln, Massachusetts  01773-1125

19

20

21

22        FARMER ARSENAULT BROCK LLC

23     617.790.4404    FAX   617.728.4403

24     Reporter:  Cynthia C. Henderson/RPR

Erin T. Withington - March 31, 2005

154

1  but he in some form would touch him every time he
2  walked by him.
3      Q. Now, at any time from December 22nd, 2003
4  to March 22nd, 2004 you never contacted GES to
5  determine if Mr. Bavis was an employee of GES;
6  correct?
7      A. Yes, I did.
8      Q. When did you do that?
9      A. Before January 7th, before I was injured I
10  spoke with a woman at GES and was told that she
11  would not give me any information.
12      Q. Well, earlier you testified you called GES
13  just to get the name and telephone number of Mr.
14  Hosseini.
15      A. Yes.
16      Q. You didn't testify that you had called to
17  get information on Bavis; right?
18      A. Oh, I asked her about Mr. Hosseini, asked
19  her about if I needed some information. Her answer was
20  she would give me no information, so I didn't get
21  any information on anyone. I didn't specifically
22  say, "I need information on Joe Bavis," no.
23      Q. But you had testified the purpose of your
24  call was to get the name and phone number of Mr.

155

1  Hosseini with GES; right?
2      A. Yes.
3      Q. And it was not to get any information on
4  Bavis?
5          MS. AMBARIK: Objection.
6      A. It wasn't an option.
7      Q. That's fine. You did not call GES on that
8  date to get information about Bavis; you were
9  calling to get information on Hosseini. Correct?
10      A. Yes.
11      Q. And at no other time did you contact GES
12  for any reason; correct?
13      A. After that, no.
14      Q. Why not?
15      A. They weren't very accommodating to even
16  give me anything about Mr. Hosseini. I was told I
17  would get no information at all. Why bother again?
18      Q. Well, because you were investigating a
19  sexual assault; correct?
20      A. Yes.
21      Q. And you didn't tell them that, did you?
22      A. That's confidential.
23      Q. Well, what's confidential in your mind?
24      A. The allegation of sexual assault and the

156

1  victim's name is confidential.
2      Q. But the fact that you are doing an
3  investigation into someone's employees is not
4  confidential, is it not?
5      A. No.
6      Q. And if you wanted information from GES, you
7  could have called and let them know that you are
8  conducting a serious investigation of any kind?
9      A. I think the fact that I called to ask them
10  about someone that worked there and was told that I
11  would get no information pretty much spoke to their
12  state of mind and how useful they were going to be
13  to me.
14      Q. On March 22, 2004 after you got the call
15  from Bavis, did you go down to the Hynes and talk
16  with some witnesses there?
17      A. No.
18      Q. Why not?
19      A. Because I made the determination to seek an
20  arrest warrant on Mr. Hosseini.
21      Q. Why?
22      A. Because of the fact that I had a victim
23  that was stating that he was still being sexually
24  assaulted on an almost daily basis by Mr. Hosseini.

157

1      Q. But you didn't try to corroborate
2  Mr. Bavis's allegations in any way, shape or form,
3  did you?
4      A. No.
5      Q. And is that consistent with the training
6  you received from the Boston Police Department or
7  from the City of Boston?
8          MS. AMBARIK: Objection. You can
9  answer.
10      A. Mr. Bavis was my probable cause so, yes,
11  probable cause, I can take an arrest warrant.
12      Q. And are you trained not to investigate or
13  try to corroborate a complaining witness's
14  allegation of sexual assault after they make it to
15  you?
16          MS. AMABARIK: Objection. You can
17  answer the question.
18      Q. Are you trained not to seek corroborating
19  evidence?
20      A. No.
21      Q. In fact, are you trained to seek
22  corroborating evidence when someone makes an
23  allegation of sexual assault?
24      A. We are encouraged to, yes.

# EXHIBIT 36

Volume I                          Pages:    1 - 242

                                  Exhibits: 1 - 27

                UNITED STATES DISTRICT COURT

                DISTRICT OF MASSACHUSETTS

                    No. 04-CV-11948-RGS

SEYED MOHSEN HOSSEINI-SEDEHY,

            Plaintiff

vs.

ERIN T. WITHINGTON and the CITY

OF BOSTON,

            Defendants


          DEPOSITION OF ERIN T. WITHINGTON

            Thursday, March 31, 2005

            10:00 a.m. - 4:32 p.m.

              SMITH & DUGGAN LLP

              55 Old Bedford Road

        Lincoln, Massachusetts  01773-1125




            FARMER ARSENAULT BROCK LLC

        617.790.4404   FAX  617.728.4403

        Reporter:  Cynthia C. Henderson/RPR

**46**

1   this investigation?
2       A. The phone calls from Mr. Bavis continued
3   daily, stating that Mr. Hosseini was still bothering
4   him, was still touching him. This went on for about
5   a week, and at some point it was once a day, at some
6   point it was two to three times a day, to the point
7   where other people in the office were getting -- I
8   don't want to -- they were getting so many messages
9   that it finally asked, "Erin, what are you going
10  to do with this case?"
11      (Recess.)
12      Q. We left off just a moment ago on Mr. Bavis
13  calling daily to the Sexual Assault Unit.
14      A. Yes.
15      Q. And who was taking these calls from Mr.
16  Bavis on a daily basis? Do you remember?
17      A. Diane, the secretary. The liaison. Excuse
18  me. Sergeant Donovan took a couple. I took a
19  couple. Mostly Diane.
20      Q. Okay. And you indicated that Bavis was
21  calling once or maybe twice a day?
22      A. Yes.
23      Q. And for how long did this go on?
24      A. Probably about five days. I think there

**47**

1   was a weekend in the middle, so I think it was a few
2   days and then the weekend and then a couple of days
3   in the beginning of the week.
4       Q. So about five workdays?
5       A. Yes.
6       Q. And when you spoke with Mr. Bavis when you
7   took these calls, say the first time he called after
8   you spoke with Mr. Hosseini and after you put the
9   report in to the D.A?
10      A. I believe he said that, something about his
11  assignment and there was still a problem, that Mr.
12  Hosseini had walked by him and touched his arm. He
13  did tell me the arm thing again, and I said, "Well,
14  Joe, touching your arm is not a sexual assault." I
15  said, "I did speak to Mr. Hosseini, and I told him
16  that to really avoid contact with you, and that you
17  should avoid contact with him. It's in the court,
18  the D.A.'s office. I am just waiting for them to
19  either call you in or set up something." I said,
20  "So, you know, give it a few more days and let me
21  know what happens."
22      Q. And what did he say on that first call, if
23  anything else?
24      A. I believe that was it. I can't remember

**48**

1   verbatim. Mostly it was just I would come in and
2   there would be messages that Diane would give me
3   that he called.
4       Q. And when he called you that first time
5   after you had submitted the report to the D.A. did
6   Bavis tell you that this occurred at work, this
7   touching of his arm?
8       A. I don't kowt that he said it. I know that I
9   actually assumed it occurred at work, so I'm sure
10  that he must have said -- well, I can't even say I
11  am sure. I thought he must have said that it
12  occurred there, but I know I assumed that he was
13  talking about work.
14      Q. Do you remember the substance of any other
15  calls you had with Mr. Bavis during those five
16  workdays?
17      A. To be honest, I didn't always return the
18  phone calls, so I didn't speak to him every day.
19      Q. And why was it that you didn't return the
20  phone calls?
21      A. Because I also have two hundred other
22  cases, and I work in the Child Abuse Unit, so I had
23  two hundred kids that I had to set up things and
24  deal with them, so I kind of had done all I could do

**49**

1   at that point with the investigation for Mr. Bavis,
2   and I didn't consider him to be in imminent danger,
3   so I kind of had to take care of other things
4   because he had consumed a lot of time at that point.
5       Q. Okay. Now, after these five days, five
6   workdays had passed and these calls were coming in
7   on a daily basis, one to two a day, what happened?
8   What was the next thing that happened with respect
9   to this investigation?
10      A. I know -- I am pretty sure within a couple
11  of those days I was out of the office two days for
12  training, so I think I came back and there was a
13  bunch of messages and stuff, and I know on the day
14  that I went and got the warrant Mr. Bavis had called
15  that morning, and I said -- I know that day he said,
16  "I am at work now. Mr. Hosseini came up to me,
17  rubbed my arms, blew me a kiss" or rubbed up against
18  him. There was some -- it didn't reach the point of
19  a sexual assault as far as something I would
20  normally investigate, but it was an assault and
21  battery, that this is still going on, this hasn't
22  stopped, so I got off the phone with him and I typed
23  up a warrant for indecent assault and battery, and I
24  went to B.M.C. to obtain the warrant.

# EXHIBIT 37

Volume I                          Pages:    1 - 242

                                  Exhibits:  1 - 27

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 04-CV-11948-RGS

SEYED MOHSEN HOSSEINI-SEDEHY,

          Plaintiff

vs.

ERIN T. WITHINGTON and the CITY

OF BOSTON,

          Defendants


DEPOSITION OF ERIN T. WITHINGTON

Thursday, March 31, 2005

10:00 a.m. - 4:32 p.m.

SMITH & DUGGAN LLP

55 Old Bedford Road

Lincoln, Massachusetts  01773-1125




FARMER ARSENAULT BROCK LLC

617.790.4404   FAX  617.728.4403

Reporter:  Cynthia C. Henderson/RPR

Erin T. Withington - March 31, 2005

---

46

1  this investigation?
2      A. The phone calls from Mr. Bavis continued
3  daily, stating that Mr. Hosseini was still bothering
4  him, was still touching him. This went on for about
5  a week, and at some point it was once a day, at some
6  point it was two to three times a day, to the point
7  where other people in the office were getting -- I
8  don't want to -- they were getting so many messages
9  that it was finally asked, "Erin, what are you going
10  to do with this case?"
11      (Recess.)
12      Q. We left off just a moment ago on Mr. Bavis
13  calling daily to the Sexual Assault Unit.
14      A. Yes.
15      Q. And who was taking these calls from Mr.
16  Bavis on a daily basis? Do you remember?
17      A. Diane, the secretary. The liaison. Excuse
18  me. Sergeant Donovan took a couple. I took a
19  couple. Mostly Diane.
20      Q. Okay. And you indicated that Bavis was
21  calling once or maybe twice a day?
22      A. Yes.
23      Q. And for how long did this go on?
24      A. Probably about five days. I think there

---

47

1  was a weekend in the middle, so I think it was a few
2  days and then the weekend and then a couple of days
3  in the beginning of the week.
4      Q. So about five workdays?
5      A. Yes.
6      Q. And when you spoke with Mr. Bavis when you
7  took these calls, say the first time he called after
8  you spoke with Mr. Hosseini and after you put the
9  report in to the D.A.?
10      A. I believe he said that, something about his
11  assignment and there was still a problem, that Mr.
12  Hosseini had walked by him and touched his arm. He
13  did tell me the arm thing again, and I said, "Well,
14  Joe, touching your arm is not a sexual assault." I
15  said, "I did speak to Mr. Hosseini, and I told him
16  that to really avoid contact with you, and that you
17  should avoid contact with him. It's in the court,
18  the D.A.'s office. I am just waiting for them to
19  either call you in or set up something." I said,
20  "So, you know, give it a few more days and let me
21  know what happens."
22      Q. And what did he say on that first call, if
23  anything else?
24      A. I believe that was it. I can't remember

---

.48

1  verbatim. Mostly it was just I would come in and
2  there would be messages that Diane would give me
3  that he called.
4      Q. And when he called you that first time
5  after you had submitted the report to the D.A. did
6  Bavis tell you that this occurred at work, this
7  touching of his arm?
8      A. I don't kow that he said it. I know that I
9  actually assumed it occurred at work, so I'm sure
10  that he must have said -- well, I can't even say I
11  am sure. I thought he must have said that it
12  occurred there, but I know I assumed that he was
13  talking about work.
14      Q. Do you remember the substance of any other
15  calls you had with Mr. Bavis during those five
16  workdays?
17      A. To be honest, I didn't always return the
18  phone calls, so I didn't speak to him every day.
19      Q. And why was it that you didn't return the
20  phone calls?
21      A. Because I also have two hundred other
22  cases, and I work in the Child Abuse Unit, so I had
23  two hundred kids that I had to set up things and
24  deal with them, so I kind of had done all I could do

---

49

1  at that point with the investigation for Mr. Bavis,
2  and I didn't consider him to be in imminent danger,
3  so I kind of had to take care of other things
4  because he had consumed a lot of time at that point.
5      Q. Okay. Now, after these five days, five
6  workdays had passed and these calls were coming in
7  on a daily basis, one to two a day, what happened?
8  What was the next thing that happened with respect
9  to this investigation?
10      A. I know -- I am pretty sure within a couple
11  of those days I was out of the office two days for
12  training, so I think I came back and there was a
13  bunch of messages and stuff, and I know on the day
14  that I went and got the warrant Mr. Bavis had called
15  that morning, and I said -- I know that day he said,
16  "I am at work now. Mr. Hosseini came up to me,
17  rubbed my arms, blew me a kiss" or rubbed up against
18  him. There was some -- it didn't reach the point of
19  a sexual assault as far as something I would
20  normally investigate, but it was an assault and
21  battery, that this is still going on, this hasn't
22  stopped, so I got off the phone with him and I typed
23  up a warrant for indecent assault and battery, and I
24  went to B.M.C. to obtain the warrant.

---

14 (Pages 50 to 53)

Erin T. Withington - March 31, 2005

50

1    Q. You stated after Mr. Bavis gave you a call
2  on that day that you got the warrant you typed
3  something up?
4    A. I typed up the application for the warrant.
5    Q. Application?
6    A. Yes.
7    Q. And other than speaking with Bavis and
8  typing up the application for the warrant on that
9  morning before you went to the court, did you do
10  anything else with respect to the investigation?
11    A. I asked Detective Barry and Detective Lembo
12  if they were available to come with me because of
13  the fact that I was very visibly pregnant and was
14  not supposed to be out arresting people.
15    Q. Asked them to come with you where?
16    A. To pick up the warrant and then to arrest
17  Mr. Hosseini.
18    Q. And did Detectives Barry and Lembo come
19  with you?
20    A. Yes.
21    Q. Do you remember at any time before you got
22  the warrant did you inquire whether Mr. Hosseini had
23  a criminal record in Massachusetts?
24    A. Did I BOP him, basically?

51

1    Q. Yes.
2    A. Yes, I did. I ran a Board of Probation
3  check on him, yes.
4    Q. BOP is Board of Probation?
5    A. Yes. I am sorry.
6    Q. Do you remember when you did that?
7    A. At some point when the reports go in
8  because we do usually put it inside the file.
9    Q. And was that before you got the warrant?
10    A. Yes.
11    Q. And what did the Board of Probation report
12  say?
13    A. That he had never been arrested.
14    Q. And what was the purpose of asking for the
15  Board of Probation report?
16    A. It's just something that we standardly put
17  in our files in regards to suspects.
18    Q. And for what purpose? Do you know?
19    A. In case anyone at any point has to take
20  over the investigation or if there is a search
21  warrant we would like to know if they have any
22  weapons charges, anything hanging over them.
23    Q. Was there any other action that you took
24  regarding this investigation before you got the

52

1  warrant?
2    A. In terms of what?
3    Q. That we haven't talked about.
4    A. Not that I know of.
5    Q. Okay. You had mentioned that you had gone
6  to some training at some point while Mr. Bavis was
7  calling you?
8    A. Yes. I believe I was out of the office.
9    Q. Okay. And you also mentioned that you -- I
10  think you became a police officer in 1995, June 28?
11    A. In Boston, yes.
12    Q. Were you a police officer before that?
13    A. Yes.
14    Q. I will just ask you some background
15  questions, then, about your professional experience.
16  Do you have a college degree?
17    A. Yes, I do.
18    Q. From where?
19    A. I have a master's degree from Anna Maria.
20    Q. Master's in criminal justice?
21    A. Yes.
22    Q. And where did you get your undergraduate
23  degree?
24    A. Suffolk University.

53

1    Q. And when did you get that degree from
2  Suffolk University?
3    A. 1991.
4    Q. What did you major in?
5    A. Sociology with a track in criminal justice.
6    A. Did you say track in criminal justice?
7    A. Yes.
8    Q. And when did you get your degree from Anna
9  Maria?
10    A. Either in 1998 or 1999.
11    Q. Did you go full time to Suffolk, full time
12  days?
13    A. Yes.
14    Q. After you graduated from Suffolk in 1991
15  what jobs did you have? What job did you take,
16  first job?
17    A. I was a social worker with the Department
18  of Mental Retardation out at the NWW Committee in
19  Newton.
20    Q. And what was the department there?
21    A. Mental Retardation.
22    Q. And what was the job?
23    A. I was a caseworker.
24    Q. And you had mentioned a couple of other

Erin T. Withington - March 31, 2005

---

54

1  initials that I missed.
2  A. Oh, the company that I worked under was the
3  NWW Committee.
4  Q. And what does that stand for, if you know?
5  A. I don't know.
6  Q. And how long did you work as a social
7  worker for the DMR?
8  A. Two years.
9  Q. And after you concluded your work for DMR,
10  what did you do then?
11  A. I went to the State Police Academy in
12  Foxborough to become a Waltham police officer.
13  Q. You said in Foxborough?
14  A. Yes.
15  Q. And when did you graduate from the Academy?
16  A. September of '93.
17  Q. And you started with the Waltham Police
18  Department in that same month?
19  A. Yes.
20  Q. How long did you work for the Waltham
21  Police Department?
22  A. Until June of 1995.
23  Q. And in the Waltham Police Department were
24  you a patrol officer?

---

56

1  A. Yes.
2  Q. What was that again?
3  A. Child abuse investigation.
4  Q. And what was the training you received to
5  get your certification as a sexual assault
6  investigator?
7  A. It's a 40-hour in-service training that
8  they hold at the Mass. Criminal Justice Training
9  Council.
10  Q. And how about the child abuse investigator
11  certification? How long was that?
12  A. That was also forty hours.
13  Q. Now, after you joined the Boston Police
14  Department in June of 1995 did you receive any
15  formal training from the Boston Police Department or
16  the City of Boston?
17  A. Other than the police academy?
18  Q. You didn't go back to the police academy,
19  did you?
20  A. Yes, I did.
21  Q. After you left the Waltham Police
22  Department in June of 1995 you went to another
23  police academy?
24  A. Yes.

---

55

1  A. Yes.
2  Q. And you left the Waltham Police Department
3  to join the Boston Police Department?
4  A. Yes.
5  Q. And was there any reason? Why did you
6  leave the Waltham Police Department?
7  A. I wanted something better.
8  Q. Now, during your two years as a Waltham,
9  almost two years as a Waltham police officer did you
10  receive any formal training?
11  This is after the Academy.
12  A. Yes.
13  Q. What formal training did you receive while
14  you were a Waltham police officer between September
15  1993 and June 1995?
16  A. I was certified as a sexual assault
17  investigator, I was certified as a child abuse
18  investigator, I attended a two-week drug
19  investigation school. That's all I can remember.
20  Q. And the first two certifications that you
21  received, one was for certification as a sexual
22  assault investigator?
23  A. Yes.
24  Q. And the second one involved children?

---

57

1  Q. Which one was that?
2  A. The Boston Police Academy.
3  Q. And when did you attend the Boston Police
4  Academy?
5  A. From June 28th of 1995 until January of
6  1996.
7  Q. Was it a six-month program?
8  A. It came out to be about forty weeks, so
9  yes.
10  Q. After you graduated from the Boston Police
11  Academy, did you receive any other formal training
12  from the Boston Police Department?
13  A. Yes, I have.
14  Q. And what formal training did you receive?
15  A. I am a member of the Internet Crimes
16  Against Children team, so I received formal training
17  in that as far as use of the computer to track
18  people attempting to lure children in. We got that
19  through the National Center for Missing and
20  Exploited Children and National Justice Center. I
21  have been to three of those trainings. They update
22  us every year, usually.
23  Q. How long are those trainings?
24  A. Two of them are forty hours. One of them

---

# EXHIBIT 38

Volume I                                    Pages:   1 - 242

Exhibits: 1 - 27

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 04-CV-11948-RGS

SEYED MOHSEN HOSSEINI-SEDEHY,

Plaintiff

vs.

ERIN T. WITHINGTON and the CITY

OF BOSTON,

Defendants


DEPOSITION OF ERIN T. WITHINGTON

Thursday, March 31, 2005

10:00 a.m. - 4:32 p.m.

SMITH & DUGGAN LLP

55 Old Bedford Road

Lincoln, Massachusetts  01773-1125




FARMER ARSENAULT BROCK LLC

617.790.4404   FAX  617.728.4403

Reporter:  Cynthia C. Henderson/RPR

14 (Pages 50 to 53)

Erin T. Withington - March 31, 2005

50

1    Q. You stated after Mr. Bavis gave you a call
2  on that day that you got the warrant you typed
3  something up?
4    A. I typed up the application for the warrant.
5    Q. Application?
6    A. Yes.
7    Q. And other than speaking with Bavis and
8  typing up the application for the warrant on that
9  morning before you went to the court, did you do
10  anything else with respect to the investigation?
11    A. I asked Detective Barry and Detective Lembo
12  if they were available to come with me because of
13  the fact that I was very visibly pregnant and was
14  not supposed to be out arresting people.
15    Q. Asked them to come with you where?
16    A. To pick up the warrant and then to arrest
17  Mr. Hosseini.
18    Q. And did Detectives Barry and Lembo come
19  with you?
20    A. Yes.
21    Q. Do you remember at any time before you got
22  the warrant did you inquire whether Mr. Hosseini had
23  a criminal record in Massachusetts?
24    A. Did I BOP him, basically?

51

1    Q. Yes.
2    A. Yes, I did. I ran a Board of Probation
3  check on him, yes.
4    Q. BOP is Board of Probation?
5    A. Yes. I am sorry.
6    Q. Do you remember when you did that?
7    A. At some point when the reports go in
8  because we do usually put it inside the file.
9    Q. And was that before you got the warrant?
10    A. Yes.
11    Q. And what did the Board of Probation report
12  say?
13    A. That he had never been arrested.
14    Q. And what was the purpose of asking for the
15  Board of Probation report?
16    A. It's just something that we standardly put
17  in our files in regards to suspects.
18    Q. And for what purpose? Do you know?
19    A. In case anyone at any point has to take
20  over the investigation or if there is a search
21  warrant we would like to know if they have any
22  weapons charges, anything hanging over them.
23    Q. Was there any other action that you took
24  regarding this investigation before you got the

52

1  warrant?
2    A. In terms of what?
3    Q. That we haven't talked about.
4    A. Not that I know of.
5    Q. Okay. You had mentioned that you had gone
6  to some training at some point while Mr. Bavis was
7  calling you?
8    A. Yes. I believe I was out of the office.
9    Q. Okay. And you also mentioned that you -- I
10  think you became a police officer in 1995, June 28?
11    A. In Boston, yes.
12    Q. Were you a police officer before that?
13    A. No.
14    Q. I will just ask you some background
15  questions, then, about your professional experience.
16  Do you have a college degree?
17    A. Yes, I do.
18    Q. From where?
19    A. I have a master's degree from Anna Maria.
20    Q. Master's in criminal justice?
21    A. Yes.
22    Q. And where did you get your undergraduate
23  degree?
24    A. Suffolk University.

53

1    Q. And when did you get that degree from
2  Suffolk University?
3    A. 1991.
4    Q. What did you major in?
5    A. Sociology with a track in criminal justice.
6    Q. Did you say track in criminal justice?
7    A. Yes.
8    Q. And when did you get your degree from Anna
9  Maria?
10    A. Either in 1998 or 1999.
11    Q. Did you go full time to Suffolk, full time
12  days?
13    A. Yes.
14    Q. After you graduated from Suffolk in 1991
15  what jobs did you have? What job did you take,
16  first job?
17    A. I was a social worker with the Department
18  of Mental Retardation out at the NWW Committee in
19  Newton.
20    Q. And what was the department there?
21    A. Mental Retardation.
22    Q. And what was the job?
23    A. I was a caseworker.
24    Q. And you had mentioned a couple of other

# EXHIBIT 39

1    Volume I                           Pages:    1 - 242

2                                       Exhibits: 1 - 27

3               UNITED STATES DISTRICT COURT

4               DISTRICT OF MASSACHUSETTS

5                  No. 04-CV-11948-RGS

6    SEYED MOHSEN HOSSEINI-SEDEHY,

7              Plaintiff

8    vs.

9    ERIN T. WITHINGTON and the CITY

10   OF BOSTON,

11              Defendants

12

13          DEPOSITION OF ERIN T. WITHINGTON

14             Thursday, March 31, 2005

15             10:00 a.m. - 4:32 p.m.

16              SMITH & DUGGAN LLP

17              55 Old Bedford Road

18        Lincoln, Massachusetts  01773-1125

19

20

21

22           FARMER ARSENAULT BROCK LLC

23        617.790.4404    FAX  617.728.4403

24        Reporter:  Cynthia C. Henderson/RPR

Erin T. Withington - March 31, 2005

166

1  want to embarrass them. I respected that of him.
2  **Q. Did that affect the thoroughness of your**
3  **investigation, in your mind?**
4  A. I expected to hear from them at some point,
5  and then a week later I was gone for two months, so
6  I didn't really have all this time to investigate
7  this case.
8  **Q. Did you hear from them after you got back?**
9  A. No.
10 **Q. Did you follow up with any of the telephone**
11 **conversations you had with Mr. Bavis inquiring about**
12 **these other "victims"?**
13 A. Yes.
14 **Q. What did he say in those telephone calls?**
15 A. "I am still talking to them. Some of them
16 want to come in and talk to you."
17 **Q. Did that cause you any concern that Mr.**
18 **Bavis still would not give you the names of these**
19 **people?**
20 A. No. I wouldn't say concern, no.
21 **Q. And why not?**
22 A. I just assumed Mr. Bavis was more concerned
23 about himself and that maybe the people, the guys
24 that he was dealing with didn't want to come to the

167

1  Sexual Assault Unit and report that they had been
2  touched by another man.
3  **Q. When you spoke with Bavis you noticed his**
4  **physical appearance; correct?**
5  A. Yes.
6  **Q. And you spoke to Mr. Hosseini and you**
7  **noticed his physical appearance?**
8  A. Yes.
9  **Q. Bavis is a bigger guy?**
10 A. Yes.
11 **Q. There was no threat in your mind of bodily**
12 **harm that could come to Mr. Bavis as a result of**
13 **this relationship; correct?**
14        MS. AMBARIK: Objection. You can
15 answer.
16 A. Yes.
17 **Q. If there was any concern in your mind about**
18 **someone getting hurt, it was Mr. Hosseini getting**
19 **hurt by Mr. Bavis or Joe Perry; correct?**
20        MS. AMBARIK: Objection. You can
21 answer.
22 A. I did advise Mr. Bavis and Mr. Perry to not
23 do anything. Only judging by their size, I would
24 assume Mr. Hosseini would have had more of a chance

168

1  of bodily injury.
2  **Q. In fact, the only people that had told you**
3  **they had threatened any bodily harm on any person**
4  **was Bavis and Joe Perry?**
5  A. Yes.
6  **Q. So your decision to seek an arrest warrant**
7  **for the arrest of Mr. Hosseini was not in any way**
8  **based on your concern that Mr. Bavis would suffer**
9  **any bodily injury; correct?**
10 A. Not injury, but touching, yes.
11        (Recess.)
12        (Incident Report prepared by Erin
13        Withington marked Exhibit No. 17
14        for identification.)
15 **Q. Can you identify what Exhibit 17 is?**
16 A. That is my incident report on the
17 sexual assault case.
18 **Q. And when was that drafted?**
19 A. 3/22/04.
20 **Q. And in relationship to when you sought the**
21 **arrest warrant for Mr. Hosseini, when was it**
22 **drafted?**
23 A. The same day.
24 **Q. And is there a time completed on the**

169

1  report?
2  A. 10:50 a.m.
3  **Q. And how soon before you had applied for**
4  **that arrest warrant did you make out this report?**
5  A. Probably right before I went down to get
6  the arrest warrant. Maybe half an hour.
7  **Q. Now, up at the top, second line over**
8  **towards the right side has "Date of Occurrence."**
9  A. Yes.
10 **Q. What date did you put?**
11 A. 1/1/03.
12 **Q. Did Mr. Bavis tell you that he was sexually**
13 **assaulted by Mr. Hosseini on January 1st, 2003?**
14 A. No.
15 **Q. Did anybody tell you that Mr. Bavis was**
16 **sexually assaulted by Mr. Hosseini on January 1st,**
17 **2003?**
18 A. No.
19 **Q. Now, in the narrative and additional**
20 **information section, what does that state?**
21 A. "In 2003 the suspect touched the victim on
22 the buttocks and rubbed his covered crotch against
23 the victim against his will, and on February 29 and
24 March 23, 2004 touched and carressed the victim on

# EXHIBIT 40

```
 1    Volume I                    Pages:    1 - 242
 2                                Exhibits: 1 - 27
 3                UNITED STATES DISTRICT COURT
 4                DISTRICT OF MASSACHUSETTS
 5                   No. 04-CV-11948-RGS
 6    SEYED MOHSEN HOSSEINI-SEDEHY,
 7              Plaintiff
 8    vs.
 9    ERIN T. WITHINGTON and the CITY
10    OF BOSTON,
11              Defendants
12
13          DEPOSITION OF ERIN T. WITHINGTON
14             Thursday, March 31, 2005
15              10:00 a.m. - 4:32 p.m.
16               SMITH & DUGGAN LLP
17               55 Old Bedford Road
18         Lincoln, Massachusetts  01773-1125
19
20
21
22          FARMER ARSENAULT BROCK LLC
23       617.790.4404   FAX  617.728.4403
24       Reporter:  Cynthia C. Henderson/RPR
```

Erin T. Withington - March 31, 2005

158

1    Q.  When you say "encouraged," isn't it a fact
2  that that is your goal as an investigator, to go out
3  and find information that will either corroborate or
4  refute a sexual assault allegation?
5    A.  Yes.
6    Q.  Your role is not to take someone's
7  complaint and pass it on to the District Attorney;
8  correct?
9    A.  No.
10   Q.  Your role is to do an investigation when
11 someone makes an allegation of sexual assault.
12 Isn't that true?
13   A.  Yes.
14   Q.  And the allegations that Mr. Bavis made
15 after you had the interview with Mr. Hosseini, you
16 chose not to investigate. Isn't that true?
17       MS. AMBARIK:  Objection.  You can
18 answer.
19   A.  No, I didn't.  No.
20   Q.  Why did you choose not to do any
21 investigation into Bavis's allegations after you had
22 conducted the interview with Mr. Hosseini?
23   A.  In the week in between?
24   Q.  At any time betweeen.

159

1    A.  Because at that point I had sent it up to
2  the D.A.'s office and assumed that both parties
3  would let it take its place through the court, as
4  most people do.  Most people tend to stay away from
5  each other after that, and that didn't occur, and it
6  was becoming an almost daily occurrence where I had
7  a victim stating that he was assaulted almost daily,
8  and I took it upon myself to seek an arrest warrant.
9    Q.  Did you even call Mr. Hosseini on his phone
10 after any one of the telephone calls that Bavis or
11 Joe Perry had made after you spoke with Mr. Hosseini
12 in person to let him know there are additional
13 allegations, "What do you say about them?"
14   A.  No.
15   Q.  Why not?
16   A.  I had already spoken to Mr. Hosseini.
17   Q.  But you didn't speak with him about any of
18 the post Mr. Hosseini interview allegations that
19 Bavis made; correct?
20   A.  Right.
21   Q.  So why didn't you at least give him a phone
22 call and ask him if this was true?
23   A.  Because I had brought him into my office,
24 and he had already stated to me that he never

160

1  touched anyone in an inappropriate way, so I really
2  didn't think he was going to say, "Oh, yes.  Now I
3  am."
4    Q.  But did you think of calling him and
5  saying, "Have they even worked with you since then?"
6    A.  No.
7    Q.  Why not?
8    A.  Because I am basing it on what
9  Mr. Bavis told me.  Mr. Bavis is my victim.  At that
10 time I have to be concerned with the fact that this
11 is still happening to him every day as a victim.
12   Q.  But you said your role as a police officer
13 was to investigate these complaints that Mr. Bavis
14 was making over the telephone post Mr. Hosseini's
15 interview?
16   A.  Yes.
17   Q.  And you chose not to perform that
18 investigation; correct?
19   A.  As I had stated previously, this took place
20 at the end of a week.  There was a weekend in the
21 middle.  In those days I was gone.  I came back,
22 spoke with Mr. Bavis, then went and sought the
23 arrest warrant, so there was one day that I spoke
24 with Mr. Bavis.

161

1    Q.  How long did it take you to type up the
2  application for the arrest warrant?
3    A.  Ten minutes.
4    Q.  How long did it take you to dial
5  Mr. Hosseini's telephone number?
6        MS. AMBARIK:  Objection.
7    A.  Seven seconds.
8    Q.  And it would have taken you less time to
9  talk with Mr. Hosseini about these allegations than
10 it would have taken to apply for the arrest warrant;
11 correct?
12   A.  True.
13   Q.  And was there some facet of this
14 investigation that caused you not to at least call
15 Mr. Hosseini?
16   A.  Mr. Bavis was my victim.  Mr. Hosseini was
17 my suspect.  We don't normally call the suspect and
18 say, "Are you still doing this?  Cut it out" after
19 we have had an interview with them.  If I have a
20 victim saying, "This is still occurring to me," at
21 that time the victim has to be the priority.
22   Q.  Actually, what you do is when you get new
23 allegations you want to speak with the suspect
24 again; correct?

42 (Pages 162 to 165)

Erin T. Withington - March 31, 2005

162

1    A. Yes.
2    Q. If there are new allegations that have been
3    made after you had spoken with a suspect, what you
4    want to do is actually get that suspect in a room
5    and talk to him or her about those allegations,
6    don't you?
7    A. Or I can end it, not let him have contact
8    with him, put an end to it and arrest the suspect.
9    Q. And it was easier in this case to just put
10   an end to this investigation; correct?
11        MS. AMBARIK: Objection. You can
12   answer.
13   A. Yes.
14   Q. Did you ever seek out fresh complaint
15   witnesses?
16   A. No.
17   Q. Why not?
18   A. Mr. Bavis stated he talked to a number of
19   people and he wasn't sure who the first person he
20   talked to was.
21   Q. Who did he say he talked to first?
22   A. He wasn't sure.
23   Q. Did you say give you the names of the
24   people you did speak with?

163

1    A. He spoke with Mr. Perry.
2    Q. Joe Perry?
3    A. Yes.
4    Q. And the other names?
5    A. He stated that this had occurred to a lot
6    of them, so a lot of them had talked amongst
7    themselves about things that had occurred. Those
8    were the other names that were supposed to have
9    followed.
10   Q. Your training as a criminal investigator
11   would require you to at least ask for those names;
12   correct?
13   A. Yes.
14   Q. Did you do so?
15   A. Yes.
16   Q. What was the response you got?
17   A. Well, "I don't know that they want to come
18   forward and give you names and be part of the sexual
19   assault, so why don't I talk to them," and I said,
20   "Why don't you talk to them, give them my name and
21   number and have them contact me."
22   Q. Did the fact that Mr. Bavis refused to give
23   you names of other potential witnesses, did you
24   think that was significant in the course of your

164

1    investigation?
2    A. Of other victims or witnesses?
3    Q. Other witnesses. Did I say victim? Other
4    witnesses.
5    A. No. I didn't think it was significant
6    because Mr. Bavis was giving them to me more as
7    other victims than other witnesses, saying it had
8    happened to them as well.
9    Q. But if you in fact had other "victims,"
10   that would be additional evidence in your
11   investigation of the Bavis allegations, would it
12   not?
13   A. Yes.
14   Q. And you chose not to press Mr. Bavis for
15   those names; correct?
16   A. Mr. Bavis can't report for someone else,
17   so, yes.
18   Q. Actually, there is no requirement
19   that or there is no prohibition of a person giving
20   you the names of other victims, is there?
21   A. No. We don't take their private reports in
22   sexual assault. It has to come from the victims
23   themselves.
24   Q. Is that a policy that the Boston police

165

1    have dictated to you?
2        MS. AMBARIK: Objection. You can
3    answer.
4    Q. I will rephrase that. Is that a policy
5    that the Boston police have made you aware of?
6        MS. AMBARIK: Objection. You can answer
7    it.
8    A. That is a policy at the Sexual
9    Assault Unit, that the victim needs to be able to
10   report for themselves.
11   Q. Is it the policy of the Boston Police
12   Department or the Sexual Assault Unit that an
13   investigator is not to take the names of other
14   potential witnesses or victims in an investigation?
15        MS. AMBARIK: Objection. You can
16   answer.
17   A. No.
18   Q. So back to Mr. Bavis, you made a decision
19   not to ask Mr. Bavis a second time for those names
20   of the alleged victims; correct?
21   A. No. I asked him, and like he said to me,
22   he didn't want to give me the names because he
23   didn't know if they would want to be involved
24   because of the fact that they are men and he didn't

# EXHIBIT 41

Volume I

Pages:  1 - 242

Exhibits: 1 - 27

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 04-CV-11948-RGS

SEYED MOHSEN HOSSEINI-SEDEHY,

Plaintiff

vs.

ERIN T. WITHINGTON and the CITY

OF BOSTON,

Defendants

DEPOSITION OF ERIN T. WITHINGTON

Thursday, March 31, 2005

10:00 a.m. - 4:32 p.m.

SMITH & DUGGAN LLP

55 Old Bedford Road

Lincoln, Massachusetts  01773-1125

FARMER ARSENAULT BROCK LLC

617.790.4404    FAX   617.728.4403

Reporter:  Cynthia C. Henderson/RPR

46 (Pages 178 to 181)

Erin T. Withington - March 31, 2005

178

1    Q. And nowhere in those other remarks do you
2    allege that or do you state, I should say, that Mr.
3    Hosseini was alleged to have touched Mr. Bavis in an
4    indecent manner on more than one occasion on an
5    unknown date in 2003; correct?
6    A. Correct.
7    Q. Do you still have your notes that you took
8    in the course of this investigation?
9    A. I don't know. I am not sure.
10   Q. What I will do is I will just make a
11   request through Rule 34 for those notes, and I just
12   ask if you do have those notes, we do intend to seek
13   a copy of them.
14   A. Okay.
15   Q. And we will do so through counsel.
16        (Arrest warrant for Mohsen
17        Hosseini marked Exhibit No. 19 for
18        identification.)
19   Q. And can you please identify what Exhibit 19
20   is?
21   A. That's the arrest warrant for Mr. Hosseini.
22   Q. That is the warrant that you sought and
23   received from the Boston Municipal Court?
24   A. Yes.

179

1    Q. And on this warrant it states, the last
2    three lines, "A conviction of this offense requires
3    the offender to register in person at the police
4    department in the city or town where he or she
5    resides no later than two days from their sentencing
6    date."
7    A. Yes.
8    Q. Did you know that when you reapplied for
9    this warrant?
10   A. Yes.
11   Q. Is that provision, is that known as a
12   sexual assault registry?
13   A. Yes.
14   Q. Did you know that you were charging Mr.
15   Hosseini with an offense for which he would have to
16   register as a sexual offender when you sought this
17   warrant on March 22nd, 2004?
18   A. Yes.
19   Q. And the date of offense on this warrant is
20   December 22nd, 2003; correct?
21   A. Yes.
22   Q. And you have already testified that is
23   incorrect, it's not a date of offense. Is that
24   correct?

180

1    A. Yes.
2        (Warrant from the Boston Municipal
3        Court marked Exhibit No. 20 for
4        identification.)
5    Q. After you received this warrant from the
6    Boston Municipal Court what did you do?
7    A. Went to 900 Boylston Street to the Hynes
8    Convention Center, went upstairs, found Mr. Hosseini
9    on the trade floor, explained to him that he was
10   under arrest and that I asked him to walk out to the
11   elevator with us and he would be handcuffed in the
12   elevator. He said he would comply, no problem. I
13   believe he gave, asked somebody to give somebody a
14   call, walked over, spoke to somebody, came back and
15   said okay. We walked him out to the elevator. He
16   was handcuffed there and brought outside, put in a
17   wagon and brought to District 4.
18   Q. When you spoke to Mr. Hosseini were you
19   alone with him?
20   A. No. I believe Detective Barry and
21   Detective Lembo were with me.
22   Q. Were there any other people other than you
23   three detectives and Mr. Hosseini present in the
24   room when you approached Mr. Hosseini and told him

181

1    he was going to be placed under arrest?
2    A. Yes.
3    Q. Who?
4    A. People, the laborers were working, and I
5    asked him to come to the side. He recognized me
6    when I came in. There was still people -- people
7    couldn't hear us, but they were still all in the
8    same open room and they were working, and I
9    explained to him that he was under arrest. He said
10   okay, walked back to someone else, and explained to
11   him that he was going with us and came back with us.
12   Q. Did you show your badges when you
13   approached Mr. Hosseini?
14   A. No. He recognized me.
15   Q. Did you later learn that when you arrested
16   Mr. Hosseini you did so in front of the Teamsters
17   that worked under him?
18   A. Mr. Hosseini wasn't officially arrested
19   until he was in the elevator, and it was just the
20   four of us.
21   Q. Well, you told Mr. Hosseini to go into the
22   elevator, and he didn't have a choice; correct?
23   A. No. He was under arrest.
24   Q. Right in the middle of the floor before you

47 (Pages 182 to 185)

Erin T. Withington - March 31, 2005

182

1  got to the elevator?
2  A. He wasn't handcuffed in front of everybody.
3  Q. But he was under arrest?
4  A. Yes.
5  Q. And he wasn't free to go?
6  A. He was not.
7  Q. He was coming with you at that time?
8  A. Yes.
9  Q. And the other Teamsters that worked under
10 him were all in that room?
11 A. Yes.
12 Q. Did you see Mr. Bavis there?
13 A. Mr. Bavis was downstairs to the right of
14 the main entrance sitting on a wall or a bench or a
15 wall inside the building.
16 Q. When you walked into the Hynes Convention
17 Center you showed your badges to the security
18 officers there?
19 A. Detective Lembo showed his badge to the
20 security officer.
21 Q. Did you ask the security officer any
22 questions about this allegation?
23 A. No.
24 Q. Did you ask the security officer if they

183

1  had any reports of any sexual offense occurring on
2  their property?
3  A. No.
4  Q. Why not?
5  A. Because at that point I had a warrant for
6  Mr. Hosseini's arrest, and he was inside the
7  building. We just wanted to let the security guard
8  know that the Boston police were in the building and
9  we were going to be arresting someone. We didn't
10 give his name.
11 Q. So when you walked into the Massachusetts
12 Convention Center, would it be fair to say you knew
13 that the convention center had security officers?
14 A. Yes.
15 Q. And you knew that before that date;
16 correct?
17 A. Yes.
18 Q. At any time after December 22nd, 2003 did
19 you pick up the phone and call the Massachusetts
20 Convention Center security office and ask for any
21 reports concerning these allegations that Bavis
22 made?
23 A. No.
24 Q. Why?

184

1  A. Mr. Bavis hadn't mentioned that he spoke
2  with anyone other than myself regarding making
3  allegations.
4  Q. Well, as a criminal investigator you don't
5  decide how you are going to investigate a crime
6  based on what the complaining witness tells you;
7  correct? You use your training and experience to
8  investigate the full circumstances of any criminal
9  allegation; right?
10 A. Yes.
11 Q. So the fact that Mr. Bavis didn't mention a
12 security officer at the Massachusetts Convention
13 Center would not mean that you as a trained
14 investigator wouldn't be interested in finding out
15 what, if anything, they knew about the circumstances
16 surrounding Mr. Bavis's and Mr. Hosseini's
17 relationship; right?
18 A. It never occurred to me.
19 Q. Did you ever ask if there was a grievance
20 that Bavis had filed because this was apparently or
21 allegedly work-related? Did he file a grievance
22 about an adverse working condition?
23 A. Mr. Bavis?
24 Q. Yes.

185

1  A. No.
2  Q. Did you ask anybody if Mr. Bavis had filed
3  a grievance with his union about any adverse working
4  conditions?
5  A. No. Anyone that I spoke to, either at GES
6  or Mr. John Perry, his answer was he didn't want to
7  get in the bullshit of Bavis. Really, no one was
8  helpful so, no, I didn't ask anyone.
9  Q. And the fact that John Perry didn't want to
10 get involved with any of Mr. Bavis's bullshit, did
11 that concern you that Bavis may not be telling you
12 the truth?
13 MS. AMBARIK: Objection. I don't think
14 it was Bavis who said that.
15 MR. BUTLER: Actually, it was.
16 THE WITNESS: It was.
17 MS. AMBARIK: My mistake.
18 Q. Did that concern you that John Perry, the
19 Teamsters supervisor or business agent or whatever
20 he was, that he said to you that he wasn't going to
21 get involved in any of Bavis's bullshit?
22 A. No. I just thought he was really rude the
23 whole conversation, so it was just another aspect of
24 his rudeness.

# EXHIBIT 42

APPLICATION _____ _____ Court of Massachusetts
_____ Department

☐ ARREST ☐ SEIZE ☐ SUMMONS ☒ WARRANT

The within named complainant requests that a complaint issue against the within named defendant, charging said defendant with the offense(s) listed below.

Boston Municipal Court
Criminal Division, Room 411 —
Fourth Floor, New Court House
Boston, MA 02108

| DATE OF APPLICATION | DATE OF OFFENSE | PLACE OF OFFENSE |
|---|---|---|
| 3/22/2004 | 2/29/2004 | 900 Boylston STreet, Boston |

NAME, ADDRESS AND ZIP CODE OF COMPLAINANT

Detective Erin Schroeder   #11456   SAU

91 East Concord STreet

Boston, MA   02118

NAME, ADDRESS AND ZIP CODE OF DEFENDANT

Mohsen Hosseni

106 13th Street   #120

Charlestown, MA

| NO | OFFENSE | G.L. Ch and Sec |
|---|---|---|
| 1 | Indecent Assault & Battery over 14 y.o   265: 0134 | 265/13H |
| 2 | Assault & Battery   DENIED   MTC | |
| 3 | Assault & Battery   DENIED   MTC | |
| 4 | | |

IF ADDITIONAL OFFENSES CHECK HERE. ☐ AND ATTACH.

## DEFENDANT IDENTIFICATION INFORMATION — Complete data below if known.

| C.C. # | DATE OF BIRTH | SEX | RACE | HEIGHT | WEIGHT | EYES | HAIR | SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|---|---|
| 040143112 | 10/11/61 | M | O | 5'9 | 160 | Bro | Blk | |

| COURT USE ONLY → | A hearing upon this complaint application will be held at the Boston Municipal Court, Rm. 411 on | DATE OF HEARING | AT | TIME OF HEARING | COURT USE ← ONLY |
|---|---|---|---|---|---|

## CASE PARTICULARS — BE SPECIFIC

| NO. | NAME OF VICTIM Owner of property, person assaulted, etc. | DESCRIPTION OF PROPERTY Goods stolen, what destroyed, etc | VALUE OF PROPERTY Over or under $100. | TYPE OF CONTROLLED SUBSTANCE OR WEAPON Marijuana, gun, etc. |
|---|---|---|---|---|
| 1 | Victim Known to Commonwealth 47 y.o Male | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |

OTHER REMARKS:   Above suspect did touch the victim's buttocks and rub his covered crotch against the suspect on 1 occassion in 2003 and on Sunday February 29, 2004 and Monday March 22, 2004 did rub the victim's arms and shoulders after being asked not to touch him by the victim.

SIGNATURE OF COMPLAINANT

IF PROCESS IS ORDERED, THIS APPLICATION MUST BE PRESENTED AT ONCE TO PLEADING CLERK AT ROOM 411

| NAMES OF WITNESSES | Recog. to S.C. | Give place of business or employment, if in Boston, otherwise, residence | ST. NO. |
|---|---|---|---|
| | | MArch 22, 2004 only | |
| | | DET SCHROEDER Arrests | |
| | | TESTIFIES   ALLOWED | |
| | | WARRANT  TO   ISSUE ① | |
| | | MARK 2 DISMISSED   2+3 | |

EXHIBIT
18
3/31/05
PENGAD 800-631-6989

State if defendant is arrested _____

Date of Arrest _____  WIT. CLERK   DENIED

BMC-CR-2 (2/86)   FOR ADDITIONAL REMARKS OR WITNESSES-USE REVERSE OF ORIGINAL AND CHECK HERE ☐

# EXHIBIT 43

Volume I                                    Pages:    1 - 242

                                            Exhibits: 1 - 27

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 04-CV-11948-RGS

SEYED MOHSEN HOSSEINI-SEDEHY,

            Plaintiff

vs.

ERIN T. WITHINGTON and the CITY

OF BOSTON,

            Defendants

DEPOSITION OF ERIN T. WITHINGTON

Thursday, March 31, 2005

10:00 a.m. - 4:32 p.m.

SMITH & DUGGAN LLP

55 Old Bedford Road

Lincoln, Massachusetts  01773-1125

FARMER ARSENAULT BROCK LLC

617.790.4404    FAX   617.728.4403

Reporter:  Cynthia C. Henderson/RPR

45 (Pages 174 to 177)

Erin T. Withington - March 31, 2005

174

1    identification.)
2    Q. Do you recognize what Exhibit 18 is?
3    A. Yes.
4    Q. What is that?
5    A. It is my application for a warrant.
6    Q. And did you indicate that you typed out
7    this application for complaint while you were at the
8    Sexual Assault Unit?
9    A. Yes.
10    Q. And what was the date of offense that you
11    represented to the court of this indecent assault
12    and battery over fourteen years of age?
13    A. 12/22/03.
14    Q. And there is a typed date underneath that
15    handwritten date of 12/22/03. Do you see that?
16    A. Yes.
17    Q. Who typed that in?
18    A. I did.
19    Q. Why did you type 2/29/04 in the date of
20    offense for the indecent assault and battery for
21    over fourteen years of age?
22    A. I think I must have made a mistake, and
23    that's why I crossed it out, because I know that
24    that's one of the dates was February 29th.

175

1    Q. And you sought a warrant for the arrest of
2    Mr. Hosseini for the offense of indecent assault and
3    battery on a person over fourteen years of age and a
4    second count of assault and battery; is that
5    correct?
6    A. Yes.
7    Q. And in the other remarks that you typed in
8    for the application and complaint, what did you type
9    in?
10    A. "Above suspect did touch the victim's
11    buttocks and rubbed his covered crotch against the
12    suspect on one occasion on Sunday, February 29,
13    2004, and March 22nd, 2004, did rub the victim's
14    arms and shoulders after being asked not to touch
15    him by the victim."
16    Q. Why did you put in the application for
17    complaint that the date of offense was December
18    22nd, 2003?
19    A. That was the time that I met with
20    Mr. Bavis.
21    Q. Did you put that date of offense in the
22    application for complaint, 12/22/2003, knowing that
23    the date of offense was not 12/22/2003?
24    A. Yes.

176

1    Q. And is that your signature on the signature
2    of complainant?
3    A. Yes.
4    Q. And at the bottom there is some
5    handwriting. I think it's five lines. Is that your
6    handwriting?
7    A. No.
8    Q. Whose handwriting is it?
9    A. Clerk magistrate.
10    Q. And what does that handwriting say?
11    A. "March 22, 2004, Detective Schroeder
12    appeared, testified, allowed warrant to issue. Mark
13    Concannon, Assistant Clerk, Number 2 and 3 denied."
14    Q. Would it be fair to say, if I can recall
15    your testimony, did you testify that the reason why
16    you were seeking a warrant for Mr. Hosseini was in
17    essence Counts 2 and 3?
18    A. No. All three counts.
19    Q. But the reason why you decided to seek the
20    arrest warrant on March 22nd, 2004 was not because
21    of this past indecent assault and battery over
22    fourteen years of age, which was count number one;
23    correct?
24    A. Yes.

177

1    Q. The reason why you decided to reapply for
2    an arrest warrant as opposed to just letting the
3    D.A. handle it was because of the offense of assault
4    and battery that you put down here as offenses two
5    and three?
6    A. It continued, yes.
7    Q. And the clerk denied, the court denied your
8    application for a complaint and a warrant for those
9    two assault and battery complaints; correct?
10    A. He denied those two complaints, not the
11    warrant.
12    Q. Right. He denied the two complaints for
13    assault and battery?
14    A. Yes.
15    Q. And when you appeared before that, the
16    court there, were you sworn in?
17    A. Yes.
18    Q. And under oath did you swear to these other
19    remarks that you had written in there?
20    A. Yes.
21    Q. And you did so without knowing whether or
22    not Bavis was even working on Sunday, February 29,
23    2004; correct?
24    A. Yes.

FARMER ARSENAULT BROCK LLC

# EXHIBIT 44

Volume I

Pages:    1 - 242

Exhibits: 1 - 27

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 04-CV-11948-RGS

SEYED MOHSEN HOSSEINI-SEDEHY,

Plaintiff

vs.

ERIN T. WITHINGTON and the CITY

OF BOSTON,

Defendants

DEPOSITION OF ERIN T. WITHINGTON

Thursday, March 31, 2005

10:00 a.m. - 4:32 p.m.

SMITH & DUGGAN LLP

55 Old Bedford Road

Lincoln, Massachusetts  01773-1125

FARMER ARSENAULT BROCK LLC

617.790.4404    FAX   617.728.4403

Reporter:  Cynthia C. Henderson/RPR

54 (Pages 210 to 213)

Erin T. Withington - March 31, 2005

210

1    A.  I told him he was under arrest for indecent
2  assault and battery on a person.
3    Q.  You never told him who made the
4  allegations?
5    A.  No.  We didn't have any conversation that
6  day.
7    Q.  So to this day you never told
8  Mr. Hosseini who the person is that alleged that he
9  committed the sexual assault that was the basis for
10  your warrant.  Isn't that true?
11    A.  I don't know whether I did or not.
12    Q.  Why didn't you?
13    MS. AMBARIK:  Objection.  She said she
14  didn't know.
15    MS. BUTLER:  Well, I want to probe.
16    MS. AMBARIK:  You just asked her the
17  question.  You can't ask her the followup question
18  as to why she doesn't know.
19    MR. BUTLER:  I can.
20    Q.  Why didn't you tell Mr. Hosseini that it
21  was Bavis that made the allegation?
22    A.  I don't know that I didn't tell him that it
23  wasn't him.
24    Q.  Well, it's not in the report; correct?

211

1    A.  Just because it's not here doesn't mean I
2  didn't tell him.
3    Q.  You didn't testify to it at any point
4  today, did you?
5    A.  Not that I know of, no, not that I
6  remember.
7    Q.  You have no reason to believe that you told
8  Mr. Hosseini that Bavis had been the one making the
9  allegations, do you?
10    MS. AMBARIK:  Objection.
11    A.  I don't know if I told Mr. Hosseini or not,
12  but it's not like everybody else didn't know because
13  Mr. Perry knew and he was on the phone, so I am
14  assuming at some point Mr. Hosseini must have known.
15    Q.  Well, you got a call three days after the
16  arrest from the lawyer asking who the complainant
17  was and you said it was two guys and only one was
18  going to be the name in the complaint; right?
19    A.  That part, that's true; so I must have had
20  that conversation.
21    Q.  But even over the phone you didn't give the
22  names because they were privileged, according to
23  you?
24    MS. AMBARIK:  Objection.  Do you

212

1  recall having that conversation?
2    THE WITNESS:  I don't recall having a
3  conversation with his attorney.
4    MS. AMBARIK:  That was your prior
5  testimony.
6    Q.  And this report, Exhibit 23, that has the
7  date assigned 3/22/2004, no place there you mention
8  that you were going to refer this matter to the
9  District Attorney; correct?
10    A.  No.  It's not mentioned in there, no.
11    (Update on Mohsen Hosseini's
12    arrest marked Exhibit No. 24 for
13    identification.)
14    Q.  Now, Exhibit No. 24, what is this report?
15    A.  This is an update about Mr. Hosseini's
16  arrest and stating that I had had conversation with
17  him prior to the arrest in my office on 3/4, and I
18  told him to leave the victim alone.
19  I received a call that morning from the victim
20  stating that Mr. Hosseini was still touching his
21  buttocks and rubbing against him after the
22  conversation with myself.
23    Q.  Now, you indicated that no statement was
24  taken from Mr. Hosseini when he was arrested because

213

1  you had a prior conversation with him in your office
2  on March 4; correct?
3    A.  Yes.
4    Q.  But you also indicated that you had and
5  today in your testimony you indicated that you had
6  received calls from Bavis alleging that there was an
7  indecent assault and battery that had occurred after
8  March 4th; correct?
9    A.  Yes.
10    Q.  And why didn't you talk with
11  Mr. Hosseini about those allegations even after you
12  had him arrested?
13    A.  Because at that point he was under arrest
14  for the indecent assault and battery.  We had
15  already had conversation regarding that, so I chose
16  not to have any conversation with him.
17    Q.  Did anything prohibit you from talking to
18  him on that day after you had arrested him and he
19  was booked at District 4?
20    A.  No.
21    Q.  And this last line that you received a call
22  that morning, referring to March 22nd, 2004, from
23  the victim stating Mr. Hosseini was still touching
24  his buttocks and rubbing against him after the

# EXHIBIT 45

Volume I

Pages:    1 - 242

Exhibits: 1 - 27

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 04-CV-11948-RGS

SEYED MOHSEN HOSSEINI-SEDEHY,

Plaintiff

vs.

ERIN T. WITHINGTON and the CITY

OF BOSTON,

Defendants

DEPOSITION OF ERIN T. WITHINGTON

Thursday, March 31, 2005

10:00 a.m. - 4:32 p.m.

SMITH & DUGGAN LLP

55 Old Bedford Road

Lincoln, Massachusetts  01773-1125

FARMER ARSENAULT BROCK LLC

617.790.4404    FAX  617.728.4403

Reporter:  Cynthia C. Henderson/RPR

54 (Pages 210 to 213)

Erin T. Withington - March 31, 2005

210

1    A. I told him he was under arrest for indecent
2  assault and battery on a person.
3      Q. You never told him who made the
4  allegations?
5      A. No. We didn't have any conversation that
6  day.
7      Q. So to this day you never told
8  Mr. Hosseini who the person is that alleged that he
9  committed the sexual assault that was the basis for
10 your warrant. Isn't that true?
11     A. I don't know whether I did or not.
12     Q. Why didn't you?
13         MS. AMBARIK: Objection. She said she
14 didn't know.
15         MS. BUTLER: Well, I want to probe.
16         MS. AMBARIK: You just asked her the
17 question. You can't ask her the followup question
18 as to why she doesn't know.
19         MR. BUTLER: I can.
20     Q. Why didn't you tell Mr. Hosseini that it
21 was Bavis that made the allegation?
22     A. I don't know that I didn't tell him that it
23 wasn't him.
24     Q. Well, it's not in the report; correct?

211

1      A. Just because it's not here doesn't mean I
2  didn't tell him.
3      Q. You didn't testify to it at any point
4  today, did you?
5      A. Not that I know of, no, not that I
6  remember.
7      Q. You have no reason to believe that you told
8  Mr. Hosseini that Bavis had been the one making the
9  allegations, do you?
10         MS. AMBARIK: Objection.
11     A. I don't know if I told Mr. Hosseini or not,
12 but it's not like everybody else didn't know because
13 Mr. Perry knew and he was on the phone, so I am
14 assuming at some point Mr. Hosseini must have known.
15     Q. Well, you got a call three days after the
16 arrest from the lawyer asking who the complainant
17 was and you said it was two guys and only one was
18 going to be the name in the complaint; right?
19     A. That part, that's true; so I must have had
20 that conversation, yes.
21     Q. But even over the phone you didn't give the
22 names because they were privileged, according to
23 you?
24         MS. AMBARIK: Objection. Do you

212

1  recall having that conversation?
2         THE WITNESS: I don't recall having a
3  conversation with his attorney.
4         MS. AMBARIK: That was your prior
5  testimony.
6      Q. And this report, Exhibit 23, that has the
7  date assigned 3/22/2004, no place there you mention
8  that you were going to refer this matter to the
9  District Attorney; correct?
10     A. No. It's not mentioned in there, no.
11         (Update on Mohsen Hosseini's
12         arrest marked Exhibit No. 24 for
13         identification.)
14     Q. Now, Exhibit No. 24, what is this report?
15     A. This is an update about Mr. Hosseini's
16 arrest and stating that I had had conversation with
17 him prior to the arrest in my office on 3/4, and I
18 told him to leave the victim alone.
19 I received a call that morning from the victim
20 stating that Mr. Hosseini was still touching his
21 buttocks and rubbing against him after the
22 conversation with myself.
23     Q. Now, you indicated that no statement was
24 taken from Mr. Hosseini when he was arrested because

213

1  you had a prior conversation with him in your office
2  on March 4; correct?
3      A. Yes.
4      Q. But you also indicated that you had and
5  today in your testimony you indicated that you had
6  received calls from Bavis alleging that there was an
7  indecent assault and battery that had occurred after
8  March 4th; correct?
9      A. Yes.
10     Q. And why didn't you talk with
11 Mr. Hosseini about those allegations even after you
12 had him arrested?
13     A. Because at that point he was under arrest
14 for the indecent assault and battery. We had
15 already had conversation regarding that, so I chose
16 not to have any conversation with him.
17     Q. Did anything prohibit you from talking to
18 him on that day after you had arrested him and he
19 was booked at District 4?
20     A. No.
21     Q. And this last line that you received a call
22 that morning, referring to March 22nd, 2004, from
23 the victim stating Mr. Hosseini was still touching
24 his buttocks and rubbing against him after the

60 (Pages 234 to 237)

Erin T. Withington - March 31, 2005

234

1    Q.  And having reviewed the article now, you
2  are aware that he was held without bail based on
3  dangerousness?
4    A.  I didn't read it.  Is it at the end?
5  I don't see it.
6        MS. AMBARIK:  We are looking for it.
7    A.  Yes.  It says he is a danger to the
8  community.
9    Q.  My question, though, in that article is
10 there is reference that one of the reasons why he
11 was held as a danger to the community is because he
12 was arrested by your department, the Boston Police
13 Department in March of 2004?
14   A.  Okay.
15   Q.  For allegedly breaking into his
16 girlfriend's house?
17   A.  Okay.
18   Q.  Were you aware that your department had
19 arrested Joe Bavis for breaking into his
20 girlfriend's apartment or house when you relied upon
21 him to seek an arrest warrant for Mohsen Hosseini on
22 March 22nd, 2004?
23   A.  No
24   Q.  To this day have you done a Board of

235

1  Probation check on Joe Bavis?
2    A.  No.
3    Q.  Shortly after you arrested
4  Mr. Hosseini you were advised that Mr. Bavis and Mr.
5  Perry both had work problems with management, isn't
6  that fair to say, shortly after the arrest?
7    A.  Advised by whom?
8    Q.  By Mr. Hossseini's attorney.
9    A.  I don't even remember the conversation with
10 Mr. Hosseini -- no.  I don't know that I was.
11   Q.  Did you do any investigation at all
12 regarding the Bavis allegations or your arrest of
13 Mr. Hosseini on March 22nd, 2004?
14   A.  No.
15   Q.  Why not?
16   A.  Because the case was pending in court, and
17 I figured if the D.A. needs something they would ask
18 me.
19   Q.  How many times did you speak with the
20 District Attorney about the Bavis allegations or Mr.
21 Hosseini?
22   A.  Prior to the case being dropped?
23   Q.  At any time from December 22nd, 2003 until
24 today.

236

1    A.  Maybe four times.
2    Q.  When was the first time?
3    A.  After Mr. Hosseini was arrested I did speak
4  with the D.A. just so he could get the facts of the
5  case, and I told him what the arrest was about and
6  things because it went to District Court.  It didn't
7  stay up in Superior Court.  We talked about that,
8  and then I think we talked a couple times about the
9  disposition of the case.
10   Q.  When was the first -- you had mentioned you
11 talked to the D.A. the first time after the arrest
12 of Mr. Hosseini.  Was that on March 22, 2004?
13   A.  I think it was the next day or the day
14 after.  I can't remember the exact date.
15   Q.  And what did you tell the D.A. about the
16 facts of the case?
17   A.  Just what was in my report.
18   Q.  And your testimony is that the D.A.'s
19 office already had your reports, Exhibits 22, 23, 24
20 and 25, as of March 22nd, 2004; correct?
21   A.  Yes.
22   Q.  And there is no doubt in your mind that
23 that's the truth; correct?
24   A.  No.  I am pretty sure they did.

237

1    Q.  And there is no doubt in your mind that you
2  had drafted those reports, Exhibits 22, 23, 24 and
3  25, before March 23rd, 2004, which is the day after
4  the arrest of Mr. Hosseini?
5    A.  I am pretty sure.  I am not sure about the
6  last one, but I am pretty sure the rest of them were
7  done, yes.
8    Q.  Now, the second conversation with the D.A.
9  about this case, this Hosseini arrest, what was the
10 conversation about?
11   A.  I had received a summons from your office,
12 and I called the D.A. to find out why they sent an
13 investigator to my home.
14   Q.  And the D.A. told you that he couldn't get
15 in touch with you?
16   A.  No.
17   Q.  What did he say?
18   A.  Do you want his exact words?
19   Q.  Yes.
20   A.  "I don't know why the fuck they sent the
21 investigator to your house.  Why didn't they try to
22 reach you at Sexual Assault?"
23   Q.  This is Joe Eisenstat?
24   A.  Yes.

FARMER ARSENAULT BROCK LLC

# EXHIBIT 46

Volume I

Pages:    1 - 242

Exhibits: 1 - 27

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 04-CV-11948-RGS

SEYED MOHSEN HOSSEINI-SEDEHY,

    Plaintiff

vs.

ERIN T. WITHINGTON and the CITY

OF BOSTON,

    Defendants

DEPOSITION OF ERIN T. WITHINGTON

Thursday, March 31, 2005

10:00 a.m. - 4:32 p.m.

SMITH & DUGGAN LLP

55 Old Bedford Road

Lincoln, Massachusetts  01773-1125

FARMER ARSENAULT BROCK LLC

617.790.4404    FAX  617.728.4403

Reporter:  Cynthia C. Henderson/RPR

Erin T. Withington - March 31, 2005

---

**158**

1  Q. When you say "encouraged," isn't it a fact
2  that that is your goal as an investigator, to go out
3  and find information that will either corroborate or
4  refute a sexual assault allegation?
5  A. Yes.
6  Q. Your role is not to take someone's
7  complaint and pass it on to the District Attorney;
8  correct?
9  A. No.
10 Q. Your role is to do an investigation when
11 someone makes an allegation of sexual assault.
12 Isn't that true?
13 A. Yes.
14 Q. And the allegations that Mr. Bavis made
15 after you had the interview with Mr. Hosseini, you
16 chose not to investigate. Isn't that true?
17     MS. AMBARIK: Objection. You can
18 answer.
19 A. No, I didn't. No.
20 Q. Why did you choose not to do any
21 investigation into Bavis's allegations after you had
22 conducted the interview with Mr. Hosseini?
23 A. In the week in between?
24 Q. At any time betweeen.

---

**159**

1  A. Because at that point I had sent it up to
2  the D.A.'s office and assumed that both parties
3  would let it take its place through the court, as
4  most people tend to stay away from
5  each other after that, and that didn't occur, and it
6  was becoming an almost daily occurrence where I had
7  a victim stating that he was assaulted almost daily,
8  and I took it upon myself to seek an arrest warrant.
9  Q. Did you even call Mr. Hosseini on his phone
10 after any one of the telephone calls that Bavis or
11 Joe Perry had made after you spoke with Mr. Hosseini
12 in person to let him know there are additional
13 allegations, "What do you say about them?"
14 A. No.
15 Q. Why not?
16 A. I had already spoken to Mr. Hosseini.
17 Q. But you didn't speak with him about any of
18 the post Mr. Hosseini interview allegations that
19 Bavis made; correct?
20 A. Right.
21 Q. So why didn't you at least give him a phone
22 call and ask him if this was true?
23 A. Because I had brought him into my office,
24 and he had already stated to me that he never

---

**160**

1  touched anyone in an inappropriate way, so I really
2  didn't think he was going to say, "Oh, yes. Now I
3  am."
4  Q. But did you think of calling him and
5  saying, "Have they even worked with you since then?"
6  A. No.
7  Q. Why not?
8  A. Because I am basing it on what
9  Mr. Bavis told me. Mr. Bavis is my victim. At that
10 time I have to be concerned with the fact that this
11 is still happening to him every day as a victim.
12 Q. But you said your role as a police officer
13 was to investigate these complaints that Mr. Bavis
14 was making over the telephone post Mr. Hosseini's
15 interview?
16 A. Yes.
17 Q. And you chose not to perform that
18 investigation; correct?
19 A. As I had stated previously, this took place
20 at the end of a week. There was a weekend in the
21 middle. In those days I was gone. I came back,
22 spoke with Mr. Bavis, then went and sought the
23 arrest warrant, so there was one day that I spoke
24 with Mr. Bavis.

---

**161**

1  Q. How long did it take you to type up the
2  application for the arrest warrant?
3  A. Ten minutes.
4  Q. How long did it take you to dial
5  Mr. Hosseini's telephone number?
6     MS. AMBARIK: Objection.
7  A. Seven seconds.
8  Q. And it would have taken you less time to
9  talk with Mr. Hosseini about these allegations than
10 it would have taken to apply for the arrest warrant;
11 correct?
12 A. True.
13 Q. And was there some facet of this
14 investigation that caused you not to at least call
15 Mr. Hosseini?
16 A. Mr. Bavis was my victim. Mr. Hosseini was
17 my suspect. We don't normally call the suspect and
18 say, "Are you still doing this? Cut it out" after
19 we have had an interview with them. If I have a
20 victim saying, "This is still occurring to me," at
21 that time the victim has to be the priority.
22 Q. Actually, what you do is when you get new
23 allegations you want to speak with the suspect
24 again; correct?

---

# EXHIBIT 47

Volume I                                Pages:    1 - 242

                                        Exhibits: 1 - 27

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 04-CV-11948-RGS

SEYED MOHSEN HOSSEINI-SEDEHY,

          Plaintiff

vs.

ERIN T. WITHINGTON and the CITY

OF BOSTON,

          Defendants


DEPOSITION OF ERIN T. WITHINGTON

Thursday, March 31, 2005

10:00 a.m. - 4:32 p.m.

SMITH & DUGGAN LLP

55 Old Bedford Road

Lincoln, Massachusetts  01773-1125




FARMER ARSENAULT BROCK LLC

617.790.4404    FAX  617.728.4403

Reporter:  Cynthia C. Henderson/RPR

57 (Pages 222 to 225)

Erin T. Withington - March 31, 2005

222

1    A.  Once I left a message, never heard back
2  from anyone.  I called either the next day or the
3  day after that, spoke to somebody who said they
4  would get back to me, and then I had to call again
5  and was told they were not going to give me any
6  information.
7    Q.  Now, in this report you had indicated that
8  you called Mr. Perry in an effort to reach Mr.
9  Hosseini to make him aware of the allegations.  Was
10  that your intent when you talked to Mr. John Perry?
11  Did you want to make Mr. Hosseini aware of the
12  allegations?
13    A.  That was my intent, to speak with
14  Mr. Hosseini, yes.
15    Q.  But there is nothing in any reports that
16  you have that you actually ever made
17  Mr. Hosseini aware of any allegations; correct?
18    A.  No.
19    Q.  In fact, during your conversation with Mr.
20  Hosseini on March 4th, 2004 you let
21  Mr. Hosseini do the talking; correct?
22    A.  Yes.
23    Q.  You didn't provide any information to him;
24  correct?

223

1    A.  I must have told him to leave the victim
2  alone.  So I must have told him at some point who
3  the victim was, according to my report.
4    Q.  But that report wasn't drafted on March 4,
5  2004, was it?
6    A.  No.
7    Q.  In fact, that report that you referred to
8  where it said you told Mr. Hosseini to leave the
9  victim alone, that wasn't drafted until after you
10  arrested Mr. Hosseini; correct?
11    A.  Yes.
12         (Summons for civil action marked
13         Exhibit No. 26 for
14         identification.)
15    Q.  Exhibit 26, what is that?
16    A.  A summons for a civil action.
17    Q.  Is that the summons for the civil action in
18  this case in which Mr. Hosseini filed a civil action
19  against you?
20    A.  Yes.
21    Q.  When did you receive that summons?
22    A.  9/29/04.
23    Q.  September 29, 2004?
24    A.  Yes.

224

1    Q.  And was that about a week before you
2  printed out the reports, Exhibit 23, 24, and 25?
3    A.  Yes.
4    Q.  I had asked some questions about John
5  Perry's comments concerning Mr. Bavis, and we
6  discussed that, but I haven't asked you further
7  questions about Jimmy Flynn's comments about Mr.
8  Bavis, and you had indicated Mr. Flynn had called
9  Bavis a loudmouth; is that correct?
10    A.  Yes.
11    Q.  And you also did not mention that
12  Mr. Flynn had anything bad to say about
13  Mr. Hosseini; correct?
14    A.  Yes.
15    Q.  He didn't say anything bad about
16  Mr. Hosseini; correct?
17    A.  Not that I remember.
18    Q.  Did you ask Mr. Flynn why he would consider
19  Bavis a loudmouth?
20    A.  No.
21    Q.  Did you consider that a negative
22  characterization that Mr. Flynn was trying to convey
23  to you when he called Mr. Bavis a loudmouth?
24    A.  No.

225

1    Q.  You didn't regard that as negative?
2    A.  No.  Just that was his opinion of him.
3    Q.  And that was a negative opinion that was
4  conveyed to you; right?
5    A.  Yes.  I mean saying somebody is loud.
6    Q.  He didn't say Mr. Bavis spoke in a loud
7  tone; he called him a loudmouth, which is a
8  disparaging term?
9    A.  Yes.
10    Q.  After you received that disparaging term
11  from Mr. Flynn regarding Mr. Bavis and John Perry's
12  disparaging remark about Mr. Bavis, did that cause
13  you to question Mr. Bavis's credibility at all?
14    A.  No.
15    Q.  Did you disregard the information that John
16  Perry gave you regarding "Bavis's bullshit" and the
17  information from Jimmy Flynn regarding the fact that
18  he believed Bavis to be a loudmouth, did you
19  disregard that information when you made a
20  determination whether or not to seek an arrest
21  warrant for Mohsen Hosseini on March 22nd, 2004?
22         MS. AMABARIK:  Objection.  You can
23  answer.
24    A.  Yes.

# EXHIBIT 48

# BOSTON POLICE

**CONFIDENTIAL**

**SEXUAL ASSAULT UNIT**
CONFIDENTIAL INFORMATION

FOLLOW UP INVESTIGATION REPORT

| AREA-DISTRICT | DATE |
|---|---|
| D-4 | 10/07/04 |

| TYPE OF INCIDENT | DATE OF INCIDENT |
|---|---|
| Indecent assault & battery 14 & above | 1/1/2003 |

| VICTIM/COMPLAINANT | ADDRESS |
|---|---|
| Joseph Bavis | 138 Athens St. |

| CC NUMBER | INCIDENT LOCATION |
|---|---|
| 040143112 | 900 Boylston St. |

| ASSIGNED TO | DATE ASSIGNED |
|---|---|
| Detective    Erin Schroeder | 3/22/2004 |

RESULTS:

I met with victim Joe Bavis and Joe Perry together on December 22, 2003 regarding some incidents that had taken place at 900 Boylston Street, Hynes Convention Center, during the years 2002-2003. Mr Bavis stated to me that he had been standing on the loading dock, he believed it to be the beginning of 2003, when the suspect (Mohsen Hosseni) came up to him and reached around and grabbed the victim's buttocks and began to grind against the victim's crotch with his own and kissed the victim on the face. The victim stated he told the suspect to leave him alone or he would hit him and the suspect, who is the victim's boss, then ordered the victim to go home for the day and leave the work site. Mr Joe Perry also works for the teamsters union and Mr Bavis requested he stay in the room while he talked to me. Mr Perry stated that the suspect has also touched his buttocks before or kissed him on the cheek and he also has told the suspect to leave him alone or he would physically hurt him.



EXHIBIT
22
3/31/05

Page 1

CONFIDENTIAL

## SEXUAL ASSAULT UNIT - CASE UPDATE

**VICTIM: Joseph Bavis**
**CC#: 040143112**
**DETECTIVE: Detective**        Erin Schroeder

**DATE ASSIGNED: 3/22/2004**

On March 4, 2004 myself and Detective Salley spoke with suspect Mohsen Hosseni at 91 East Concord Street. Mr Hosseni was read and given to read the Miranda Warnings which he waived and signed and I had the following conversation with him:  He stated to me he thought he was there because Joe Perry had filed sexual harassment charges against him and he wanted me to know that Mr Perry is a very lazy worker and that they have had issues about his laziness and being sent home for not doing his work before. He said he was told that Mr Perry told John Foley that he was filing sexual harassment charges against Mr Hosseni so he was not surprized to receive a phone call from the Boston Police. I then asked him if he had ever touched Mr Perry in a sexually inappropriate way and he said absolutely not that that was a flat out lie. I then asked him if he had ever had any problems with his touching any of the men and he stated about 1 1/2 years ago he came up to Joe Bavis and put his hands on Joe Bavis' shoulders and Mr Bavis started yelling and carrying on and both parties apologized to each other. He then said that was the only incident that had ever occurred between himself and the men that stood out in his mind. At this point the interview was concluded.



**EXHIBIT**
23
3/31/00

CASE STATUS:

APPROVED SUPERVISOR:_____

APPROVED DATE:_____

Thursday, October 07, 2004

Page 1 of 1

CONFIDENTIAL

## SEXUAL ASSAULT UNIT - CASE UPDATE 2

**VICTIM:** Joseph Bavis

**DATE ASSIGNED:** 3/22/2004

**CC#:** 040143112

**DETECTIVE:** Detective          Erin Schroeder

On March 22, 2004 Mohsen Hosseni was arrested for a warrant from BMC for 1 count Indecent Assault & Battery #0401CR001774. Mr Hosseni was transported and booked at District 4 and no statement was taken from him at that time due to the fact I had already had conversation with him prior to the arrest in my office on 3/4/04 and had told him to leave the victim alone. I received a call that morning from the victim stating that Mr Hosseni was still touching his buttocks and rubbing against him after the conversation with myself.



EXHIBIT
2 4
3/31/05

CASE STATUS:

APPROVED SUPERVISOR:_____          APPROVED DATE:_____

Thursday, October 07, 2004          Page 1 of 1

CONFIDENTIAL

## SEXUAL ASSAULT UNIT - CASE UPDATE3

**VICTIM:** Joseph Bavis                    **DATE ASSIGNED:** 3/22/2004

**CC#:** 040143112

**DETECTIVE: Detective          Erin Schroeder**

I was made aware when I came back from being out injured (January 6, 2004-March 3, 2004) that numerous phone calls were made weekly from Mr Bavis and Mr Joe Perry to the Sexual Assault Unit regarding ongoing problems they were having with Mr Hosseni and his inappropriate touching and comments. Upon returning to work I immediately set up an interview with Mr Hosseni to make him aware of the allegations made against him.  I also contacted the Hynes Convention Center attorney, Arthur Fritch, in late December 2003 (after my initial December 22, 2003 interview with Mr Bavis) and let him know there was an allegation made regarding 2 employees of GES who were working within the building and wanted to ask if they needed to be present for any interviews or any actions that may have arose from the allegations.  Mr Fritch informed me that GES was contracted by the Hynes and therefore were only working within the building but not for The Hynes Convention Center itself.  I also made numerous attempts with the union people, including, John Perry (who informed me that he did not know any personal information about Mr Hosseni to make it possible for me to reach him and make him aware of the allegations and suggested that I call the main GES or ESR office but didn't know where they were located).  I did attempt to reach Mr Hosseni from a phone number I was given by another union member, who asked that I not include his name in the report but I believe was a Mr Dodds, and I did attempt to contact Mr Hosseni in December 2003 but had to leave a voice message at the number I was given.



**CASE STATUS:**

APPROVED SUPERVISOR:_____          APPROVED DATE:_____

Thursday, October 07, 2004                    Page 1 of 1