UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| SEYED MOHSEN HOSSEINI-SEDEHY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ERIN T. WITHINGTON ) <br> and CITY OF BOSTON, ) <br> ) <br> Defendants. ) | ) Civil Action No. 04-cv-11948-RGS |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE
TO EXCLUDE TESTIMONY OF MEMBERS OF THE SUFFOLK COUNTY
DISTRICT ATTORNEY'S OFFICE**

The Defendant improperly seeks to exclude other members of law enforcement from testifying against her allegedly because their evidence would not be relevant to the issue of liability and that such evidence would "essentially result in a mini-trial of the Plaintiff's innocence or guilt." Contrary to the Defendant's assertion that the only issue in the case is whether the Defendant violated Mr. Hosseini's constitutional rights, the trial will also concern the amount of compensatory and punitive damages. The prosecutor's testimony will, in fact, bear on the Defendant's liability because he will describe the information known to the Defendant at the time of her decision to arrest the Plaintiff. The witnesses from the Suffolk County District Attorney's Office will also offer evidence relevant to compensatory and punitive damages. Moreover, the evidence that the members of the Suffolk County District Attorney's Office will offer will not result in a mini-trial concerning the Plaintiff's guilt or innocence of the Defendant's allegation.

## BACKGROUND

*The Initial Investigation*[1]

On December 22, 2003, the Defendant interviewed the Teamster. On that date, the Defendant, as an experienced Boston police officer of almost two thousand criminal investigations, was aware that about one half of all complainants in the course of her career had lied to her about their criminal complaints. She was aware on that date that the Teamster "had problems with the police before . . . as a suspect." The Teamster apparently alleged that Mr. Hosseini touched his buttocks and rubbed his covered crotch against the Teamster on one occasion in 2003. The Teamster, however, refused to provide the names of alleged witnesses to the Defendant. He also claimed that he could not remember the date of this alleged sexual assault. After the interview with the Teamster, the Defendant determined that she would neither seek an arrest warrant for Mr. Hosseini nor apply for a criminal complaint against him. However, the Defendant did wish to speak with Mr. Hosseini.

The Defendant talked to the president of the local Teamsters' Union in order to get Mr. Hosseini's contact information. When asked if he would provide information to contact Mr. Hosseini the Teamsters' president stated that "he was not going to get involved in [the Teamster's] bullshit." When the Defendant finally contacted Mr. Hosseini, Mr. Hosseini was away on vacation. Mr. Hosseini contacted the Defendant upon his return from vacation, however, the Defendant chose not to meet with Mr. Hosseini at that time because she was out injured with a broken ankle. While the Defendant was on disability leave for two months, the Teamster called about twenty times, even after the Defendant sent a message to him that she was

---

[1] This background section has additional facts not included in the Background section of the Plaintiff's Memorandum in Support of His Motion in Limine Excluding Evidence of the Defendant's Family's Law Enforcement History.

out of work. The Defendant was pressured by her supervisor to do something to stop the Teamster's repeated phone calls.

On March 4, 2004, the first day the Defendant returned to work, Mr. Hosseini traveled to her office to meet her. During the interview, Mr. Hosseini explained that a laborer named Joseph Perry and the Teamster were problem workers. The Defendant was told that Joseph Perry had made allegations at work against Mr. Hosseini that were proven false. Mr. Hosseini also told her that when the Teamster was caught doing something inappropriate at work, the Teamster became loud in order to distract attention from his wrongdoing. Mr. Hosseini explained that he once grabbed the Teamster by the shoulders when the Teamster was engaged in work misconduct. After the meeting with Mr. Hosseini, the Defendant again decided that she would not seek an arrest warrant or a complaint against Mr. Hosseini.

The Teamster called the Defendant daily and sometimes two or three times a day to try to get the Defendant to take action against Mr. Hosseini. Approximately two months after refusing to provide the Defendant with the names of witnesses to the alleged crime, the Teamster told the Defendant that James Flynn had seen the crime. The Defendant claims that she spoke with Mr. Flynn, who was a former New York City police officer, near the time that she interviewed Mr. Hosseini. Mr. Flynn told the Defendant that the Teamster's allegations were not true and warned the Defendant that the Teamster was a loudmouth.

*The Decision to Seek an Arrest Warrant*

The daily phone calls from the Teamster continued. On March 22, 2004, after another phone call from the Teamster, the Defendant decided to obtain an arrest warrant for Mr. Hosseini. The Defendant was not concerned for the Teamster's safety because the Teamster was

bigger than Mr. Hosseini, and the Teamster reported that he would harm Mr. Hosseini if he touched him again. Before seeking the warrant, the Defendant was aware that Mr. Hosseini had no criminal record, was married, and had a five-year-old son.

In order to obtain the warrant, the Defendant represented to the Boston Municipal Court (BMC) that Mr. Hosseini was a risk of flight, even though Mr. Hosseini went to the Defendant's office the very day that she returned to work to address the false criminal allegation. Moreover, in the application for complaint, the Defendant misrepresented the date of the alleged sexual assault to be December 22, 2003, almost one year after the Teamster alleged in order to make the alleged crime appear fresher than reported to her. After obtaining the arrest warrant, the Defendant went to the Hynes Convention Center and arrested Mr. Hosseini in front of union members. Mr. Hosseini was booked and placed in a cell with other prisoners.

*The Defendant's Subsequent Misconduct*

Mr. Hosseini's criminal case dragged on for almost three months. During pre-trial matters, the assistant district attorney tried to obtain follow-up police reports from the Defendant without success. Thus, it was left to Mr. Hosseini to disprove the Teamster's allegations. Mr. Hosseini's counsel was required to serve a subpoena on the Teamsters' Healthcare and the Department of Employment and Training (DET) to obtain documentary evidence showing that since the Teamster was not working for GES in 2003, the Teamster's allegation could not be true. Additionally, Mr. Hosseini's counsel had spent a great deal of time opposing the DET's motion to quash the subpoena served upon it. After Mr. Hosseini provided the exculpatory evidence and made several court appearances, including a trial date that was continued because the Defendant did not appear in court, the assistant district attorney finally filed a nolle prosequi on June 14, 2004. When the assistant district attorney spoke with the Defendant about her

investigation, she told him she "filed the report based solely on the persistent phone calls of [the Teamster] and has no further evidence to support his claim."

During the course of discovery in this civil action, which was filed three months after the criminal case was dismissed, the Defendant produced three police reports allegedly drafted on April 20, 2004, while Mr. Hosseini was trying to prove his innocence. However, the Defendant did not provide these to the assistant district attorney to assist him in the criminal case. Rather, these reports were generated to create the false impression that the Defendant's actions were reasonable in light of the circumstances known to her. In a report entitled Case Update 2, the Defendant claimed, contrary to her sworn statement to the BMC, that the Teamster told her on March 22, 2004, that Mr. Hosseini "was *still* touching his buttocks and rubbing against him." (emphasis added.) In the course of discovery in this civil action, the Defendant generated two additional police reports dated September 27, 2004, more than three months after the criminal case was dismissed. In the first, Case Update 3, the Defendant claimed that the Teamster alleged "ongoing problems . . . with Mr. Hosseini and his inappropriate touching." In Case Update 4, the Defendant claimed that the Teamster "was not aware of the exact date when the touching occurred because it happened very frequently . . . ." Moreover at her deposition, the Defendant claimed that before seeking an arrest warrant the Teamster reported to her that "he was still being sexually assaulted on almost a daily basis by Mr. Hosseini."

**ARGUMENT**

*Probable Cause*

The Defendant is incorrect when she claims that witnesses from the Suffolk County District Attorney's Office will not offer any evidence concerning probable cause. Assistant District Attorney Joseph Eisenstadt will offer evidence concerning the circumstances known to

the Defendant on March 22, 2004. The Defendant admitted to ADA Eisenstadt that the only evidence to support the complaint against Mr. Hosseini was the Teamster's persistent phone calls. In light of the fact that the Defendant chose not to memorialize the facts and circumstances within her knowledge at the time of the arrest contemporaneously with the arrest, ADA Eisenstadt's evidence is crucial to understanding the evidence known to the Defendant at the time of the arrest. The fact that this evidence could also be used to show the Defendant's motive, which is not an issue for probable cause, does not take away its probative value for the objective reasonableness inquiry into probable cause.

In addition to the evidentiary value of a party opponent admission, evidence from members of the Suffolk County District Attorney's Office will be offered for impeachment of the Defendant if she testifies at trial to claims that she made at her deposition. In the Defendant's Case Update 2, she claimed that Mr. Hosseini "was *still* touching his buttocks and rubbing against him." (emphasis added.) In police reports subsequently generated she claimed that the Teamster alleged "ongoing problems . . . with Mr. Hosseini and his inappropriate touching," and that the Teamster "was not aware of the exact date when the touching occurred because it happened very frequently . . . ." Months later at her deposition, the Defendant claimed that the Teamster reported to her that "he was still being sexually assaulted on almost a daily basis by Mr. Hosseini" before she sought an arrest warrant. ADA Eisenstadt's testimony will contradict the expected testimony of the Defendant. For these reasons, the evidence from ADA Eisenstadt is relevant to probable cause.

*Compensatory Damages*

ADA Eisenstadt will also offer testimony concerning what Mr. Hosseini was forced to endure as a result of the Defendant's constitutional tort. He will explain that the criminal process dragged on for almost three months, which will bear directly on Mr. Hosseini's mental anguish and suffering. It will also corroborate the monetary harm done to Mr. Hosseini as a result of defending the criminal complaint filed by the Defendant. For these reasons, the evidence from ADA Eisenstadt is relevant to compensatory damages.

*Punitive Damages*

"A jury may be permitted to award punitive damages in a §1983 action when the defendant's conduct is 'shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Bisbal-Ramos v. City of Mayaguez*, 467 F.3d 16, 25 (1st Cir. 2006) quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983). "Thus, the inquiry should focus on the acting party's state of mind, and the central question is whether the defendant acted in the face of a perceived risk that her action would violate federal law." *Powell v. Alexander*, 391 F.3d 1, 15 (1st Cir. 2004) (citations omitted.) "Furthermore, a punitive damages award may be 'justified not only by defendants' actions on the date in question but also by their subsequent behavior.'" *Davis v. Rennie*, 264 F.3d 86, 115 (1st Cir. 2001) quoting *Hall v. Ochs*, 817 F.2d 920, 927 (1st Cir. 1987) (internal punctuation omitted.)

Both ADA Eisenstadt and the keeper of records for the Suffolk County District Attorney's Office will offer evidence probative to the issue of punitive damages. ADA Eisenstadt will testify, as described above, to the Defendant's motive in arresting Mr. Hosseini. At the very least this evidence will help establish that the Defendant's conduct involved reckless or callous indifference to the federally protected rights of Mr. Hosseini.

ADA Eisenstadt and the keeper of records for the Suffolk County District Attorney's Office will also offer evidence to help show that the Defendant tried to cover up her wrongful arrest of Mr. Hosseini by embellishing the evidence that she actually had in her possession when she arrested him. Their testimony will also help show that the police reports that the Defendant generated were not intended to assist the prosecutor's in pursuit of the criminal case because the reports were never provided to the prosecutors. In fact some of the reports post-dated not only the nolle prosequi but also the filing of this civil action. For these reasons, the evidence from members of the Suffolk County District Attorney's Office is relevant to punitive damages.

## CONCLUSION

Mr. Hosseini respectfully asks the Court to deny the Defendant's motion to exclude evidence offered by members of the Suffolk County District Attorney's Office.

Respectfully submitted,
Seyed Mohsen Hosseini-Sedehy
By his attorneys,

/s/ Gerard A. Butler, Jr.
Gerard A. Butler, Jr.
BBO # 557176
Christopher A. Duggan
BBO # 544150
Smith & Duggan LLP
Lincoln North
55 Old Bedford Road
Lincoln, MA 01773-1125
(617) 228-4400

Date:   February 9, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 9, 2007.